**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| FRESH & EASY, LLC,[1] | : Case No. 15-12220 (CSS) |
| | : |
| Debtor. | : |
| | : |

**DECLARATION OF AMIR AGAM IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Amir Agam, do hereby declare, under penalty of perjury, the following to the best of my knowledge and belief:

1.      I am a Senior Managing Director in the professional services firm of FTI Consulting, Inc. ("FTI"), with an office at 633 W. 5th Street, Suite 1600, Los Angeles, California 90071-2027.

2.      On or about June 1, 2015, Fresh & Easy, LLC (f/k/a Y-Opco, LLC) (the "Debtor" or "Fresh & Easy") retained FTI to provide financial advisory and consulting services to the Debtor and to assist in its financial management and restructuring.[2]  On October 29, 2015, I was appointed by the Debtor's Special Committee (as defined below) as the Debtor's Chief Restructuring Officer (the "CRO"), and I am authorized to submit this declaration (the "Declaration") in support of the Debtor's chapter 11 petition and related first day pleadings (collectively, the "First Day Motions").[3]

---

[1]      The last four digits of the Debtor's federal taxpayer identification number are 8906.  The Debtor's mailing address is 20101 Hamilton Avenue, Suite 350, Torrance, CA 90502.

[2]      From June 1, 2015 to August 11, 2015, FTI also represented the Debtor's non-debtor affiliate, Fresh Foods, LLC.  On August 11, 2015, FTI resigned from its engagement on behalf of Fresh Foods, LLC, and FTI has exclusively represented the Debtor since that time.

[3]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the relevant First Day Motion summarized below, as applicable.

3.     Throughout FTI's engagement, and since being appointed as CRO, I have been one of the people responsible for advising the Debtor regarding its restructuring plans and strategies, and, ultimately, commencing the liquidation initiatives described herein.  Prior to the commencement of this chapter 11 case (this "Chapter 11 Case"), I, *inter alia*, (i) reviewed and discussed the Debtor's strategy regarding the development of potential restructuring alternatives, and, ultimately,  implementation of the wind-down process, (ii) supervised the preparation of documentation needed to implement the orderly liquidation contemplated during this Chapter 11 Case, and (iii) consulted on a regular basis with the Debtor's senior management with respect to the foregoing.

4.     I am generally familiar with the Debtor's day-to-day operations, business affairs, and books and records.  Representatives of FTI, at my direction, have worked with management and the Debtor's advisors to prepare the First Day Motions and accompanying proposed forms of orders, and I am generally familiar with the facts asserted and relief requested therein.  Except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees or retained advisors, and, if called as a witness, would competently testify thereto.

5.     On October 30, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of its assets for the benefits of its creditors.  The Debtor intends to operate its business and manage its properties as a debtor in possession while it winds down its operations and implements an orderly liquidation strategy that was commenced prior to the Petition Date, primarily through going out of business sales at the Debtor's retail stores (the "Store Closing Sales").  To minimize the adverse effects of

filing for chapter 11 protection and to enhance its ability to maximize the value of its estate through the Store Closing Sales and other efforts, the Debtor has filed the First Day Motions, which are described herein and for which this Declaration is intended to offer evidentiary support.  The Debtor also contemplates the eventual consummation of a proposed global settlement agreement between the Debtor's estate and its non-debtor affiliates, subject to approval by this Court (the "Settlement").  As noted below, the Debtor intends to promptly commence negotiations with the Official Committee of Unsecured Creditors (the "UCC"), upon appointment of the UCC, with respect to the Settlement.

6.    Section I of this Declaration summarizes the Debtor's prepetition attempts to right-size the Debtor's lease portfolio and operational structure, streamline the Debtor's operations, and raise capital to give the Debtor runway sufficient to attain profitability, and sets forth a broad overview of the Debtor's chapter 11 objectives, contemplated wind down initiatives, and the benefits thereof.  Section II describes the Debtor's business history, corporate structure, and prepetition indebtedness.  Section III describes the events and circumstances that triggered the commencement of this Chapter 11 Case and the Debtor's prepetition restructuring efforts and ultimate determination to conduct an orderly liquidation through the use of professional liquidators.  Section IV further details the Debtor's objectives for this Chapter 11 Case and the contemplated means by which such objectives will be met.  Finally, Section V sets forth the relevant facts in support of the First Day Motions and summarizes the relief requested thereby.

## I.    Summary and Overview

7.    The Debtor, a chain of grocery stores in the Southwest United States, operates in an industry that has become increasingly competitive.  Indeed, the Debtor is not the

only supermarket chain that has been struggling to survive: Haggen Holdings, LLC, a West

Coast grocery retailer, recently filed for chapter 11 protection in this Court.  Whereas traditional

grocery store chains have always been historically competitive, market competition has been

exacerbated by mega-retailers and specialty grocery chains entering the grocery business in

recent years.  As a result, the Debtor has struggled to grow market share among shoppers, and a

large number of historically unprofitable stores combined with an underutilized capacity at the

Produce Facility and Kitchen Facility (each as defined below) and the Debtor's general and

administrative expenses have terminally undermined the Debtor's ability to achieve profitability

and, ultimately, led to the need for this Chapter 11 Case.

        8.     The Debtor enters this Chapter 11 Case having exhausted its prepetition

restructuring options and commenced the Store Closing Sales at their retail locations once it

became apparent that further financing to operate as a going concern was neither available nor

forthcoming, including from the Debtor's corporate parent and other non-debtor affiliates, who

had historically funded the Debtor's operating losses while the Debtor attempted to implement

operational and strategic initiatives to reduce costs and rationalize its balance sheet.  After

attempts to identify going concern restructuring options, the Debtor's special committee of

independent managers—further discussed below—determined that the Store Closing Sales and

this subsequent Chapter 11 Case provided the best opportunity to maximize estate value for the

Debtor's creditors and all interested parties.

        9.     As noted above and further detailed in Sections III and IV below, the

Debtor has, in the last two years, struggled to overcome its financial challenges.  While it has

substantially corrected many operational inefficiencies, the Debtor has consistently incurred

operational losses stemming from, among other things, onerous lease obligations,

underperforming retail locations, and increased competition in the natural and organic fresh food industry in particular and the grocery retail industry in general. During this period and through the middle of October 2015, the Debtor, in regular consultation with its non-debtor affiliates who were funding the Debtor's losses prior to the Petition Date, explored many potential restructuring alternatives in hopes of consummating a going concern transaction. The Debtor consulted with its legal and financial advisors, real estate professionals and consultants to review possible strategies to help the Debtor achieve the primary goals of renegotiating burdensome leases (or altogether terminating such leases on favorable terms), preserving beneficial trade terms with vendors, and sufficiently streamlining operations to allow the Debtor to retain loyal customers, attract new ones, and generate improved cash flows as its business model evolved. In that regard, and as further described below, the Debtor's parent company, YFE Holdings, Inc. ("YFE") hired an investment banker, Moelis & Company ("Moelis") to obtain prepetition financing (including equity infusions) and to explore a potential sale of all or substantial parts of the Debtor's businesses. The Debtor later hired Imperial Capital, LLC ("Imperial") to explore a potential sale of the Debtor's business and potential debtor in possession financing options. In addition, the Debtor hired certain real estate professionals and experts to help the Debtor renegotiate, terminate, sell or assign burdensome leases. Unfortunately, this process did not produce any viable sources of financing or any third-party buyers within the timeframe in which the Debtor had the ability to fund its business.

