## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FRESH & EASY, LLC,[1] | : | Case No. 15-12220 (CSS) |
| | : | |
| Debtor. | : | |
| | : | |

## MOTION OF THE DEBTOR FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-PETITION LENDERS PURSUANT TO 11 U.S.C. § 364; (III) AUTHORIZING THE USE OF CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION TO PREPETITION CREDIT PARTIES AND MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (IV) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL RULE 4001-2

The above-captioned debtor (the "Debtor") hereby submits this motion (the "Motion") for the entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit B, and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i) authorizing the Debtor to obtain postpetition financing pursuant to a secured debtor-in-possession financing facility (the "DIP Facility") on the terms described herein and in that certain *Amended and Restated Credit Agreement* (the "DIP Credit Agreement");[2] (ii) granting automatically perfected priming liens and secured claims to

---

[1]        The last four digits of the Debtor's federal taxpayer identification number are 8906.  The Debtor's mailing address is 20101 Hamilton Avenue, Suite 350, Torrance, CA 90502.

[2]        Capitalized terms used but not otherwise defined herein shall the meaning given to such terms in the DIP Credit Agreement or the Interim Order, as applicable.

the lenders under the DIP Facility (the "DIP Lenders"); (iii) authorizing the Debtor to use cash collateral of the Prepetition Credit Parties (defined below) and provide adequate protection in connection therewith; (iv) scheduling a final hearing with respect to the relief requested herein; and (v) granting related relief.  In support of this Motion, the Debtor incorporates the statements contained in the *Declaration of Amir Agam in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously herewith and further respectfully state as follows:

## PRELIMINARY STATEMENT

1.       As more fully described in this Motion and in the First Day Declaration, despite tremendous effort and great improvement, the Debtor's business has never been profitable.  This prompted the Debtor's predecessor entities to file bankruptcy in 2013, and effectuate a sale of their assets (the "Sale").  Since then, the historical profitability issues the Debtor experienced since acquiring the assets through the Sale have been accompanied by increased competition.  Ultimately, these issues precipitated the Debtor's decision to wind down its operations, initiate store closing sales, and commence this chapter 11 case.

2.       Through the DIP Facility, the Debtor will have access to the necessary funding to continue its store closing sales, otherwise liquidate its assets, and fund this chapter 11 case.  The Debtor believes that entry into the DIP Credit Agreement is in the best interests of the Debtor's estate because the DIP Facility provides the funding needed to accomplish these tasks and, thereby, to maximize the value of the Debtor's assets.

3.       Moreover, despite the efforts detailed below, the Debtor was unable to obtain alternative financing on terms more favorable than those set forth in the DIP Facility – or at all, as all eight other potential lenders contacted by the Debtor declined to provide a DIP Facility.  Only Wells Fargo Bank, National Association ("Wells Fargo"), who serves as

administrative agent and collateral agent (in such capacity, the "Prepetition Agent") and lender

under the Debtor's prepetition credit facility (the "Prepetition Lender" and, together with the

Prepetition Agent in its capacity as such, the "Prepetition Credit Parties") agreed to provide the

Debtor its needed funding.[3]

   4. For each of the foregoing reasons, the independent managers of the Debtor

(the "Special Committee") consider it in the best interest of the Debtor to enter into the DIP

Facility, and the Debtor hereby seeks its approval.

## JURISDICTION AND VENUE

   5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334, and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware, dated as of February 29, 2012 (the "Amended Standing Order").

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final

order consistent with Article III of the United States Constitution.  Venue is proper in this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.**  **General**

   6. On October 30, 2015 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  Concurrently with this Motion, the

Debtor has also filed certain other motions and applications seeking certain "first day" relief to

enable the Debtor to maximize the value of its assets through a liquidation of its assets.

---

[3] As discussed below in the disclosures of material terms, Wells Fargo is selling a 100% last-out participation in the DIP Facility to YFE Holdings, Inc. ("YFE"), the Debtor's corporate parent, but will continue to act as DIP Agent.

7.    The Debtor has continued in possession of its properties and operates its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.    No request has been made for the appointment of a trustee or examiner and no official committee has been established in this chapter 11 case.

9.    Additional information about the Debtor's business and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

**B.    Prepetition Indebtedness**

10.    The Debtor's prepetition debt structure primarily consists of (i) prepetition secured lenders, including Wells Fargo Bank, National Association ("Wells Fargo") and capital lease lessors;  (ii) a guaranty in favor of Tesco Treasury Services PLC, an affiliate of Tesco PLC, unsecured by the Debtor but secured by certain property and cash of sister entity Fresh Foods, LLC ("Fresh Foods"); (iii) unsecured debt owed to the Debtor's parent, YFE, and sister entities Fresh Foods and FEFOS, LLC ("FEFOS" and together with YFE, Fresh Foods, and each of their respective officers, directors, managers, agents, shareholders, managing members, professionals or employees, the "Debtor Affiliates"); and (iv) other unsecured debt, including trade debt and claims of landlords for unpaid rent.

**1.    Prepetition Credit Facility**

11.    In connection with the closing of the Sale, on November 25, 2013, the Debtor (as lead borrower), Fresh Foods (as a borrower), and YFE (as guarantor), entered into that certain Credit Agreement dated as of November 25, 2013, with an effective date of November 26, 2013 (as amended, modified, or supplemented prior to the Petition Date, the "Prepetition Credit Agreement").  After its formation, FEFOS later guaranteed the amounts

owing under the Prepetition Credit Agreement by execution of that certain *Joinder Agreement* dated March 19, 2015.

12.     The Prepetition Credit Facility provides a credit line of up to $55 million, which can be borrowed in the form of (i) revolving loans (as defined therein, "Committed Loans"); (ii) swing line revolving loans, subject to a sublimit of $10 million (as defined therein, "Swing Line Loans") and (iii) letters of credit (the "Wells Fargo LCs"). As of the Petition Date, the Debtor was liable to the Prepetition Credit Parties for borrowings under the Prepetition Credit Facility in an amount no less than $23,376,206.[4] on account of Wells Fargo LCs (together with interest, letter of credit fees, and unused commitment fees, accrued and accruing, costs, and any fees and expenses due and owing thereunder, the "Prepetition Credit Facility Indebtedness"). As of the Petition Date, the Debtor had no outstanding "Committed Loans" (as defined in the Prepetition Credit Agreement). Credit extensions made under the Prepetition Credit Facility are governed by a borrowing base consisting of advances against credit card receivables, inventory and pledged cash. As of the date hereof, the Debtor believes that once Wells Fargo completes its sweeps of cash proceeds that have accumulated in the Debtor's accounts (which are currently frozen due to these proceedings), the obligations owed under the Prepetition Credit Facility will be fully cash collateralized. Additional deposits in transit will be swept into this account. The twelve Wells Fargo LCs secure payment obligations to certain utilities (Southern California Edison; Pacific Gas and Electric Company; and Salt River Project Agricultural Improvement and Power District), certain large landlords (Omninet Hamilton, LP; Trop & Jones LLC; Optimus Property Management, LLC; 2800 Wilshire, LLC; and Midland Loan Services), certain insurers (National Union Fire Insurance Co. of Pittsburgh and Argonaut Insurance Co.), a taxing

---

[4]     This amount does not reflect the draw of one letter of credit in the amount of $6.5 million, discussed below, whose beneficiary was OneWest Bank, which is in the process of being processed by Wells Fargo.

authority (the state of Nevada, as security for sales tax permits) and OneWest Bank, for YFE management fees, the latter of which was drawn on or about October 30, 2015.

13.     Interest on the Prepetition Credit Facility historically accrued at variable rates based on the LIBOR Rate or the Base Rate.  Since the Prepetiton Credit Facility was originated in November 2013, interest rates historically ranged from 4.5 percent to 4.75 percent for loans, and letter of credit fees historically ranged from 2.25 percent to 2.50, with an unused commitment fee of 0.375 percent on committed but unborrowed amounts.  These rates represented non-default rates of interest, however.  On October 22, 2015, by letter dated October 21, 2015, Wells Fargo, in its capacity as Prepetition Agent, declared an event of default under the Prepetition Credit Facility.  As a result of this event of default, the Prepetition Agent also began charging default interest to the Debtor (an additional two percent per annum) and declared a "Cash Dominion Event" (as defined in the Prepetition Credit Agreement), thereby imposing certain restrictions on the ability of the Debtor to transfer funds out of its bank accounts with Wells Fargo without the permission of the Prepetition Agent.