10.     As detailed herein, the Debtor's business has always had negative operating cash flow. Prior to the purchase of the Debtor's operations by its current equity holder, an affiliate of Tesco PLC ("Tesco") funded these operating losses. More recently, the Debtor's affiliates have funded its operating losses as the Debtor has attempted to execute a restructuring

and to attain cash flow profitability.  While significant progress has been made, the Debtor

remains cash flow negative, and has concluded that, given the lack of funding to continue

operations for a longer period of time for a sale process, there are no verifiable prospects for a

go-forward enterprise at this time.[4]

11.     When it became apparent that the Debtor would not be able to obtain

additional funding to continue operations outside of a chapter 11 process from third parties or its

affiliates and, therefore, did not have adequate liquidity to fund its ongoing operations, the

Debtor, through a special committee of its board of managers, determined that a sale process

pursuant to section 363 of the Bankruptcy Code was the most likely way to preserve the Debtor's

viability as a going-concern.  To that end, the special committee (the "Special Committee"),

comprised of two independent managers, Terrence J. Wallock and Richard E. Newsted (together,

the "Independent Managers"), appointed by the board of directors of the Debtor's sole equity

holder,[5] approved the pursuit of a going-concern sale, among other restructuring options, and

marketing was conducted in conjunction therewith.  However, the Debtor was unable to locate a

third party willing to fund the administrative costs of a sale process through a debtor-in-

possession financing facility in this timeframe, and therefore the Debtor was forced to abandon

its going-concern sale efforts in favor of wind-down initiatives implemented through the Store

Closing Sales.

---

[4]     The Debtor, primarily through one of its board members, has been engaging in discussions with potential purchasers, however, at this time the Debtor is not aware of any executable proposals for a going concern business.

[5]     The Independent Managers were initially appointed on or about July 8, 2015, to the respective Board of Managers of both the Debtor and its non-debtor affiliate, Fresh Foods (as defined below).  However, as detailed below, the Independent Managers resigned from Fresh Food's Board of Managers on or about August 6, 2015, and have made decisions exclusively on behalf of the Debtor and considered all transactions affecting the Debtor, including with respect to potential restructuring alternatives and postpetition lending arrangements, solely on behalf of the Debtor since that time.

54567/0001-

12.     The market in which the Debtor operates continues to struggle, as evidenced by recent chapter 11 filings of other grocery chains before this Court and others.  The Debtor believes that commencing this proceeding to allow for the conclusion of an efficient and orderly wind down process, sanctioned by this Court, represents the best way to maximize value for its stakeholders.  In furtherance of that process, and as discussed further below, the Debtor entered into an agreement with Hilco Merchant Resources, LLC ("Hilco") on or about October 21, 2015 to conduct the Store Closing Sales at all of its remaining open stores, and the Store Closing Sales commenced on October 23, 2015.  The Debtor also began negotiating with its affiliates regarding a proposed settlement with general unsecured creditors that would (i) enable the Debtor to complete the orderly wind down of its business and assets, (ii) provide for the satisfaction of administrative claims and (iii) propose a recovery for unsecured creditors.  Finally, the Debtor is also negotiating an agreement to sell its distribution center equipment and intends to retain DJM Realty Services, LLC ("DJM") and CBRE, Inc. ("CBRE"), jointly, to market its remaining leasehold interests.

## II.     Business History, Corporate Structure and Prepetition Indebtedness

*A.     Overview of the Debtor's Business and History*

13.     The Debtor has historically operated retail grocery stores in California, Nevada and Arizona that principally focused on offering high quality, freshly prepared and ready-to-eat products.  The "Fresh & Easy" brand was founded in 2006 through affiliates of Tesco, a large grocery retailer based in the United Kingdom, and quickly expanded to a total of approximately 200 operating stores by 2012.  Throughout that six-year period, however, the entities then comprising the "Fresh & Easy" branded enterprise struggled to record operating profits, thus prompting certain of those entities to file voluntary petitions for chapter 11

54567/0001-

bankruptcy relief on September 30, 2013, in this Court, which cases were jointly administered

through the lead case *In re: Fresh & Easy Neighborhood Market Inc., et al.*, Case No. 13-12569

(KJC) (the "Prior Chapter 11 Case").[6]

14.     In accordance with a court-approved sale process and related bid

procedures, YFE won the right for it or one or more of its designees to purchase assets sufficient

to allow it to operate (i) 167 operating stores and 14 "work in progress" or otherwise non-

operating stores; (ii) production facilities in Riverside, California including a separate meat

facility (the "Meat Facility"), a fresh produce facility (the "Produce Facility") and a kitchen

facility (the "Kitchen Facility," and collectively with the Meat Facility and the Produce Facility,

the "Campus Facilities"), each housed in its own building, providing "Fresh & Easy" branded

fresh food products; and (iii) a 680,000 square foot distribution facility (the "Distribution

Facility") located near the Campus Facilities.  An order approving the sale (the "Prior Sale") to

YFE was entered on November 22, 2013.  *See* Prior Chapter 11 Case, Docket No. 378.

15.     After the Prior Sale was approved, but prior to its closing, YFE formed

two subsidiaries to serve as its designees, and, after closing, also formed a third subsidiary.  The

three subsidiaries, each a Delaware limited liability company with YFE as its sole member,

consist of (i) the Debtor, (ii) non-debtor Fresh Foods, LLC (f/k/a Campus Opco, LLC) ("Fresh

Foods"), and (iii) non-debtor FEFOS, LLC ("FEFOS").[7]  The Debtor's auditor, Ernst & Young

LLP, recently confirmed to the Debtor's board of managers and the Special Committee that all

---

[6]      Certain of the facts set forth in this paragraph are from my review of the *Declaration of James Dibbo in Support of Chapter 11 Petitions and First Day Motions and Applications*, filed at Docket No. 3 in the Prior Chapter 11 Case.  I also have been advised that a final decree closing the Prior Chapter 11 Case was entered on June 9, 2015, at Docket No. 1225.