14.     By its terms, the Prepetition Credit Facility matures on November 26, 2018, but may be prepaid with an early termination fee of $137,500, which amount represents a compromised reduction of one half of the full amount  The Prepetition Credit Facility is secured by a first priority lien on substantially all personal property of the Debtor and Fresh Foods, subject to certain excluded property, which excluded property is primarily the property of Fresh Foods and is instead subject to the lien of Tesco Treasury Services PLC, as discussed below.

15.     The DIP Credit Agreement amends and restates the Prepetition Credit Agreement, as summarized below.

6

## 2. **Tesco Guaranty Debt**

16.     As a prerequisite to YFE's agreement to purchase those assets it acquired in the Prior Chapter 11 Case, Tesco Treasury Services PLC was obligated to provide YFE or its designee with a $120 million loan.  On November 25, 2013, Fresh Foods (then named Campus Opco, LLC) executed a secured promissory note (as modified by later documents, the "Original Tesco Note") in favor of Tesco Treasury Services PLC representing the obligation to repay the $120 million borrowed thereunder.[5]  As originally executed, the Original Tesco Note bore interest at five percent per annum, compounded quarterly and payable in cash on the last business day of each March, June, September and December during the term of the Original Tesco Note; provided, however, that during the first four years of the note, Fresh Foods received the option to capitalize interest accruing that quarter rather than immediately pay such interest when due, and any interest so capitalized would accrue at seven percent per annum.  The maturity date of the Original Tesco Note was the earlier of (i) November 26, 2020 or (ii) the occurrence of certain events giving rise to a sale or change in control of any of the food preparation facilities owned by Fresh Foods at the time (the "Meat Facility," "Produce Facility" and "Kitchen Facility" and, collectively, the "Campus Facilities"), or of Fresh Foods.

17.     Pursuant to that certain *Amended and Restated Secured Promissory Note* dated as of August 6, 2015, amending and restating the Original Tesco Note (the "Tesco Secured Note"), Tesco Treasury Services PLC agreed to reduce the principal under the Original Tesco

---

[5]     YFE, for the benefit of itself and certain other affiliates, and the Debtor as "Service Recipients," also entered into a Transitional Services Agreement with Tesco Stores Limited dated November 25, 2013 (the "Tesco TSA"), and Tesco received a warrant for the purchase of shares of common stock in YFE.  In connection with the sale of the Meat Facility, the Tesco TSA was amended, and the common stock warrants were supplemented with the issuance of 180,000 shares of Series A preferred stock in YFE to Tesco Treasury Services Plc.  While YFE is the counterparty to the Tesco TSA, the Debtor is the primary beneficiary of these services.  As a result, the Debtor has historically paid the monthly fees arising under the Tesco TSA and currently intends to continue that practice on a post-petition basis.

Note to $100 million in exchange for certain consideration, including among other things, including the issuance of 180,000 shares of Series A preferred stock in YFE to Tesco Treasury Services Plc. and an earlier maturity date, which earlier date is the first to occur of (i) May 29, 2018 and (ii) the closing of a sale on the remaining Campus Facilities.  The Tesco Secured Note is secured by a first-priority mortgage on each of the Produce Facility and Kitchen Facility (as modified, the "Tesco Mortgage"), including fixtures and equipment but subject to certain permitted liens, as detailed in the Tesco Secured Note, and the Tesco Mortgage and that certain *Security Agreement* dated November 25, 2013 (as later modified).  Contemporaneously with the amendment of the Original Tesco Note to the Tesco Secured Note, the Meat Facility was sold, and a portion of the proceeds went to pay down the Tesco Secured Note, reducing its balance to $75 million.  Prior to that sale, the Tesco Secured Note was secured by a mortgage on the Meat Facility, as well as the Produce Facility and Kitchen Facility, and remains secured by the Produce Facility and Kitchen Facility, each of which is owned by Fresh Foods.

18.     The Tesco Secured Note is guaranteed by the Debtor and YFE through a guaranty dated November 25, 2013 and that certain *Consent of Guarantor and Reaffirmation and Amendment of Guaranty* dated August 6, 2015 (the "Tesco Guaranty"), but neither the Debtor nor YFE pledged an interest in any property to secure their respective guarantees.

### 3. Affiliate Unsecured Debt

19.     As of the Petition Date, the Debtor's books and records indicate that it owes its parent, YFE, approximately $89.8 million pursuant to a promissory note (the "YFE Closing Note") in the original principal amount of $78 million dated November 25, 2013, with an effective date of November 26, 2013 (including accrued interest at the rate of seven percent per annum, compounded annually).

20.    On or about September 11, 2015, the Debtor executed a promissory note in favor of Fresh Foods in the initial amount of $4.15 million payable to Fresh Foods (the "Fresh Foods Note") in order to continue to fund the Debtor's prepetition operating losses and enable the Debtor to explore all restructuring alternatives.  Per the terms outlined therein, the face amount of the Fresh Foods Note will increase as Fresh Foods makes additional loans to the Debtor, and if the Debtor elects to make in kind interest payments due under the Fresh Foods Note.  Interest accrues at seven percent per annum under the Fresh Foods Note, payable in kind in arrears, compounding on the last day of each calendar quarter.  The maturity date of the Fresh Foods Note is August 20, 2016.  The current amount owed under the Fresh Foods Note is approximately $9.4 million.  Similarly, on October 2, 2015, FEFOS advanced the Debtor approximately $4.9 million to fund the Debtor's operations so that the Debtor could continue to explore all restructuring alternatives and attempt to structure a sale of its assets.

### 4.  Other Unsecured Debt

21.    As of the Petition Date, the Debtor's books and records reflected accounts payable due and owing in the amount of approximately $47.1 million on account of trade debt.  Approximately $53.1 million in total unsecured, non-intercompany debt is due and owing as of the Petition Date, including amounts owed to the Debtor's landlords.

### C.    The Debtor's Immediate Need for Liquidity

22.    In anticipation of their immediate need for postpetition financing and the use of cash collateral, the Debtor has, in consultation with Mr. Amir Agam, its proposed chief restructuring officer ("CRO"), and other personnel from the firm of FTI Consulting, Inc. ("FTI"), performed a review and analysis of its projected cash needs.  Based upon that review and analysis, the Debtor and FTI have prepared a budget outlining the Debtor's postpetition cash

needs, which was negotiated with, and ultimately approved by, Wells Fargo, who is operating as

the Agent under the DIP Facility (in such capacity, the "DIP Agent") and the DIP Lenders (the

"Budget"), a copy of which is attached hereto as Exhibit A. The Debtor believes that the Budget

is an accurate reflection of its funding requirements, will allow it to meet its obligations –

including administrative expenses in this chapter 11 case – and is reasonable and appropriate

under the circumstances.

      23.    As reflected in the Budget, the Debtor requires funding to complete the

wind down of its operations, otherwise liquidate its assets, and administer this chapter 11 case.

Therefore, it is essential that the Debtor obtain immediate postpetition financing and authority to

use cash collateral, as contemplated by the DIP Credit Agreement. The absence of needed

liquidity at this critical early stage of this chapter 11 case would compromise the Debtor's ability

to maximize the value of its estate. In sum, without the relief requested in the Motion, the

Debtor would suffer substantial, immediate and irreparable harm. Accordingly, the Debtor's

need for access to postpetition financing and the use of cash collateral on the terms set forth in

the DIP Credit Agreement is immediate and urgent.