[7]      A copy of an organizational chart that includes YFE, Fresh Foods and FEFOS (collectively, the "Affiliates") is attached hereto as Exhibit A.

operations at the stores and Campus Facilities are properly operations of the Debtor, and that neither Fresh Foods nor FEFOS have active operations.  Accordingly, the information contained herein reflects that determination, and was derived from, and with reliance on, conclusions reached by the Debtor's third party auditors.

16.    As part of the Prior Sale, the real estate comprising the Meat Facility, the Produce Facility and the Kitchen Facility was transferred to Fresh Foods, and individual store leases were each transferred to Fresh & Easy.  The Distribution Facility and fourteen store locations were sold by the debtors in the Prior Chapter 11 Case to EM-50 UAV SLBCO LLC, an entity formed by Fortress Investment Group LLC, serving as YFE's designee in its purchasing rights, which then entered into lease agreements with Fresh & Easy.  Certain other real estate owned in fee simple (consisting of nineteen unencumbered locations) was also transferred to Fresh & Easy directly, but was later transferred to FEFOS pursuant to a Real Estate Purchase and Sale Agreement dated April 28, 2014, and effective as of such date (the "FEFOS Agreement").[8] Under the FEFOS Agreement, FEFOS received the real estate at the nineteen locations listed therein, but did not obtain any ownership of intellectual property, signage, furniture, fixtures, equipment or inventory at these locations, all of which remained—and currently remain (to the extent they have been retained)—with Fresh & Easy.  Substantially contemporaneous with the FEFOS transaction, Fresh & Easy entered into a rent-free lease with FEFOS for certain of the properties for two years, terminable on thirty days' notice, but remained liable for the related real property taxes relating to the properties sold to FEFOS.

17.    Prior to the Petition Date, Fresh Foods sold the Meat Facility to an affiliate of JBS S.A. ("JBS") pursuant to that certain *Facility Transfer Agreement* dated Nov. 18, 2014,

---

[8]    As of the Petition Date, thirteen of these locations were no longer operating and remain subject to ongoing disposition efforts.  The Debtor's remaining six active FEFOS-owned locations are, likewise, being marketed.

and certain related documents, which sale closed in August, 2015.  Thereafter, the Debtor

continued to purchase product from the Meat Facility pursuant to that certain *Meat Supply*

*Agreement* dated November 18, 2014, entered into by and between the Debtor and JBS.  The

Debtor also continued production operations at the Produce Facility and Kitchen Facility.

18.    In an effort to mitigate the operational losses further detailed in

Section III, below, the Debtor closed 56 stores in late March 2015.  Approximately four months

later, an additional 14 stores were closed, leaving the Debtor with 97 operating stores, 70 "dark"

stores, 13 "work in process" stores, and the ongoing operation of the Distribution Facility.  Since

that time, the Debtor affirmatively vacated a majority of the "dark" store locations by

unequivocally surrendering possession to applicable landlords prior to the Petition Date, and,

concurrently herewith, has filed a motion (the "Lease Rejection Motion") seeking to immediately

reject such agreements effective as of the date hereof.  The Debtor also has successfully

terminated its lease obligations with respect to 22 "dark" stores through negotiated three

terminations and 19 lease assignments.

19.    The Debtor's revenue from its retail operations, excluding sales taxes and

deducting for coupons, in the twelve months ending September 2015 was $653.3 million.

B.    *Prepetition Indebtedness*

20.    The Debtor's prepetition debt structure primarily consists of (i) prepetition

secured lenders, including Wells Fargo Bank, National Association ("Wells Fargo") and capital

lease lessors; (ii) a guaranty in favor of Tesco Treasury Services PLC, an affiliate of Tesco,

unsecured by the Debtor but secured by certain property and cash held by Fresh Foods;

(iii) unsecured debt owed to the Debtor's affiliates on account of intercompany loans made to the

Debtor' affiliates; and (iv) other unsecured debt, including trade debt and claims of landlords for unpaid rent.

1.  Wells Fargo Facility

21.     On November 25, 2013, the Debtor (as lead borrower), Fresh Foods (as a borrower), and YFE (as guarantor) entered into that certain Credit Agreement with Wells Fargo as administrative agent and letter of credit issuer (the "Wells Fargo Facility").  After its formation, FEFOS later guaranteed the obligations owing under the Wells Fargo Facility pursuant to its execution of that certain *Joinder Agreement* dated March 19, 2015.  The Wells Fargo Facility contains a stated maturity date of November 26, 2018.

22.     The Wells Fargo Facility provides a credit line of up to $55 million, which can be borrowed in the form of (i) revolving loans (as defined therein, "Committed Loans"); (ii) swing line revolving loans, subject to a sublimit of $10 million (as defined therein, "Swing Line Loans") and (iii) letters of credit (collectively, the "Wells Fargo LCs").  As of the Petition Date, approximately $23.4 million[9] is outstanding for obligations owed on account of the Wells Fargo LCs.   Credit extensions made under the Wells Fargo Facility were governed by a Borrowing Base consisting of advances against credit card receivables, inventory and pledged cash.  As of the date hereof, the Debtor believes that once Wells Fargo completes its sweeps of cash proceeds that have accumulated in the Debtor's accounts (which are currently frozen due to these proceedings), the obligations owed under the Prepetition Credit Facility will be fully cash collateralized.  Additional deposits in transit will be swept into this account.  The Wells Fargo LCs secure payment obligations to certain utilities, large landlords and insurers, one taxing authority, and OneWest Bank, for YFE management fees.

---

[9]     This amount does not reflect the draw of one letter of credit in the amount of $6.5 million, discussed below, whose beneficiary was OneWest Bank, which is in the process of being processed by Wells Fargo.

23.     The Wells Fargo Facility is secured by a first priority lien on substantially all personal property of the Debtor and Fresh Foods, subject to certain excluded property, which is the property of Fresh Foods and is instead subject to the lien of Tesco Treasury Services PLC, as discussed below.  On October 22, 2015, by letter dated October 21, 2015, Wells Fargo declared an event of default under the Wells Fargo Facility.  As a result of this event of default, Wells Fargo also has declared a "Cash Dominion Event" (as defined in the Wells Fargo Facility) and imposed certain restrictions on the ability of the Debtor to transfer funds out of its bank accounts with Wells Fargo without the permission of Wells Fargo.  As discussed, below, Wells Fargo is also the administrative agent for Debtor's proposed debtor-in-possession financing.