**D.**     **The Debtor's Efforts to Obtain Financing**

      24.    The Debtor's efforts to obtain third-party financing have been extensive.

Within the past year, the Debtor implemented a pre-petition financing process under the direction

of a top-shelf investment banking firm, Moelis & Company, to canvass the market regarding

prospects for financing or an equity infusion and potential discussions about an outright sale of

the Debtor and its assets. Although this process yielded no financing alternatives, the Debtor

retained Imperial Capital, LLC ("Imperial") on or about July 13, 2015, to initiate and supervise a

due diligence process pursuant to which Imperial contacted a wide spectrum of potential

strategic and financial buyers and lenders regarding the Debtor's business, operational needs and

forward looking prospects.  Shortly before the Debtor began the process of negotiating the DIP

Credit Agreement and DIP Facility, Imperial contacted nine potential lenders, including Wells

Fargo.  Each prospective lender other than Wells Fargo declined to provide the Debtor with an

alternative debtor-in-possession financing proposal, much less a proposal on better terms than

the DIP Facility.

## RELIEF REQUESTED

25.    For the reasons set forth herein, the Debtor seeks authorization to enter

into the DIP Credit Agreement to obtain the funds available through the DIP Facility pursuant to

the terms set forth in this Motion, the DIP Credit Agreement, the Interim Order and the Final

Order.  Specifically, by this Motion, the Debtor hereby seeks, among other things: (i) to obtain

secured, superpriority, debtor-in-possession financing with commitments in an aggregate

principal amount up to $6,250,000 (the "Aggregate Commitments") pursuant to the DIP Credit

Agreement, (ii) authorization for the Debtor to execute and enter into the documents

contemplated by the DIP Facility upon the terms and conditions set forth in the DIP Credit

Agreement, substantially in the form attached hereto as Exhibit C, and all instruments, security

agreements, assignments, pledges, mortgages and other documents referred to therein or

requested by the DIP Credit Parties to give effect to the terms thereof, including without

limitation, the Acknowledgement of Continuing Effectiveness of Ancillary Loan Documents

executed in connection with the DIP Credit Agreement (collectively, the "DIP Financing

Documents")[6] and to perform its obligations thereunder and such other and further acts as may

---

[6]    Included in the DIP Financing Documents is a "Last Out Participation Agreement" dated November [__], 2015, wherein Wells Fargo, in its capacity as a DIP Lender, has sold a 100% participation in the DIP Facility to YFE

be required in connection with the DIP Financing Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Financing Documents (the "DIP Obligations") as such amounts become due and payable; (iii) to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), in which the Prepetition Credit Parties have an interest, subject to the terms and conditions set forth in the Interim Order and later Final Order; (iv) authorization for the Debtor to grant automatically perfected priming security interests in and liens upon all of the DIP Collateral to the DIP Agent for the benefit of the DIP Lenders and the DIP Agent (the "DIP Credit Parties"), and granting superpriority administrative expense status to the DIP Obligations, in each case on the terms and relative priorities set forth in the Interim DIP Order and later Final Order; (v) authorization to grant adequate protection to the Prepetition Credit Parties to the extent of any diminution in value of their interests in the DIP Collateral and subject to the Carve-Out, all as set forth in the Interim Order and later Final Order; (vi) authorization to schedule a preliminary hearing on this Motion pursuant to Bankruptcy Rule 4001 and authority from entry of the Interim Order until a final hearing (the "Final Hearing") to obtain credit under the terms of the DIP Facility and in accordance with the Interim Order; (vii) authorization to schedule the Final Hearing on the Motion no later than 30 days after entry of the Interim Order, to consider entry of the Final Order on a final basis, as well as the approval of notice procedures with respect thereto; (viii) authorization for modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the implantation of the terms of the Interim Order and later Final Order; and (ix) a waiver of any applicable stay, including pursuant to Bankruptcy Rule 6004, and immediate effectiveness of the Interim Order and the Final Order, as applicable.

## MATERIAL TERMS OF THE DIP FACILITY

26.    Bankruptcy Rule 4001(c)(1)(B) requires that a motion for authority to

obtain credit list or summarize, and set out the location within the relevant documents, all

material provisions of the proposed credit agreement and form of order, including interest rate,

maturity, events of default, liens, borrowing limits and borrowing conditions.  Fed. R. Bankr. P.

4001(c)(1)(B).  The principal terms of the DIP Facility are as follows:[7]

| Required Disclosures | Summary of Material Terms |
| --- | --- |
| **DIP Credit Parties**<br><br>*DIP Credit Agreement Preamble* | <u>Borrower</u>:  Fresh & Easy, LLC (the Debtor)<br><br><u>Agent</u>:  Wells Fargo Bank, N.A.<br><br><u>Lender</u>:  Wells Fargo Bank, N.A., with a 100% participation sold to YFE Holdings, Inc. or such other participants as may participate, pursuant to a "Last Out Participation Agreement."<br><br><u>Acknowledgement Agreement Parties</u>: Acknowledgement Agreement executed by Debtor and non-Debtor Parties to Prepetition Credit ` Agreement |
| **Borrowing Limits**<br><br>*Interim Order at ¶ 1 and 2.b* | Aggregate Commitments for loans of up to $6,250,000.  During the period from entry of the Interim Order through and including the earlier of the entry of the Final Order or December 4, 2015 (the "<u>Interim Period</u>"), and subject to the terms and conditions of the Interim DIP Order and the DIP Financing Documents, loans in an aggregate outstanding principal amount not to exceed $2.5 million. |
| **Interest Rate and Default Interest**<br><br>*DIP Credit Agreement § 2.08* | <u>Base Rate Loans</u>:     Base Rate + 10% per annum<br>(Would be approximately13.75% per annum based on current Base Rate)<br><br><u>Default Interest</u>: An additional 2.0% per annum |
| **Borrowing Conditions and Restrictions on Use of Proceeds** | Standard and customary conditions to the borrowing of funds for financings of this type, including the requirement for a Budget prior to borrowing.  Additional conditions include: |

---

[7]    This summary is qualified, in its entirety, by the provisions of the DIP Credit Agreement and the Interim Order.  Unless otherwise defined within this Motion, capitalized terms used within this summary only shall have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.

| | |
|---|---|
| *DIP Credit Agreement §§ 4.01, 4.02, 6.11, 6.24 and 7.17*<br><br>*Interim Order at ¶¶ 12 and 19* | <u>Budget and Permitted Variances</u>: Compliance with the Budget, subject to an unfavorable variance from the Budget, tested on a weekly basis (the "<u>Testing Period</u>"), not exceeding (a) 15% with respect to cumulative total operating receipts to the Budget for such Testing Period and (ii) 15% more than the cumulative Total Disbursements in the Budget for such Testing Period (without giving effect to the making of Loans or the repayments or prepayments of Loans) on a cumulative basis to the Budget ("<u>Permitted Variances</u>"). *DIP Credit Agreement § 6.11 and definition of "Permitted Variances"*<br><br><u>Prohibited Uses in Interim Order</u>: None of the Carve-Out, any Cash Collateral or the proceeds of the DIP Financing may be used by the Debtor, any Committee (except as permitted under the Investigation Budget), and any trustee or other estate representative appointed in the Chapter 11 Case or any Successor Case, or any other person, party or entity (or to pay any Professional Fees or any other fees or expenses incurred by any Professional in connection therewith) for any of the following (each a "<u>Prohibited Purpose</u>"): (a) objecting to or contesting the validity or enforceability of the Interim DIP Order or any DIP Obligations, DIP Liens, DIP Collateral, the Prepetition Debt or the Prepetition Security Interests, provided that the Committee may spend up to $25,000 (the "<u>Investigation Budget</u>") for the fees and expenses incurred in connection with the investigation of any DIP Obligations, DIP Liens, DIP Collateral, Prepetition Security Interest, Prepetition Debt, or Prepetition Credit Documents; provided that the Investigation Budget may not fund the assertion or prosecution of claims; (b) other than to enforce the terms of the DIP Financing or the Interim DIP Order, investigating, asserting or prosecuting any claim or cause of action against (i) any of the DIP Credit Parties or the Debtor Affiliates and each of their respective officers, directors, members, partners, affiliates, trustees, beneficiaries, managers, stock holders, equity holders, employees, agents, advisors, professionals, successors and assigns, and (ii) the Debtor Affiliates, and (iii) any person or entity that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with any DIP Credit Parties or the Debtor Affiliates and their respective officers, directors, members, partners, trustees, beneficiaries, managers, stock holders, equity holders, employees, agents, advisors, professionals successors and assigns, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (w) any claims and defenses, any Avoidance Actions or other actions arising under chapter 5 or section 724(a) of the Bankruptcy Code; (x) any so-called "lender liability" claims and causes of action against any of the DIP Credit Parties, the Debtor Affiliates or any of the Prepetition Credit Parties; (y) any action with respect to the validity, enforceability, priority and extent of the DIP Obligations or the Prepetition Debt, or the validity, extent, and priority |