2. Tesco Guaranty Debt

24.     As a prerequisite to YFE's agreement to purchase those assets it acquired in the Prior Chapter 11 Case, Tesco Treasury Services PLC was obligated to provide YFE or its designee with a $120 million loan.  On November 25, 2013, Fresh Foods (then named Campus Opco, LLC) executed a secured promissory note (as modified by later documents, the "Original Tesco Note") in favor of Tesco Treasury Services PLC representing the obligation to repay the $120 million borrowed thereunder.[10]  As originally executed, the Original Tesco Note bore interest at five percent per annum, compounded quarterly and payable in cash on the last business day of each March, June, September and December during the term of the Original

---

[10]     YFE, for the benefit of itself and certain other affiliates, and the Debtor as "Service Recipients," also entered into a Transitional Services Agreement with Tesco Stores Limited dated November 25, 2013 (the "Tesco TSA"), and Tesco received a warrant for the purchase of shares of common stock in YFE.  In connection with the sale of the Meat Facility, the Tesco TSA was amended, and the common stock warrants were supplemented with the issuance of 180,000 shares of Series A preferred stock in YFE to Tesco Treasury Services Plc.  While YFE is the counterparty to the Tesco TSA, the Debtor is the primary beneficiary of these services.  As a result, the Debtor has historically paid the monthly fees arising under the Tesco TSA and currently intends to continue that practice on a post-petition basis.

Tesco Note; provided, however, that during the first four years of the note, Fresh Foods received the option to capitalize interest accruing that quarter rather than immediately pay such interest when due, and any interest so capitalized would accrue at seven percent per annum. The maturity date of the Original Tesco Note was the earlier of (i) November 26, 2020 or (ii) the occurrence of certain events giving rise to a sale or change in control of any of the Campus Facilities, or of Fresh Foods.

25.     Pursuant to that certain *Amended and Restated Secured Promissory Note* dated as of August 6, 2015, amending and restating the Original Tesco Note (the "Tesco Secured Note"), Tesco Treasury Services PLC agreed to reduce the principal under the Original Tesco Note to $100 million in exchange for certain consideration, including the issuance of 180,000 shares of Series A preferred stock in YFE to Tesco Treasury Services Plc. and an earlier maturity date, which earlier date is the first to occur of (i) May 29, 2018 and (ii) the closing of a sale on the remaining Campus Facilities. The Tesco Secured Note is secured by a first-priority mortgage on each of the Produce Facility and Kitchen Facility (as modified, the "Tesco Mortgage"), including fixtures and equipment but subject to certain permitted liens, as detailed in the Tesco Secured Note, and the Tesco Mortgage and that certain *Security Agreement* dated November 25, 2013 (as later modified).[11]

26.     The Tesco Secured Note is guaranteed by the Debtor and YFE through a guaranty dated November 25, 2013 and that certain *Consent of Guarantor and Reaffirmation and Amendment of Guaranty* dated August 6, 2015 (the "Tesco Guaranty"), but neither the Debtor nor YFE pledged an interest in any property to secure their respective guarantees.

---

[11]     As discussed above, in August 2015 the Meat Facility was sold to JBS and a portion of the proceeds went to pay down the Tesco Secured Note, reducing its balance to $75 million. Prior to that sale, the Tesco Secured Note was secured by a mortgage on the Meat Facility, as well as the Produce Facility and Kitchen Facility.

3. Affiliated Unsecured Debt

27.    As of the Petition Date, the Debtor's books and records indicate that it owes its parent, YFE, approximately $89.8 million pursuant to a promissory note (the "YFE Closing Note") in the original principal amount of $78 million dated November 25, 2013, with an effective date of November 26, 2013 (including accrued interest at the rate of seven percent per annum, compounded annually).

28.    On or about September 11, 2015, the Debtor executed a promissory note in favor of Fresh Foods in the initial amount of $4.15 million payable to Fresh Foods (the "Fresh Foods Note") in order to continue to fund the Debtor's prepetition operating losses and enable the Debtor to explore all restructuring alternatives.  Per the terms outlined therein, the face amount of the Fresh Foods Note will increase as Fresh Foods makes additional loans to the Debtor, and if the Debtor elects to make in kind interest payments due under the Fresh Foods Note.  Interest accrues at seven percent per annum under the Fresh Foods Note, payable in kind in arrears, compounding on the last day of each calendar quarter.  The maturity date of the Fresh Foods Note is August 20, 2016.  The current amount owed under the Fresh Foods Note is approximately $9.4 million.

29.    On or about October 2, 2015, FEFOS advanced the Debtor approximately $4.9 million to fund the Debtor's operations so that the Debtor could continue to explore all restructuring alternatives and attempt to structure a sale of its assets.

4. Other Unsecured Debt

30.    As of the Petition Date, the Debtor's books and records reflected accounts payable due and owing in the amount of approximately 47.1 million on account of trade debt.

Approximately $53.1 million in total unsecured, non-intercompany debt is due and owing as of the Petition Date, including amounts owed to the Debtor's landlords.

III.    **Circumstances Leading to the Commencement of this Chapter 11 Case and Prepetition Restructuring Efforts**

31.    As evidenced by the Prior Chapter 11 Case and disclosures made in connection therewith, the debtors in the Prior Case were not profitable.  Although the Debtor has substantially improved its operating performance, and despite its best efforts to right-size its costs and implement sales and operational objectives, the Debtor has yet to achieve profitability.

32.    Prior to the Petition Date, the Debtor began redefining its business model while maintaining its goal of providing fresh and healthy food.  The Debtor's action steps included, but were not limited to, (i) marketing cumbersome leases to potential transaction partners; (ii) terminating retail operations at the Debtor's least profitable locations; and (iii) negotiating rent reductions and, in some instances, lease termination agreements, all of which were done with the assistance of retained advisors and consultants who are well versed in the real estate and grocery market industry.  Indeed, in the seven months preceding the Petition Date, the Debtor terminated its retail activity at 70 locations.  The Debtor also moved its headquarters to a location with less expensive rent in June 2015.

33.    While taking steps to restructure its lease portfolio and reduce its significant rental obligations, the Debtor simultaneously solicited interest from third parties that the Debtor, in consultation with its advisors, determined may be interested in purchasing substantially all of the Debtor's assets or otherwise engaging in a restructuring transaction.  YFE engaged Moelis in early 2015, on the Debtor's behalf, to contact a broad range of potential investors, including strategic buyers, traditional private equity firms, special situation funds, and sovereign wealth funds, among others, with the specific goal of raising capital through an equity

54567/0001-

infusion.  Approximately 83 potential investors were contacted, and 36 executed non-disclosure agreements and began conducting due diligence on the Debtor's operations and financial wherewithal.  Ultimately, at least 13 parties engaged in introductory meetings with the Debtor's management.  Throughout its engagement, and primarily during May and early June 2015, Moelis repeatedly initiated and/or conducted meetings with several financial sponsor and strategic partners, industry competitors, and notable private equity firms.  A wide array of transaction alternatives were discussed, but ultimately, Moelis's marketing process did not generate any viable business opportunities, as negotiations never advanced past the initial stages. Moelis's engagement ended in June 2015.