|  | of the DIP Liens (or the value of the DIP Collateral) or the Prepetition Security Interests; and/or (z) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens or the Prepetition Security Interests, or any other DIP Obligations or the Prepetition Debt; (c) seeking to modify any of the rights remedies, priorities, privileges, protections and benefits granted in the Interim DIP Order, under the Prepetition Debt and the Prepetition Security Interests to any Prepetition Credit Party, or under the DIP Financing Documents to any DIP Credit Party; (d) objecting to, contesting, delaying, preventing, hindering, or otherwise interfering with in any way the DIP Credit Parties' assertion, enforcement or realization on the Cash Collateral (including the Excluded Cash Collateral) or the DIP Collateral in accordance with the DIP Financing Documents, including the exercise of rights and remedies by any DIP Credit Party with respect to any DIP Collateral after the occurrence and during the continuance of an Event of Default, provided that the Debtor may contest or dispute whether an Event of Default has occurred and shall be entitled to any notice provisions provided in the Interim DIP Order; (e) objecting to, contesting, delaying, preventing, hindering, or otherwise interfering with in any way the Prepetition Credit Parties' assertion, enforcement or realization on the Cash Collateral (including the Excluded Cash Collateral) or the DIP Collateral in accordance with the Interim DIP Order and the Prepetition Credit Documents, or (f) requesting authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other than from the DIP Credit Parties. *Interim Order at ¶ 12*<br><br>Letter of Credit Reimbursement: Upon entry of the Interim DIP Order, Excluded Cash Collateral shall be applied to reimburse $6.5 million drawn on or about October 30, 2015 by One West Bank, FSB and all letter of credit fees incidental thereto. *Interim Order at ¶ 19* |
|---|---|
| **Fees and Credit Party Expenses**<br><br>*DIP Credit Agreement §§2.03(l), 2.09 and 10.04*<br><br>*Interim Order at ¶¶ 2(a), 8(i) and 17* | Letter of Credit Fee:  The Debtor shall pay to the DIP Agent for the account of each DIP Lender in accordance with its Applicable Percentage a Letter of Credit Fee for each Letter of Credit equal to 2.5% <u>times</u> the daily Stated Amount under each such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit).  Letter of Credit Fees shall be (i) due and payable on the first day after the end of each Fiscal Quarter commencing with the first such date to occur after the issuance of such Letter of Credit, and after the Letter of Credit Expiration Date, on demand, and (ii) computed on a quarterly basis in arrears. *DIP Credit Agreement § 2.03(l)*<br><br>Reimbursement of Credit Party Expenses: The Debtor and other Loan Parties (as defined in the DIP Credit Agreement) shall pay to the Agent or to any of the DIP Lenders (which includes YFE in its capacity as |

|  | participant under the DIP Credit Agreement) all "Credit Party Expenses" as defined in the DIP Credit Agreement. *Interim Order at ¶ 17 and DIP Credit Agreement § 10.04(a)* |
|---|---|
|  | <u>Prepetition Indemnity Account</u>:  Upon the entry of the Final DIP Order, the Debtor shall establish an account in the control of the Prepetition Agent and the Prepetition Lenders (the "<u>Prepetition Indemnity Account</u>"), into which the sum of $250,000 of Cash Collateral shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtor in favor of the Prepetition Agent or the Prepetition Lenders under the Prepetition Credit Documents, including without limitation, the provisions of Sections 10.04 (a) and (b) of the Prepetition Credit Agreement (the "<u>Prepetition Indemnity Obligations</u>"). *Interim Order at ¶ 8(i).* |
|  | <u>Commitment Fee</u>: $48,750 payable to YFE, as DIP Lender. *DIP Credit Agreement § 2.09* |
| **Maturity**<br><br>*DIP Credit Agreement, definition of "Maturity Date"* | <u>Maturity Date</u>:  The DIP Facility Maturity Date is the date that is ninety (90) days after entry of the Interim DIP Order. |
| **Prepayment of DIP Obligations**<br><br>*DIP Credit Agreement, § 2.07(b)*<br><br>*Interim Order at ¶ 7(g)* | Prepayment of DIP Obligations:  The Debtor shall not prepay the DIP Obligations (whether voluntarily or otherwise) except as permitted under the DIP Credit Agreement, including Section 2.07 of the DIP Credit Agreement. *Interim Order at ¶ 7(g)*<br><br>To the extent that at any time the Debtor maintains deposits in excess of $1,500,000 that are not maintained as Excluded Cash Collateral to secure the Prepetition Debt, the Debtor shall repay the DIP Agent for the ratable benefit of the DIP Lenders the amount of such excess. *DIP Credit Agreement, § 2.07(b)* |
| **Termination**<br><br>*DIP Credit Agreement, definition of "Termination Date"* | <u>Termination Date</u>:  The DIP Credit Agreement will terminate on the earliest to occur of (i) Maturity Date, (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) on account of an Event of Default, (iii) conversion of the chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, (iv) dismissal of the chapter 11 case, (v) the effective date of the Debtor's chapter 11 plan in this Chapter 11 Case that has been confirmed by an order of the Bankruptcy Court, and (vi) a sale of all or substantially all of the assets of the Debtor under Section 363 of the Bankruptcy Court, or completion of the Store Closing Sale. |

| | |
|---|---|
| **Events of Default**<br><br>*DIP Credit Agreement § 8.01*<br><br><br>*Interim Order at ¶21* | Standard and customary events of default for financings of this type. Additionally, the following events are Events of Default under the DIP Credit Agreement:<br><br>Bankruptcy Court Orders:   If the Debtor is unable to obtain (i) entry of the Interim DIP Order on or before November 5, 2015 or (iii) within 30 days after entry of the Interim Order, entry of the Final Order.<br><br>Cross-Default: Except as a result of the commencement of the chapter 11 case, or unless payment is stayed by the Court, cross-default to (i) material indebtedness of any Loan Party and (ii) swap contracts with a termination value greater than $5,000,000.<br><br>Budget:  Any Variance from the Budget shall occur, other than a Permitted Variance. |
| **Priority of and Security for DIP Financing Liens**<br><br>*Interim Order at ¶¶ 3 and 5* | Security: Effective immediately upon the entry of the Interim Order and the execution and delivery of the DIP Credit Agreement, the DIP Agent (for itself and the ratable benefit of the DIP Lenders) shall be granted, subject to the Carve-Out, postpetition security interests and liens upon all real, personal and mixed property of the Debtor, whether now owned or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), any investment in such cash or cash equivalents, money, motor vehicles and rolling stock, inventory, goods, accounts receivable, other rights to payment, causes of actions, claims, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax refunds, insurance proceeds, commercial tort claims of any type or nature whatsoever currently exist (and without the need to comply with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any such commercial tort claim), all claims, causes of action, choses in action, whether contractual, tortious, equitable, legal or otherwise, whether contingent or asserted, claimed or not yet asserted, which arise in any manner or to any extent, whether directly or indirectly, including from or in respect of the conduct of the Debtor's business from its inception in November 2013 through the present, and whether based upon or arising from action or inaction of the Debtor, action or inaction of parties affiliated with the Debtor (including, without limitation, the Debtor Affiliates or any of their or the Debtor's respective officers, directors, managers, agents, professionals or employees), or otherwise, including, without limitation, any claim |

(including Avoidance Actions, subject to entry of the Final DIP Order) which could or might be derivatively asserted on behalf of the Debtor, a creditor of the Debtor or a member or interest holder in the Debtor (each and all of which are hereby found and declared to exist as of the date hereof and constitute "property of the estate" (within the meaning of the Bankruptcy Code) as of and upon the date hereof), all Collateral (as defined in the DIP Credit Agreement), and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing (all of the foregoing collateral collectively referred to as the "DIP Collateral," and all such liens granted to the DIP Agent as provided in the DIP Financing Documents and for the ratable benefit of the DIP Lenders in respect of the DIP Obligations under, and as defined in the DIP Credit Agreement, the "DIP Liens"), which DIP Collateral and DIP Liens shall include avoidance actions under sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553 and 724(a) of the Bankruptcy Code (the "Avoidance Actions") (subject to the entry of the Final DIP Order) and the proceeds of such Avoidance Actions (the "Avoidance Proceeds"). *Interim Order at ¶ 3*

Priority: The priority of the DIP Liens shall in each and every case be first priority senior liens, as follows:

(a) 364(c)(2) Liens:  Pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, unavoidable, first priority lien on all unencumbered DIP Collateral as of the Petition Date.