34.    Although the prior sale process yielded no investment, equity or sale alternatives, the Debtor retained Imperial on or about July 13, 2015, to initiate and supervise a subsequent sale process pursuant to which Imperial contacted a wide spectrum of potential strategic and financial buyers regarding the Debtor's business, operational needs and forward looking prospects.  As a result thereof, Imperial distributed approximately 75 teasers and non-disclosure agreements (such agreements, "NDAs") to interested parties, and 34 parties executed NDAs.

35.    From an operations standpoint, prior to commencing the Store Closing Sales, the Debtor continued to make significant strides in an effort to improve its financial performance.  Specifically, the Debtor (among other actions)  (i) reduced its marketing budget; (ii) reduced its discounting and couponing; and (iii) partnered with Amazon, under its "Prime Now" platform, to provide delivery service from certain Fresh & Easy stores to the Debtor's customers.  These initiatives were effective, but the Debtor was unable to sufficiently overcome the liquidity constraints triggered by the Debtor's lease obligations and the financial drain

resulting from the Debtor's operations.  Further, the Debtor's affiliates have advised the Debtor

that they will no longer fund the Debtor's operating losses, as they have done in the past, outside

of the process proposed herein.

36.     Since its appointment, the Special Committee has reviewed and analyzed

the Debtor's restructuring alternatives, and when it became apparent that Fresh Foods might

become a potential purchaser or post-petition lender, the Independent Managers' service on

Fresh Foods' board of managers ceased on or about August 6, 2015.  Thereafter, the Special

Committee has exclusively served the Debtor and considered all transactions affecting the

Debtor, including with respect to winding down the Debtor's affairs and post-petition lending

arrangements, with complete independence.  Ultimately, the Special Committee determined the

Debtor could not continue as a going concern, and approved proceeding with the Store Closing

Sales.  Subsequently, the Debtor's chief executive officer, James W. Keyes, resigned as chief

executive officer of the Debtor, but remains on the board of the Debtor.

37.     Given the Debtor's lack of liquidity, the absence of potential going-

concern purchasers, and the cessation of operations, I believe that the Debtor has exhausted its

going concern alternatives at this time and that the orderly wind down of the Debtor's operations,

subject to Court supervision, represents the best means through which to maximize value for the

estate and all parties interested therein.

**IV.     Objectives for Chapter 11 and Proposed Initiatives**

38.     For the reasons outlined above, the Debtor believes that the

commencement of this Chapter 11 Case is a necessary and prudent measure to maximize the

value of the Debtor's estate.  At the outset of this proceeding, the Debtor will seek approval to

continue to conduct the Store Closing Sales and maximize value therefrom, as discussed further

below.  The Debtor will also take a number of steps to reduce its expenses, such as the filing of the Lease Rejection Motion, pursuant to which it seeks to reject a number of burdensome store leases that it was not able to successfully market and assign prepetition.  As noted above, the Debtor has already vacated these premises and unequivocally surrendered possession to applicable landlords.  Thereafter, the Debtor anticipates seeking Court approval of the Settlement and, given its limited liquidity, the Debtor views the immediate, structured and orderly wind down of its operations as the best available means through which to maximize estate value.

39.    The Debtor has put in place a series of processes to liquidate its assets as efficiently as possible, including store inventory, store furniture fixtures and equipment, equipment in the Debtor's distribution center, and the Debtor's leasehold interests.  Because of the limited value of the Debtor's assets relative to liquidation costs and the costs of these proceedings, the Debtor estimates that absent additional recoveries from the sale of leasehold interests (which are possible, but unknown), the Debtor will not generate enough proceeds from the sales of its assets to repay its DIP facility and pay for all administrative claims in these proceedings.

40.    Therefore, the Debtor worked with its affiliates to negotiate the Settlement, which is a commitment of the Debtor's affiliates to satisfy all allowed administrative claims in these cases and provide a recovery for unsecured creditors.

41.    The Debtor believes that the Settlement, or a subsequently negotiated similar alternative to the Settlement, provides an opportunity to negotiate with general unsecured creditors in order to achieve a result that maximizes value for all stakeholders.  The Settlement will not be entered into without the consent of the UCC appointed in this case.  The Settlement provides a workable plan to provide for the Debtor's administrative and priority claims and to

54567/0001-

provide a recovery for unsecured creditors.  The Debtor will work with the UCC to analyze the

settlement so that the UCC can choose whether to support the Settlement or negotiate an

alternative settlement with the key parties in interest.

**V.        First-Day Motions**

42.        As a result of my first-hand knowledge, and through my review of various

materials and information, discussions with members of the Debtor's management and the

Debtor's outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief

sought by the Debtor in the First Day Motions, (b) the need for the Debtor to continue to operate

effectively during the wind down process, (c) the deleterious effects upon the Debtor of not

obtaining such relief, and (d) the immediate and irreparable harm to which the Debtor will be

exposed unless the relief requested in the First Day Motions is granted without further delay.

43.        I submit this Declaration in support of the Debtor's chapter 11 petition and

First Day Motions.  I or members of the FTI team participated in preparing and/or have reviewed

each First Day Motion (including the exhibits and schedules attached thereto) and, to the best of

my knowledge, believe the facts set forth therein are true and correct.  Such representation is

based upon information and belief and through my review of various materials and information,

as well as my experience and knowledge of the Debtor's operations and financial condition, and

information provided to me by the Debtor's management team or advisors on which I reasonably

relied.  If I were called upon to testify, I could and would, based on the foregoing, testify

competently to the facts set forth in each First Day Motion and this Declaration.

44.        The relief sought in the First Day Motions will minimize the adverse

effects of this Chapter 11 Case on the Debtor, its employees and its creditors, and help ensure

that the value of the Debtor's assets is maximized for the benefit of all interested parties.  As

described more fully below, the relief requested in the First Day Motions was carefully tailored

by the Debtor, in consultation with its professionals, to ensure that the Debtor's immediate

operational needs are met so as to allow the Store Closing Sales to succeed, and that the Debtor

suffers no immediate and irreparable harm during the wind down process.  I, or my colleagues at

my instruction, participated in the analysis that led to the creation of each First Day Motion, and

assisted in developing the relief requested therein and reviewing pleadings related thereto.  At all

times, the Debtor's management and professionals remained cognizant of the limitations

imposed on a debtor-in-possession and, in light of those limitations, the Debtor narrowed the

relief requested at the outset of this Chapter 11 Case to those matters that require urgent relief to

sustain the Debtor's immediate operations as they are wound down, and preserve value during

the pendency of this Chapter 11 Case.