(b) 364(d)(1) Liens:  Pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, unavoidable Lien on all DIP Collateral that is junior only to (x) the existing Prepetition Security Interests in favor of the Prepetition Credit Parties and securing the Prepetition Debt, but only to the extent such Prepetition Security Interests are valid, perfected, enforceable, and unavoidable security interests, and (y) any Priority Lien in the DIP Collateral existing in favor of any other person or entity as of the Petition Date and all liens junior to the Prepetition Security Interests, and (z) the Carve-Out (the Liens referenced in clauses (x), (y), and (z) collectively, the "Permitted Senior Liens"). *Interim Order at ¶ 5*

| | |
|---|---|
| **Superpriority Administrative Expense Claim Status**<br><br>*Interim Order at ¶4* | <u>Superpriority Claim to Agent</u>.  In addition to the DIP Liens, (a) effective immediately upon entry of the Interim DIP Order, all of the DIP Obligations authorized to be incurred by the Debtor pursuant to the Interim DIP Order and (b) effective immediately upon entry of the Final DIP Order, all of the DIP Obligations, shall be deemed to constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to (i) the payment of the Carve-Out to the extent specifically provided in the DIP Financing Documents and the Interim DIP Order and (ii) any claims of the Prepetition Credit Parties to the extent arising under section 507(b) of the Bankruptcy Code, over all administrative expense claims, unsecured claims, and all other claims against the Debtor, now existing or hereafter arising (whether arising in the Chapter 11 Case or any Successor Case), of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment (the "<u>DIP Superpriority Claims</u>"); provided, however, that, effective immediately upon the entry of the Interim DIP Order, the Debtor shall not be deemed  in the Interim DIP Order to waive any claims pursuant to section 506(c).  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code (without the need to file any proofs of claim) and shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof, including, without limitation, all Avoidance Proceeds.  Other than as provided in the DIP Financing Documents and this Interim DIP Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, 331, and 363 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the DIP Superpriority Claims, or the DIP Obligations, or with any other claims of the DIP Credit Parties arising hereunder. |
| **Carve-Out**<br><br>*Interim Order at ¶ 11* | <u>Carve-Out</u>:  Means, collectively:<br><br>    (a) all unpaid fees required to be paid (i) to the Clerk of this Court and (ii) to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c) together with interest payable thereon;<br><br>    (b) fees and expenses incurred subsequent to the delivery of a |

<table>
<tr>
<td></td>
<td>

Carve-Out Trigger Notice by the professionals to the Debtor and the Committee in an aggregate amount not to exceed $250,000 (the "Carve Out Cap"), comprising the sum of (A) all allowed unpaid fees, expenses, and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) incurred by the Debtor and the Committee subsequent to receipt of the Carve-Out Trigger Notice; and

(c) all allowed and unpaid professional fees and disbursements (regardless of when such fees, expenses, and disbursements become allowed by order of the Court) incurred or accrued by the Debtor or the Committee prior to receipt of the Carve-Out Trigger Notice, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent professional fee budget (the "Professional Fee Budget") delivered to and approved by the DIP Credit Parties prior to any Event of Default that is then continuing (to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i) and (ii), to the extent allowed by the Court at any time; provided that, following receipt of the Carve-Out Trigger Notice.

</td>
</tr>
<tr>
<td>

**Adequate Protection**

*Interim Order at ¶ 7*

</td>
<td>

Adequate Protection for the Prepetition Credit Parties: As adequate protection for any Collateral Diminution suffered by any Prepetition Credit Parties, the Debtor shall maintain its current Cash Management System, provide certain reports to the Prepetition Agent, and the Prepetition Credit Parties will receive:

(a) upon entry of the Interim Order, valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "Adequate Protection Liens") to secure, and only to the extent of, the Adequate Protection Claims, if any. The Adequate Protection Liens shall be (i) senior and shall not be subject or subordinate to the DIP Liens and (ii) junior and subordinate to the Permitted Senior Liens. The Adequate Protection Liens shall not be subject to sections 506(c) (effective upon entry of the Final DIP Order), 510, 549, or 550 of the Bankruptcy Code, and no lien avoided and preserved for the benefit of the Debtor's estate pursuant to section 510 of the Bankruptcy Code shall be made *pari passu* with or senior to any Adequate Protection Liens.

(b) Adequate Protection Claims in the form of allowed superpriority administrative claims pursuant to sections 503(b) and 507(b) of the Bankruptcy Code that shall have priority in payment over any and all administrative expenses of the kinds specified or

</td>
</tr>
</table>

<table>
<tr><td></td><td>

ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, which shall at all times be senior to the rights of the DIP Credit Parties, the Debtor, and any successor trustee or any creditor in the Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, and shall be (x) senior and shall not be subordinate in right of payment to the DIP Superpriority Claims and (y) shall be junior and subordinate in right of payment to the Carve-Out; and

(c) the Debtor shall (i) pay interest at the non-default rate and letter of credit, cash management and other fees as and when due to the Prepetition Credit Parties pursuant to the Prepetition Credit Documents, (ii) daily, provide to the Prepetition Credit Parties additional cash collateral for the Prepetition L/C's in an amount necessary to maintain "Availability" as required the Interim DIP Order, which will be added to and constitute additional Excluded Cash Collateral, and (iii) reimburse (1) the reasonable and documented out-of-pocket professional fees and expenses incurred by the Prepetition Agent pursuant to the Prepetition Credit Documents arising prior to the Petition Date and (2) on a current basis, the reasonable and documented out-of-pocket professional fees and expenses incurred by the Prepetition Agent pursuant to the Prepetition Credit Documents arising on or subsequent to the Petition Date (collectively, such fees in clause (ii), the "Invoiced Fees. The professionals for the Prepetition Agent shall not be required to comply with the U.S. Trustee fee guidelines for the payment of fees and expenses.