A.      *Claims Agent Retention Application*

45.      The Debtor requests entry of an order, pursuant to section 156(c) of title

28 of the United States Code, and Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), authorizing the retention and appointment of Epiq Bankruptcy Solutions, LLC ("Epiq"),

as claims and noticing agent in this Chapter 11 Case.  I believe that the relief requested in Epiq's

retention application will ease the administrative burden on the Clerk of the Court in connection

with this Chapter 11 Case.  In addition, I have been advised by counsel that Epiq's (or a similar

firm's) retention is required by the Local Rules in light of the Debtor's anticipated number of

creditors.

46.      Therefore, on behalf of the Debtor, I respectfully request that Epiq's

retention application be approved.

B.    *Utilities Motion*

47.    By this motion (the "Utility Motion"), to ensure continued provision of utility services (the "Utility Services") at the Debtor's retail locations, corporate headquarters and distribution facilities, among other places, including facilities owned by Fresh Foods but operated by the Debtor, the Debtor seeks entry of interim and final orders (i) prohibiting the Debtor's utility service providers (the "Utility Service Providers") from altering, refusing, or discontinuing utility services on account of unpaid prepetition invoices, (ii) deeming the Utility Service Providers adequately assured of future performance, and (iii) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtor to provide adequate assurance of future payment to the Utility Service Providers.  The Debtor proposes to establish a segregated account into which the Debtor will deposit a sum equal to approximately two weeks of the Debtor's estimated aggregate utility expenses[12] and, additionally, has proposed procedures to address any request made by the Utility Service Providers for additional adequate assurance.

48.    Any disruption of the Debtor's Utility Services would cause irreparable harm to the Debtor's business operations, its estate, and the success of the Store Closing Sales. The successful consummation of the Store Closing Sales and the sales of other assets require that the Utility Services be provided on a continual and uninterrupted basis.  Any disruption of Utility Services could have a significant impact on the Debtor's business operations and efforts to maximize value for the estate.  Additionally, the Debtor has established a good payment history with virtually all of its Utility Service Providers.

---

[12]    For purposes of this calculation, and as detailed in Utilities Motion, a small number of Utility Companies with overwhelming adequate assurance of future payment arising under significant letters of credit were excluded.

49.     For the foregoing reasons, the Debtor submits, and I believe, that the relief requested in the Utility Motion is in the best interest of the Debtor, its estate and its creditors, and therefore should be approved

C.      *Cash Management Motion*

50.     By this motion (the "Cash Management Motion"), the Debtor seeks entry of an order, among other things, (i) authorizing continued use of its existing (a) bank accounts, (b) cash management system, and (c) checks and business forms and (ii) waiving the investment and deposit requirements of 11 U.S.C. § 345(b) on an interim basis.  In addition, the Debtor also requests a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require the Debtor to close all prepetition bank accounts, open new accounts designated as debtor in possession accounts, and provide new business forms and stationary.

51.     As described in detail in the Cash Management Motion, the Debtor maintains a cash management and disbursement system in the ordinary course of its operations (the "Cash Management System").  To lessen the disruption caused by the bankruptcy filing and maximize the value of its estate in this Chapter 11 Case, it is vital that the Debtor maintain its Cash Management System and be authorized to, *inter alia*, pay any outstanding fees owed in relation to its bank accounts.

52.     The Debtor maintains current and accurate accounting records of daily transactions and submits that maintaining this Cash Management System will prevent undue disruption to the Debtor's operations while protecting the Debtor's cash for the benefit of its estate.  It is important that the Debtor be able to consolidate management of cash and centrally

coordinate transfers of funds to efficiently and effectively operate its business operations. Accordingly, the Debtor requests approval of the Cash Management Motion.

D.     *Insurance Motion*

53.     By this motion (the "<u>Insurance Motion</u>"), the Debtor requests the entry of an order (i) authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, perform under renewed or renew the Insurance Programs (as defined below), (b) pay, in its sole discretion, all undisputed policy premiums, claims, deductibles, retentions, administrative fees, broker fees, and other obligations relating to the Insurance Programs (such obligations, the "<u>Insurance Obligations</u>") that were or are due and payable, and relate to the period before or after the Petition Date, and (c) continue the Financed Programs (as defined below) and enter into new premium financing programs, as appropriate in the Debtor's business judgment and (ii) authorizing the Debtor's banks (the "<u>Banks</u>") to honor and process check and electronic transfer requests related thereto.

54.     In the ordinary course of business, the Debtor has maintained, and continues to maintain, a number of insurance policies for management liability, general liability, property, automobile liability, umbrella, foreign liability, and product recall.  The Debtor employs Lockton Insurance Brokers, LLC as its insurance broker (the "<u>Broker</u>") to assist it with the procurement and negotiation of its Insurance Programs.  The Broker provides services to and receives compensation (the "<u>Broker Fees</u>") from the Debtor.

55.     I believe that maintaining the Debtor's insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transaction.  Authority to pay any prepetition Insurance Obligations—to the extent that the Debtor determines that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of

54567/0001-

impairment of the coverage, benefits or proceeds provided under the Insurance Programs—is imperative, as the insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtor's assets, and, in most cases, such coverage is required by the various contracts and laws that govern the Debtor. Furthermore, it is my understanding that, under the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, during this Chapter 11 Case the Debtor is obligated to maintain certain insurance coverage, which coverage is provided by certain of the policies included in the Insurance Programs.

56.     Because it is not economically advantageous for the Debtor to pay the premiums on each of its Insurance Programs on an annual basis, from time to time, in the ordinary course of business, the premiums on certain of the Insurance Programs are financed (such programs, the "Financed Programs") pursuant to two premium finance agreements (each, a "PFA," and together, the "PFAs") between YFE and Premium Assignment Corporation ("Premium Assignment").

57.     Although YFE is primarily liable on the PFAs, the Debtor, as the operating entity amongst its affiliates, is the primary beneficiary of the PFAs. Thus, the Debtor has historically paid the monthly installment amounts due to Premium Assignment under the PFAs and intends to continue this practice on a post-petition basis. If the Debtor is unable to continue making any required payments under the PFAs, Premium Assignment may be permitted to terminate the Financed Programs, at which point the Debtor would be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost. Given the importance of maintaining insurance coverage under the Financed Programs and preserving the Debtor's cash flow by financing insurance premiums, I believe that it is in the best interest of

the Debtor's estate and creditors that the Debtor be authorized to continue its historic practice of paying amounts due under the PFAs.

58.     Accordingly, for the reasons set forth herein and in the Insurance Motion, I respectfully request that the Insurance Motion be approved.