</td></tr>
</table>

| **Acknowledgments**<br><br>*Interim Order at ¶ D(v)* | The Debtor stipulates to the amount due under the Prepetition Credit Documents and the enforceability of, and liens granted under, the Prepetition Credit Agreements. |
|---|---|
| **Waivers and Consents**<br><br>*Interim Order at ¶¶ 10, 16, 22, 26*<br><br>*DIP Credit Agreement §§ 9.14 and 10.04* | (a) <u>Waiver of Automatic Stay</u>: The automatic stay is vacated and modified to the extent necessary to permit the DIP Credit Parties to exercise, upon the occurrence and during the continuance of an Event of Default, all rights and remedies provided for in the DIP Facility Documents, pursuant to and subject to the terms and conditions set forth in paragraph 22 of the Interim Order, including a five-business day Default Notice Period as detailed therein. *Interim Order at ¶ 22*<br><br>(b) <u>Automatic Perfection of Liens</u>: Upon entry of the Interim Order, the DIP Liens and Adequate Protection Liens shall be deemed |

<table>
<tr><td></td><td>valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute, avoidance, impairment or subordination (other than as expressly set forth in the Interim Order), at the time and as of the date of entry of the Interim Order.  *Interim Order at ¶ 16*<br><br>(c) <u>Waiver of Section 506(c)</u>:  Usual and customary waiver of section 506(c) of the Bankruptcy Code, upon entry of the Final Order, for any DIP Credit Party, any Prepetition Credit Party or any of the DIP Collateral or Prepetition Security Interests.  *Interim Order at ¶ 10*<br><br>(d) <u>Waiver of Claims and Causes of Action</u>:  The Debtor waives its right to bring any claim or cause of action against any DIP Credit Parties or any Debtor Affiliates.  *Interim Order at ¶ 26*<br><br>(e) <u>Indemnification</u>: Standard and customary for financings of this type, including that Debtor agrees that the Agent and any Related Party shall have no liability as a result of the DIP Agreement or any other Loan Document.  *DIP Credit Agreement §§ 9.14 and 10.04*</td></tr>
</table>

## <u>REQUIREMENTS UNDER LOCAL RULE 4001-2</u>

27.      Rule 4001-2 of the Local Rules requires that certain provisions contained in the DIP Credit Agreement be highlighted and that the Debtor provide justification for the inclusion of such highlighted provisions.  The Debtor hereby identifies and discusses the following provisions of the DIP Credit Agreement and the Interim Order:

28.      <u>Cross-Collateralization to Prepetition Credit Parties</u>: Local Rule 4001-2(a)(i)(A) requires disclosure of "cross-collateralization" clauses.  <u>See</u> Del. Bankr. L.R. 4001-2(a)(i)(A).  As of and prior to the Petition Date, the Prepetition Credit Parties possessed a first-priority lien on substantially all of the Debtor's assets.  As such, the Debtor submits the DIP Facility does not provide a lien in postpetition assets that would not otherwise inure to the benefit of the Prepetition Credit Parties.

29.    <u>Provisions Binding the Estate</u>: Local Rule 4001-2(a)(i)(B) requires

disclosure of provisions or findings of fact that bind the estate or other parties in interest with

respect to the validity, perfection or amount of a secured creditors prepetition lien or the waiver

of claims against the secured creditor *without* first giving parties in interest at least seventy-five

(75) days from entry of the order and the creditor's committee, if formed, at least sixty (60) days

from the date of its formation to investigate such matters.  <u>See</u> Del. Bankr. L.R. 4001-2(a)(i)(B).

30.    The Interim DIP Order establishes the minimum investigation periods

contemplated by Local Rule 4001-2(a)(i)(B).  As such, the Debtor is not required to discuss them

here, but does so in the interest of summarizing them for the convenience of the Court.  And as

they comply with the periods contemplated by the Local Rules, the Debtor submits they are

reasonable and appropriate.

31.    <u>Waiver of Section 506(c) of the Bankruptcy Code</u>:  Local

Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of

whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  <u>See</u> Del.

Bankr. L.R. 4001-2(a)(i)(C).

32.    The Interim Order provides that the waiver of any rights under

section 506(c) of the Bankruptcy Code is subject to entry of the Final Order.  Because this

waiver only will be effective upon entry of the Final Order and to the extent such order so

provides, the Debtor respectfully submits that parties in interest will have an opportunity to be

heard and, as such, the waiver will not be "without notice," but the Debtor discloses the

provision out of an abundance of caution.

33.    <u>Carve-Out</u>: Local Rule 4001-2(a)(i)(F) requires disclosure of *disparate*

treatment between the professionals retained by the Debtor and the professionals retained by the

unsecured creditors' committee with respect to a professional fee carve out. See Del. Bankr. L.R. 4001-2(a)(i)(F).

34.    Budgeted professional fees comprise the primary component of the Carve-Out. The Budget provides $900,000.00 for Committee professionals and $2.8 million for Debtor professionals. The Debtor submits this ratio is common in cases of similar size before this Court, accurately accounts for the increased administrative tasks required of Debtor professionals, and is reasonable and appropriate under the circumstances.

35.    Waiver of Section 552(b)(1): Pursuant to Local Rule 4001-2(a)(i)(H), a movant must identify any provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1). The Interim Order provides that subject to the entry of the Final Order, the "equities of the case" exception set forth in section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent on behalf of any DIP Credit Party or (b) the Prepetition Agent on behalf of any Prepetition Credit Party. Interim Order at ¶¶ 5 and 8. The Debtor believes that such relief is often provided, and appropriate, upon entry of the Final Order.

## REQUEST FOR APPROVAL OF THE DIP FACILITY AND RELATED ACTIONS

### I.    Sections 364(c) and (d) of the Bankruptcy Code

36.    As described above, it is essential to the success of the Debtor'' chapter 11 case that the Debtor immediately obtain access to sufficient postpetition financing and use of cash collateral. The preservation of estate assets and the Debtor's ability to maximize value for stakeholders depends heavily upon the expeditious approval of the relief requested herein.

37.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. See 11 U.S.C. § 364. If a debtor in possession cannot obtain postpetition credit on an unsecured

basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to

obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative

expense status, or is secured by a senior lien on unencumbered property, or a junior lien on

encumbered property, or a combination of the foregoing. See 11 U.S.C. § 364(c).[8]  In addition,

pursuant to section 364(d) of the Bankruptcy Code,[9] a court may authorize a debtor to obtain

postpetition credit secured by a lien that is equal or senior in priority to existing liens on

encumbered property (i.e., a "priming" lien) when a debtor is unable to obtain credit on other

terms and the interests of existing lienholders are adequately protected, or if the existing

lienholders consent to such priming.

---

[8]      Section 364(c) of the Bankruptcy Code provides as follows:

> (c)      If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

> (1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

[9]      Section 364(d) of the Bankruptcy Code provides as follows:

> (d)(1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

> (A)      the trustee is unable to obtain such credit otherwise; and

> (B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

> (2)      In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

## II.    Approval Under Section 364(c) of the Bankruptcy Code

38.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c); see In re Ames Dep't Stores, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

39.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)    the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test); In re Ames Dep't Stores, 115 B.R. at 39.

### A.    The Debtor Was Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis

40.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the

protections of sections 364(c) of the Bankruptcy Code. <u>Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." <u>Id.</u>; <u>see</u> <u>also</u> <u>In re Ames Dep't Stores</u>, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct … an exhaustive search for financing." <u>In re Sky Valley, Inc.</u>, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>Anchor Sav. Bank FSB v. Sky Valley, Inc.</u>, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

   41. As described above, the Debtor engaged in a robust process to secure debtor-in-possession financing. The Debtor, with the assistance of its advisors, explored various alternative sources of capital and financing, including the DIP Facility. The Debtor's extensive efforts to seek the necessary postpetition financing within the Debtor's existing capital structure, as well as from other large, sophisticated lenders, were reasonable and sufficient and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code. <u>See</u>, <u>e.g.</u>, <u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (a debtor seeking financing under section 364(c) of the Bankruptcy Code made an acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); <u>In re Ames Dep't Stores</u>, 115 B.R. at 40 (same).

B.    **The DIP Facility is Necessary to Administer, Maximize and Preserve the Assets of the Debtor's Estate**

42.    It is essential that the Debtor immediately obtain the financing necessary to administer, maximize and preserve the assets of its estate. If the Debtor is without sufficient funds to operate administer this chapter 11 case and operate the Store Closing Sales immediately, value will be lost, irreparably harming the Debtor's estate.

C.    **The Terms of the DIP Facility are Fair, Reasonable and Appropriate Under the Circumstances**

43.    The terms and conditions of the DIP Facility must be judged by a bankruptcy court taking into account the debtor's financial circumstances and alternatives. In re W. Pac. Airlines, Inc., 223 B.R. 567, 572 (Bankr. D. Colo. 1997) (although terms of financing facility fees were "onerous, costly, and tough," facility was approved because it fairly reflected the debtor's "situation and the market in which the debtor is forced to participate as a result of its financial circumstances and the deadlines it faces").