E.     *Wages Motion*[13]

59.     Pursuant to this motion (the "Wages Motion"), the Debtor requests entry of an order (a) authorizing, but not directing, the Debtor, in accordance with its stated policies and in its discretion, to (i) pay prepetition employee wages, salaries and other accrued compensation, (ii) reimburse prepetition employee business expenses, (iii) make contributions to prepetition benefit programs and continue such programs in the ordinary course of business, (iv) honor workers' compensation obligations, as applicable, (v) make payments for which prepetition payroll deductions were made, (vi) pay processing costs and administrative expenses relating to the foregoing payments and contributions, and (vii) make payments to third parties incident to the foregoing payments and contributions and (b) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing.

60.     As of the Petition Date, the Debtor employs approximately 2,950 employees, of which approximately 1,460 are full-time and 1,490 are part-time.[14]  Although the Debtor has generally paid its wage, salary, and other obligations in accordance with its ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for Employees may nevertheless be due and owing.

---

[13]     Capitalized terms used in Section IV(E), but not otherwise defined herein, shall have the meanings ascribed to such terms in the Wages Motion.

[14] Approximately 240 of the Debtor's employees were terminated on the petition date, but included in this number.

61.     Many of the Debtor's Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, these Employees will be exposed to significant financial hardship if the Debtor is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtor is unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtor and the success of the Debtor's wind down efforts and this Chapter 11 Case.  Given the Store Closing Sales, Employees have already started seeking alternative employment, and in the absence of the payments contemplated by the Wages Motion, the Debtor's immediate wind down efforts will be further hindered and the Store Closing Sales and the Debtor's other efforts will not generate maximum proceeds.  If Employees are inclined to find alternative employment, the Debtor would be required to replace such Employees to conduct the Store Closing Sales and the Debtor's other business, at a substantial cost to the Debtor.

62.     The Debtor also seeks authority to honor the GOB Incentive Program and to have such awards included in Employee's final paychecks, prior to the "second day" hearing in this Chapter 11 Case.  Under the GOB Incentive Program, the team leads, assistant managers, store managers and general manager for any given store will be entitled to a lump sum cash award if their store completes its Store Closing Sale on or before November 15, 2015, and such Employee remains employed as of such date.  The Debtor does not seek authority to make payments under the GOB Incentive Program to any insiders.  The GOB Incentive Program plays an integral role in motivating those Employees that are critical to the successful completion of the Store Closing Sales and is designed to maximize Employee morale at a time the Debtor faces a tremendous risk of Employee attrition.  The Debtor believes payment of these modest amounts

in Employee's final paychecks will maximize the incentivizing effect of the GOB Incentive

Program and may spare the Debtor certain administrative costs that would be associated with

initiating a separate special payroll if the GOB Incentive Program is approved at a later date.

Finally, the payments contemplated under the GOB Incentive Program will not result in any

Employee receiving a payment over $12,475, even when aggregated with outstanding Unpaid

Wages owed to such Employees.

63.     I believe that the relief requested in the Wages Motion is in the best

interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the

Debtor to continue to operate its business in chapter 11 without disruption.  Accordingly, on

behalf of the Debtor, I respectfully request that the Wages Motion be approved.

I.     *Customer Programs Motion*

64.     By this motion (the "<u>Customer Programs Motion</u>"), the Debtor seeks entry

of an order (i) authorizing the Debtor to honor certain customer programs, as detailed in the

Customer Programs Motion (the "Customer Obligations") and (ii) approving the manner of

notice of the commencement of the Chapter 11 Case to certain customers.  Honoring the

Customer Obligations will not require an actual "cash outlay" on the part of the Debtor, but

rather will consist of honoring gift cards and rewards credit issued prior to the Petition Date.

65.     I believe that honoring the Customer Obligations as detailed in the

Customer Programs Motion will help to maximize the value of the Debtor's estate by limiting

claims that might be allowable against the Debtor relating to the Customer Obligations in a way

that also encourages customers to purchase product from the Debtor at its Store Closing Sales.

The Debtor believes that the ability to honor the Customer Obligations maintains positive

relationships with its core customers and the ability for customers to continue to receive the

benefits of the Customer Obligations entices customers to come to the Debtor's locations, likely leading to increases in sales.  Accordingly, to preserve the value of the Debtor's estate, I believe that the Debtor should be permitted, in its sole discretion, to honor prepetition Customer Obligations in the ordinary course.

66.     In addition, the Debtor requests Court approval to omit the approximately 3 million customers enrolled its customer rewards program (the "Friends Rewards Program") from its list of creditors filed in the Chapter 11 Case, and to not serve copies of pleadings filed in the Chapter 11 Case upon such customers as required by Bankruptcy Rule 2002 solely on the basis that they are enrolled in the Friends Rewards Program.  Instead, as described in the Customer Programs Motion, the Debtor requests that the Court enter an order providing that the Debtor may serve the notice of commencement of the Chapter 11 Case and any claims bar date orders by electronic mail to those customers for whom the Debtor has an electronic mail address, and post notice of the commencement of the Chapter 11 Case in the Debtor's retail stores and on its website, in each case with a reference to the website for this case established by the Debtor's claims agent, Epiq Bankruptcy Solutions LLC.  Given the costs associated with mailing notice to the 3 million customers enrolled in the Friends Rewards Program, the Debtor's decision to honor rewards points during the Store Closing Sales, and the nature of the unsecured claims held by the customers in the Friends Rewards Program, if any, I believe the proposed manner of notice is appropriate under the circumstances.

67.     For the reasons set forth above, I respectfully request that the Customer Programs Motion be approved.

J.    *Taxes Motion*

68.    By this motion (the "Taxes Motion"), the Debtor requests entry of an order (i) authorizing, but not directing, the Debtor, in its discretion, to pay sales and use taxes (the "Sales and Use Taxes") that the Debtor incurred prepetition that are or will become due and payable to authorities (each, an "Authority," and collectively, the "Authorities") and (ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing.

69.    The Debtor seeks authority to pay certain Sales and Use Taxes that accrued prepetition but were not in fact paid or processed prepetition, or were paid prepetition in an amount less than is actually owed, or to the extent any such payments made prepetition were rejected, lost, or otherwise not received in full by any Authority.  Further, there may be Sales and Use Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the Petition Date, which the Debtor seeks authority to pay pursuant to the Taxes Motion.  Finally, to the extent that any checks, drafts, deposits, or transfers issued or initiated by the Debtor on account of prepetition Taxes and Fees have not cleared as of the Petition Date, the Debtor also seeks authority for banks and other financial institutions to honor and process such payments.

70.    Some of the Authorities may initiate an audit of the Debtor if the Sales and Use Taxes are not paid on time.  Such audits will unnecessarily divert the Debtor's attention away from this Chapter 11 Case and result in unnecessary expenses.  Moreover, if the Debtor does not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay, seek payment from the Debtor's

managers and officers, or pursue other remedies that will materially and immediately harm the estate.