44.    Judged from that perspective, the terms of the DIP Facility are fair and reasonable under the circumstances. The DIP Facility provides sufficient liquidity to the Debtor to wind-down its business in an orderly manner and is the best available option. No other party approached by the Debtor and its advisors was willing to make a postpetition loan to the Debtor. After having engaged in arm's-length negotiations with the DIP Agent through its counsel and other advisors, the Debtor believes that the DIP Facility is the best solution for the Debtor's immediate liquidity needs and its long-term liquidation goals.

45.    In addition, the DIP Facility does not directly or indirectly deprive the Debtor's estates or other parties in interest of possible rights and powers by restricting the services for which chapter 11 professionals may be paid. See In re Tenney Vill. Co., 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that,

among other things, did not provide a carve-out for professional fees).  Instead, the proposed DIP

Facility and the proposed Interim Order provide generally that the security interests and

superpriority administrative expense claims granted to the DIP Lenders and Prepetition Credit

Parties are subject to the Carve-Out, which provides for (a) all unpaid fees of the Clerk of the

Court and the Office of the United States Trustee and (b) fees and expenses for any professional

retained pursuant to sections 327, 328 or 1103 of the Bankruptcy Code of the Debtor and any

statutory committee of unsecured creditors, subject to the Carve-Out Cap and the Aggregate

Carve-Out Cap.  In Ames Department Stores, the bankruptcy court found that such "carve-outs"

are not only reasonable but are necessary to ensure that official committees and debtors' estates

are adequately assisted by counsel and other professionals.  In re Ames Dep't Stores, 115 B.R. at

40.

46.     Likewise, the fees and charges required by the DIP Lenders under the DIP

Facility are well within the range of reasonableness under the circumstances –

47.     Finally, there is nothing in the DIP Facility to prevent the Debtor from

considering alternative sources of financing prior to entry of the Final Order.  Should a superior

alternative materialize, the Debtor, subject to repayment of all Obligations (which shall include

any consideration due under the DIP Credit Agreement or the Interim Order that has been earned

as of that date) owing to the DIP Lenders, may take it.

48.     For these reasons, in the Debtor's business judgment, the terms of the DIP

Facility are fair and reasonable in light of the circumstances of this case.

D.     **The DIP Facility is in the Best
       Interests of the Debtor's Estate and Creditors**

49.     The Debtor believes that the approval of the DIP Facility is in the best

interests of the Debtor's estate and their creditors.  As stated above, without immediate access to

the cash collateral and the funds available under the DIP Facility, the Debtor would quickly face

a liquidity shortage, which would destroy the Debtor's ability to wind-down its operations in

optimal fashion.

### III.    Approval Under Section 364(d) of the Bankruptcy Code

50.    The statutory requirement for obtaining postpetition credit under

section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the

debtors in possession are "unable to obtain such credit otherwise."  See Shaw Indus., Inc. v. First

Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 863, 865 (Bankr. W.D. Pa. 2003)

(where debtor made efforts by "contact[ing] numerous lenders" and was unable to obtain credit

without a priming lien, it had met its burden under section 364(d)); In re 495 Cent. Park, 136 B.R.

at 630-31 (holding that debtor must make an effort to obtain credit without the requirement of a

priming lien but is not required to seek credit from every possible lender); In re Dunes Casino

Hotel, 69 B.R. 784, 796 (Bankr. D.N.J. 1986) (holding that the debtor had made required efforts

under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted

unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least

three such lenders were willing to advance funds secured by a superpriority lien).

51.    As fully described above, the Debtor conducted a robust solicitation

process and no other postpetition credit was available to the Debtor.  Through the DIP Facility,

the DIP Lenders will receive, pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected

Lien on all DIP Collateral that is junior only to (x) the existing Prepetition Security Interests in

favor of the Prepetition Credit Parties and securing the Prepetition Debt, and (y) any other

Priority Liens in the DIP Collateral existing in favor of any other person or entity as of the

Petition Date, and all liens junior to the Prepetition Security Interests, and (z) the Carve-Out.  To

the extent the DIP Lenders are priming any other party, such party may seek adequate protection.

52.    Thus, the requirements of section 364(d)(1)(B) of the Bankruptcy Code have been fulfilled, to the extent applicable, and the proposed DIP Facility should be approved.

## IV.    Application of the Business Judgment Standard

### A.    Entry into the DIP Credit Agreement is an Exercise of the Debtor's Sound Business Judgment

53.    As described above and in the First Day Declaration, after appropriate diligence and analysis, the Debtor has concluded that the DIP Facility is the best option available under the circumstances of this case.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business judgment in granting section 364 financing"); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); cf. In re Filene's Basement, LLC, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (stating "[t]ransactions under § 363 must be based upon the sound business judgment of the debtor or trustee.").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

54.    The Debtor has exercised sound business judgment in determining that a postpetition credit facility is appropriate and has satisfied the legal prerequisites to incur debt

under the DIP Facility.  In light of the Debtor's overall circumstances, and the fact that the

Debtor could not obtain postpetition financing from another lending source, much less on terms

superior to the DIP Facility, the Debtor's decision to enter into the DIP Facility is a sound

exercise of the Debtor's business judgment.  Accordingly, the Court should grant the Debtor

authority to enter into the DIP Facility and obtain funds from the DIP Lenders on the basis

described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

## REQUEST FOR USE OF CASH COLLATERAL

55.    By this Motion, the Debtor also requests authority to use cash collateral on

the terms set forth in the proposed Interim Order.  The Debtor submits that this use of cash

collateral is authorized pursuant to section 363(c) of the Bankruptcy Code.

56.    Section 363(c) of the Bankruptcy Code provides as follows:

> (1)    If the business of the debtor is authorized to be operated
> under section 721, 1108, 1203, 1204, or 1304 of this title and
> unless the court orders otherwise, the trustee may enter into
> transactions, including the sale or lease of property of the estate, in
> the ordinary course of business, without notice or a hearing, and
> may use property of the estate in the ordinary course of business
> without notice or a hearing.

> (2)    The trustee may not use, sell, or lease cash collateral under
> paragraph (1) of this subsection unless—

> > (a)    each entity that has an interest in such cash
> > collateral consents; or

> > (b)    the court, after notice and a hearing, authorizes such
> > use, sale, or lease in accordance with the provisions of this
> > section.

11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code further provides, in pertinent part,

that "on request of an entity that has an interest in property . . . proposed to be used, sold, or

leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use,

sale, or lease as is necessary to provide adequate protection of such interest . . . ." 11 U.S.C. § 363(e).

57.     The Debtor must have sufficient liquidity to carry out its plans to maximize the value of its assets for its various stakeholders.  It is, therefore, essential to the success of the Debtor's chapter 11 case that the Debtor immediately obtain authority to use cash collateral.  The preservation of estate assets, the Debtor's continuing viability and its ability to maximize value for stakeholders successfully, thus, depend heavily upon the expeditious approval of the relief requested herein.

I.     **The Use of Cash Collateral is Necessary
to Administer, Maximize and Preserve the Assets of the Debtor's Estates**

58.     The Debtor has the consent of the Prepetition Credit Parties to the use of their cash collateral, conditioned on the adequate protection proposed by the Debtor herein. Nevertheless, the Debtor submits that it also satisfies the requirements for non-consensual use of cash collateral pursuant to section 363(c)(2)(b) of the Bankruptcy Code.

59.     The Debtor requires immediate access to its cash and the proceeds of existing accounts receivable and inventory to administer, preserve, and maximize its value during the wind-down process.  A bankruptcy court may hold a preliminary hearing to authorize a debtor's use of cash collateral if the estate will suffer immediate and irreparable harm if not permitted to use cash collateral during the period prior to a final determination on a motion. Fed. R. Bankr. P. 4001(b)(2).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's value as a going concern.  Cf. Evergreen Int'l Airlines, Inc. v. Pan Am Corp. (In re Pan Am Corp.), No. 91 Civ. 8319, 1992 WL 154200, at *1 (S.D.N.Y. June 18, 1992) (discussing "immediate and irreparable harm" under Bankruptcy Rule 4001(c)(2)).  Bankruptcy Rule 4001(b)(2) is designed to help the estate by permitting a preliminary hearing to be

conducted as quickly as possible if there is an emergency need for the use of cash collateral, such as the need to meet payroll or to preserve assets. See 9 COLLIER ON BANKRUPTCY ¶ 4001.06[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

60.    The proposed emergency use of cash collateral is an essential component to affording the Debtor the liquidity it needs to maximize the value of its assets and to navigate the chapter 11 process. A critical need for the liquidity sufficient to maximize value is sufficient to meet the immediate and irreparable harm standard. See In re Ames Dept. Stores, Inc., 115 B.R. at 36 n.2, 38 n.4.