71.     I believe that the Debtor's failure to pay the Sales and Use Taxes could have a material adverse impact on the Debtor's ability to maximize the value of its assets for the benefit of all stakeholders.  Additionally, any attempt to collect the Sales and Use Taxes from the Debtor's managers and officers has the potential to divert the attention of those individuals away from the Debtor's restructuring initiatives.

72.     Accordingly, for the reasons set forth herein and in the Taxes Motion, I respectfully request that the Taxes Motion be approved.

K.      *Hilco Motion*

73.     By this motion (the "Hilco Assumption Motion"), the Debtor requests authority to assume an agency agreement entered into by and between the Debtor and Hilco Merchants Resources, LLC ("Hilco") and continue the Store Closing Sales.  In October 2015, the Debtor and its advisors began contacting certain nationally-recognized potential liquidators (who are well suited to effectuate a transaction of this magnitude) to solicit interest in bidding on the right to conduct the Store Closing Sales.  The Debtor discussed the Store Closing Sales with such nationally-recognized liquidator firms and solicited bids from these firms.

74.     After extensive negotiations, with the assistance of FTI, the Debtor selected Hilco to conduct the Store Closing Sales, in accordance with the Letter Agreement Governing Inventory Disposition (the "Disposition Agreement").  The Store Closing Sales commenced on or about October 23, 2015.  Following the Petition Date the Debtor seeks to assume the Disposition Agreement, and allow Hilco to continue with the Store Closing Sales. The Debtor submits that assumption of the Disposition Agreement and that the ability to

54567/0001-

continue with the Store Closing Sales, without interruption, is necessary to preserve the value of

the Debtor's estate and avoid irreparable harm.  Further, the Debtor seeks approval for Hilco to

liquidate the furniture, fixtures, and equipment ("FF&E") at the Debtor's stores.  Under the

arrangement with Hilco, Hilco will provide a significant proceeds guarantee, set at $17,500 per

store in exchange for the full rights to proceeds from liquidating the FF&E at the retail stores.

Under the terms of this arrangement, Hilco is to complete the sale of the inventory and FF&E

such that the Debtor can exit any leases that it wishes to reject prior to November 30, 2015

(unless Hilco assumes December rent obligations for leases that would otherwise have been

rejected), thus eliminating the need to incur December rent.  Cumulative monthly rent for the

Debtor's operating stores is approximately $2.5 million per month.

75.     Accordingly, I respectfully request that the Hilco Assumption Motion be

approved.

L.     *DIP Financing Motion*

76.     To provide funding for this Chapter 11 Case and working capital for its

remaining operations and liquidation efforts, the Debtor has filed a motion (the "DIP Motion")

seeking, among other things, (i) authorization to obtain proposed postpetition financing

consisting of a secured debtor in possession facility (the "DIP Facility") of up to $6.25 million

provided by Wells Fargo through an amendment and restatement of the Prepetition Credit

Facility (although it is my understanding that YFE has agreed to a last-out participation in the

DIP Facility and is funding advances under this facility), and (ii) authority to use the cash

collateral of Wells Fargo and provide Wells Fargo adequate protection relating thereto.  The DIP

Facility is structured to permit draws upon it after the interim and final DIP Facility hearings.

77.    Through the DIP Facility, the Debtor will have access to necessary funding to continue to, among other things, fund corporate personnel needed to assist with the Debtor's wind-down and liquidation efforts and fund costs associated with this Chapter 11 Case. For these reasons, the Debtor believes that entry into the DIP Facility is in the best interests of the Debtor's estate because the DIP Facility will help maximize the value of the Debtor's estate.

78.    The Debtor and its affiliates have made efforts to obtain third-party financing.  Within the past year, the Debtor implemented a pre-petition financing process through Moelis, an experienced investment bank who was retained by the Debtor's affiliate, YFE, to canvass the market regarding prospects for financing or an equity infusion and potential discussions about an outright sale of the Debtor and its assets.  Although this process yielded no financing alternatives, the Debtor retained Imperial on or about July 13, 2015, to initiate and supervise a process pursuant to which Imperial contacted a wide spectrum of potential strategic and financial buyers regarding the Debtor's business, operational needs and forward looking prospects.  While the Debtor was negotiating DIP financing arrangements with its affiliates for an in court going concern sale process, , Imperial or the Debtor contacted nine potential lenders, including Wells Fargo.  Given the lack of verified valuable assets in the Debtor's estate, at the time, none of the prospective lenders were willing to provide the Debtor with an alternative debtor-in-possession financing proposal.  The current proposed DIP Facility is a smaller facility designed to assist the Debtor in facilitating a wind-down and liquidation, however potential lenders would still need to overcome the challenge created by the Debtor's limited assets.

79.    In the exercise of its business judgment, the Special Committee determined that entry into the DIP Facility is necessary and proper to ensure that the Debtor can maximize the value of its estate in this Chapter 11 Case.

80.    As a condition of the DIP Facility, the Debtor must remain in compliance with the Budget (as defined in the DIP Motion).  I am familiar with the DIP Budget and I, along with other employees and officers of the Debtor, assisted in the development of the Budget. The Budget was developed based upon a comprehensive review of the Debtor's wind-down efforts and remaining operations and considers the operational changes necessitated by, and the additional costs associated with, the Debtor's chapter 11 filing.  While various assumptions that are beyond the control of management necessarily form the basis for the Budget, I believe that the revenue and expense projections are reasonably likely to be achieved by the Debtor and that the Debtor is likely to be in compliance with the Budget (within the permitted variances) for the duration of this Chapter 11 case.  Given the lack of alternative options, I believe that the terms of the DIP Facility provide the Debtor with the best opportunity to maximize the value of its assets.

81.    As also reflected by the Budget, the Debtor requires funding to continue its wind-down efforts without delay.  Therefore, it is essential that the Debtor obtain immediate postpetition financing and authority to use cash collateral, as contemplated by the DIP Credit Agreement.  Absent such liquidity at this critical early stage, the Debtor would suffer immediate and irreparable harm, and would foreclose its ability to maximize the value of its estate.  Without immediate access to the cash collateral and the funds available under the DIP Facility, the Debtor would quickly face a liquidity shortage.

82.    For the foregoing reasons, and those set forth in the DIP Motion, I respectfully request that the DIP Motion be approved.

## V.  Conclusion

83.     In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of this Chapter 11 Case, I respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  November 3, 2015
Los Angeles, California

_____
Amir Agam
Chief Restructuring Officer

# EXHIBIT A

**Corporate Organization Chart**

Fresh & Easy, LLC Organizational Chart