**II.    The Prepetition Credit Parties are Adequately Protected**

61.    Section 363(c)(2) contemplates that the Court may authorize the Debtor to use cash collateral even without the consent of the secured parties with an interest therein. See 11 U.S.C. § 363(c)(2)(B). In considering whether to authorize use of cash collateral, however, upon a party's request, a court must find that the interests of the holder of the secured claim are adequately protected if they do not consent to such use.

62.    The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition. See In re 495 Cent. Park, 136 B.R. at 631 (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11); In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (same).

63.    The means by which adequate protection can be provided are addressed in section 361 of the Bankruptcy Code, which sets forth three non-exclusive forms of adequate protection:

> (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property;

>    (b) provision of additional or replacement liens to the extent the use of
>    property results in a diminution in value of an entity's interest in property;
>    and
>
>    (c) such other relief as will result in an entity realizing the indubitable
>    equivalent of its interest in property.

11 U.S.C. § 361. As the foregoing is neither exclusive nor exhaustive, there is a great deal of

flexibility in terms of what may constitute adequate protection. MBank Dallas, N.A. v.

O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987). Ultimately, adequate

protection is determined on a case-by-case basis in light of the particular facts and circumstances

presented. Id. (stating that "the courts have considered 'adequate protection' a concept which is

to be decided flexibly on the proverbial 'case-by-case' basis.") (citations omitted); In re 495 Cent.

Park, 136 B.R. at 631 (stating that, "although section 361 presents some specific illustrations of

adequate protection, the statute is not exclusive" and "suggests a broad and flexible definition");

Pagano v. Cooper (In re Cooper), 22 B.R. 718, 720 n.3 (Bankr. E.D. Pa. 1982) ("While adequate

protection is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the

intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of

each case and general equitable principles." (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess.

339 (1977)); see also 3 COLLIER ON BANKRUPTCY ¶ 363.05 (Alan N. Resnick & Henry J.

Sommer eds., 16th ed.) (stating that, although section 361 provides examples of adequate

protection, "[t]hese examples are not intended to be limiting, and the circumstances of the case

will dictate the necessary relief to be given").

    64.    Courts have held that adequate protection may also be demonstrated by a

showing that the secured creditor's interest in the collateral is preserved by the debtor's use of

the cash collateral in a manner that maintains or enhances the collateral's value. See In re Salem

Plaza Assocs., 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was

adequately protected when cash collateral was used to pay necessary operating expenses);

In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing

debtor to use cash collateral to operate and maintain office building, thereby protecting secured

lender's collateral and existing equity cushion); accord McCombs Props. VI, Ltd. v. First Tex.

Sav. Ass'n (In re McCombs Props. VI, Ltd.), 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding

that committing to use cash collateral for operating expenses substantially eliminated the risk of

diminution in the secured creditor's interest in the collateral).

65.     In this chapter 11 case, the Prepetition Credit Parties are adequately

protected because (a) the Debtor's use of cash collateral in accordance with the Budget will serve

only to maximize the value of the Prepetition Credit Parties' collateral, (b) the Prepetition Credit

Parties will receive the Adequate Protection Liens described above, (c) the Prepetition Credit

Parties will receive the allowed superpriority administrative claims described above, (d) the

Debtor shall pay interest as and when due to the Prepetition Credit Parties pursuant to the

Prepetition Credit Agreement and consistent with the Budget, and (e) as described above, the

Debtor shall reimburse the Invoiced Fees incurred by the Prepetition Agent pursuant to the

Prepetition Credit Documents.  Moreover, the Debtor believes that the Prepetition Credit Parties

are fully secured as of the date hereof.

66.     The Debtor submits that, under the circumstances, any one of the

foregoing would suffice as adequate protection and, taken together, the Prepetition Credit Parties

clearly are more than adequately protected under the circumstances with regard to the Debtor's

proposed use of cash collateral.

67.     If funds are not made available to pay essential items on an emergency

basis, the value of the Debtor's assets (including the collateral of the Prepetition Credit Parties)

would be eroded to the detriment of all parties in interest.  On the other hand, use of limited cash

collateral in accordance with the Budget, combined with the funds available under the DIP

Facility, will allow the Debtor to administer, preserve and even enhance the value of the

Prepetition Credit Parties' collateral.  Accordingly, there is no harm done to the Prepetition

Credit Parties' interests by the Debtor's proposed use of cash collateral, and the Debtor believes

that, combined with the adequate protection being provided under the Interim Order, the

Prepetition Credit Parties require no other or further adequate protection.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

68.    The Debtor seeks a modification of the automatic stay imposed by

operation of section 362 of the Bankruptcy Code to the extent contemplated by the provisions of

the DIP Credit Agreement as described above.

69.    Such stay modification provisions are customary features of postpetition

financing facilities and, in the Debtor's business judgment, are reasonable under the

circumstances.  Accordingly, the Debtor respectfully requests that this Court modify the

automatic stay to the extent contemplated by the DIP Facility and the proposed Interim Order.

## GOOD FAITH

70.    The terms and conditions of the DIP Facility and the use of cash collateral

are fair and reasonable and were negotiated by the parties in good faith and at arms' length.

Therefore, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy

Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of

this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent

order of this or any other court.

## REQUEST FOR HEARING AND AUTHORITY TO
## MAKE INTERIM BORROWINGS UNDER THE DIP FACILITY

71.     Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct an interim hearing and authorize the Debtor's use of the DIP Facility and cash collateral in order to (a) maintain and finance the ongoing liquidation operations of the Debtor, and (b) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest.

72.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Fed. R. Bankr. P. 4001(c).  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., In re Simasko, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); see also In re Ames Dep't Stores, 115 B.R. at 38.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., In re Simasko, 47 B.R. at 449; In re Ames Dep't Stores, 115 B.R. at 36.

73.     Pursuant to Bankruptcy Rule 4001(c), the Debtor respectfully requests that the Court conduct a preliminary hearing on the Motion and authorize the Debtor, from the entry of the Interim Order until the Final Hearing, to obtain access to interim borrowing under the terms contained in the DIP Facility, and to utilize cash collateral.

## SCHEDULING FINAL HEARING

74.    The Debtor respectfully requests that the Court schedule the Final Hearing for a date no later than 30 days from the Petition Date, and set a deadline to object to entry of the Final Order as set forth in the proposed Interim Order.

## NOTICE

75.    Notice of this Motion shall be provided to: (i) the U.S. Trustee; (ii) the parties included on the Debtor's list of thirty (30) largest unsecured creditors, as identified in its chapter 11 petition; (iii) counsel to the Prepetition Agent; (iv) counsel to the DIP Agent; and (v) all parties entitled to notice pursuant to Local Rule 9013-1(m).  Due to the nature of the relief requested herein, the Debtor respectfully submits that no further notice of this Motion is necessary.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (a) enter an Interim Order substantially in the form attached hereto as Exhibit B; (b) set a date for a hearing to consider entry of the Final Order, and (c) any other relief that the Court deems just and proper.

Dated:  November 3, 2015           COLE SCHOTZ P.C.
        Wilmington, Delaware

        */s/ Patrick J. Reilley*
        Norman L. Pernick (No. 2290)
        J. Kate Stickles (No. 2917)
        Patrick J. Reilley (No. 4451)
        David W. Giattino (No. 5614)
        500 Delaware Avenue
        Suite 1410
        Wilmington, Delaware 19801

        *Proposed Counsel to the Debtor*
        *and Debtor in Possession*