**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| FRESH & EASY, LLC,[1] | : | Case No. 15-12220 (CSS) |
| Debtor. | : | |

**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE CONTINUATION OF STORE CLOSING SALES IN ACCORDANCE WITH THE DISPOSITION AGREEMENT AND SALE GUIDELINES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION OF THE DISPOSITION AGREEMENT; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtor (the "Debtor") submits this motion (the "Motion"), pursuant to sections 105, 363, 364, 365, and 554 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6003, 6004, 6006, and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of (1) an interim order in the form attached hereto as Exhibit A (the "Interim Order"), (i) authorizing the Debtor to continue store-closing or similar-themed sales in accordance with the terms of (a) the Letter Agreement Governing Inventory Disposition (the "Agreement"), by and between the Debtor and Hilco Merchant Resources, LLC (the "Agent"), as modified by the First Amendment to Letter Agreement Governing Inventory Disposition, a copy of which is attached as Exhibit 1 to the Interim Order, (b) the store-closing sale guidelines (the "Sale Guidelines") attached as Exhibit 2 to the Interim Order, with such sales to be free and clear of all liens, claims, encumbrances, and interests; and (ii) granting certain related relief, on an interim basis (collectively, the "Store

[1] The last four digits of the Debtor's federal taxpayer identification number are 8906. The Debtor's mailing address is 20101 Hamilton Avenue, Suite 350, Torrance, CA 90502.

Closing Relief"), and (2) following service of this Motion and after an opportunity to be heard at a final hearing (the "Final Hearing"), a final order (the "Final Order")[2] granting the Store Closing Relief on a final basis and authorizing the assumption of the Agreement. In support of this Motion, the Debtor incorporates the statements contained in the *Declaration of Amir Agam in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[3] filed contemporaneously herewith, and further respectfully state as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "Amended Standing Order"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105, 363, 364, 365, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004, 6006, and 6007.

## BACKGROUND

### A. General

2. On October 30, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Concurrently with this Motion, the Debtor has also filed certain other motions and applications seeking certain "first day" relief to enable the Debtor to maximize the value of its assets through a liquidation of its assets.

---

2 A proposed form of the Final Order will be filed with the Court prior to the Final Hearing.

3 Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

3. The Debtor has continued in possession of its properties and operates its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. No request has been made for the appointment of a trustee or examiner, and no official committee has been established in this chapter 11 case.

5. Additional information about the Debtor's business and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

**B. The Proposed Store Closing Sales and Pre-Petition Marketing Efforts**

6. As set forth in further detail in the First Day Declaration, the Debtor operates grocery stores in California, Nevada, and Arizona that principally focus on offering high-quality, freshly prepared, and ready-to-eat products. As of the date hereof, the Debtor has exhausted its prepetition restructuring options and commenced store closing sales (the "Store Closing Sales") at its retail locations (the "Closing Stores"). The Debtor's special committee of independent managers determined that the Store Closing Sales and the subsequent chapter 11 proceeding provided the best opportunity to maximize estate value for the Debtor's creditors and all interested parties.

7. Accordingly, in early October 2015, the Debtor and its advisors began contacting certain nationally-recognized potential liquidators (who are well suited to effectuate a transaction of this magnitude) to solicit interest in bidding on the right to conduct the Store Closing Sales. The Debtor discussed the Store Closing Sales with such nationally-recognized liquidator firms and solicited bids from these firms.

8. After extensive negotiations, with the assistance of personnel from FTI Consulting, Inc. ("FTI"), the Debtor selected the Agent to conduct the Store Closing Sales and

determined to liquidate the merchandise (the "Merchandise") and, at the Debtor's direction, furniture, fixtures, and equipment (the "FF&E") of the Closing Stores in accordance with the terms of the Agreement (the material terms of which are set forth below) and the Sale Guidelines. The Store Closing Sales commenced on or about October 23, 2015.

**C. The Agreement**

9. Under the terms of the Agreement, subject to this Court's approval of the attached Interim Order and Final Order, the Agent will serve as the exclusive agent to the Debtor for the purpose of conducting a sale of certain Merchandise and FF&E at the Closing Stores using the procedures outlined in the Sale Guidelines. The Debtor seeks to assume the Agreement so that it may leverage the experience and resources of the Agent in performing large-scale liquidations while retaining control over the sale process, which the Debtor believes will provide the maximum benefit to the estate.

10. The material terms of the Agreement are described in the summary chart below.[4]

| Provision | Description |
|---|---|
| Sale Term | On or about October 23, 2015 to November 15, 2015 |
| Agent's Undertakings | (a) provide qualified supervisors (the "Supervisors") engaged by Agent to oversee the management of the Stores;<br>(b) determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant and in compliance with the lease provisions for each Store, unless excused by consent of the landlord or order from a Court of competent jurisdiction;<br>(c) recommend appropriate discounts of Merchandise, staffing levels for the Stores, approved in advance by Merchant, and appropriate bonus and incentive programs, if any, for the Stores' employees, approved in |

[4] Capitalized terms used but not otherwise in this summary chart shall have the meanings ascribed to them in the Agreement. To the extent that this summary differs in any way from the terms set forth in the Agreement, the terms of the Agreement shall control.

| | |
|---|---|
| | advance by Merchant;<br><br>(d) oversee display of Merchandise for the Stores;<br><br>(e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses;<br><br>(f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties;<br><br>(g) assist Merchant in connection with managing and controlling loss prevention;<br><br>(h) provide recommendations to the Merchant with respect to DC Merchandise and DSD Merchandise and replenishment thereof and, in that regard, Agent will assist Merchant with preparing an allocation schedule, but in any event, strongly encourages Merchant to transfer DC Merchandise to the Stores no later than ten (10) days after the Sale Commencement Date;<br><br>(i) provide support (at no additional charge by Agent) in obtaining appropriate authorization and permits to conduct the Sale from state and local authorities (if applicable) at Merchant's sole cost and expense; and<br><br>(j) provide such other related services deemed necessary or appropriate by Merchant and Agent. |
| Merchant's Undertakings | (a) be the employer of the Stores' employees, other than the Supervisors supplied by the Agent;<br><br>(b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant;<br><br>(c) prepare and process all tax forms and other documentation;<br><br>(d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores;<br><br>(e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors;<br><br>(f) execute all agreements determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale;<br><br>(g) arrange for the ordinary maintenance of all point-of-sale equipment |

| | |
|---|---|
| | required for the Stores;<br><br>(h) to the extent included in the Sale, make arrangements for and provide for the shipment of DC Merchandise and DSD Merchandise to the Stores;<br><br>(i) provide Agent with reporting to enable Agent to properly oversee the Sale (the "Reports"); and<br><br>(j) ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement. |
| Agent Fee and Expenses | Provided the Gross Cost Recovery is no less than ninety-five percent (95%) (the "Base Fee Threshold"), Agent shall earn a fee equal to one percent (1%) of the aggregate Gross Proceeds of Merchandise sold at the Stores.<br><br>If the Gross Cost Recovery is less than the Base Fee Threshold, Agent shall not earn any fee for services.<br><br>If the Gross Cost Recovery is equal or greater than one hundred five percent (105%), Agent's fee shall be increased by one half of one percent (0.5%) for a total Agent's fee of one and one-half percent (1.5%) of the aggregate Gross Proceeds of Merchandise sold at the Stores. |
| FF&E | As set forth in the First Amendment, the Debtor exercised its discretion to have the Agent sell the FF&E in the Stores on a guaranteed return basis.<br><br>Specifically, Agent shall have the exclusive right to sell, transfer, or otherwise dispose of the FF&E at Stores, which FF&E at the Stores shall include (without limitation) all gondola, shelfing, refrigeration, all point of sale equipment, and checkout counters (collectively, the "Store FF&E").<br><br>Agent guarantees and agrees to pay Merchant $1,697,500 (the "Store Guarantee"), to be paid as follows: (x) 50% one business day after entry of an interim order approving the transactions contemplated by the Agreement, as amended, in form and substance reasonably satisfactory to Agent and Merchant; and (y) 50% one business day after entry of a final order approving assumption of the Agreement, as amended, in form and substance reasonably satisfactory to Agent and Merchant.<br><br>Until 5 p.m. (Pacific Time) on November 8, 2015 (the "Exclusion Deadline"), upon written notice to Agent in accordance with the Agreement (including by email) and subject to Merchant and Agent's agreement with respect to an adjustment to the Store Guarantee, Merchant shall have the option to exclude the then unsold Store FF&E at one or more Stores from the FF&E Sale (the "Exclusion Option"). Upon execution of the First Amendment, the Agent may market all Store FF&E for sale; provided, however, that between the date |

| | |
|---|---|
| | of the First Amendment and the Exclusion Deadline, the Agent may not consummate a sale of Store FF&E that is essential to the operation of a supermarket, such as gondola, shelving, refrigeration, point of sale equipment, or checkout counters, without first providing written notice to the Merchant in accordance with the Agreement (including by email) of a binding offer to sell in which case Merchant shall have three (3) days after receipt of such notice within which to exercise the Exclusion Option with respect to the Store(s) from which the Agent proposes to sell such essential Store FF&E; provided, however, further, that if Merchant does not exercise such Exclusion Option within such three-day period, Agent may consummate the sale of such essential Store FF&E without further notice or consent from Merchant; provided, however, further, that notwithstanding the foregoing, Agent may consummate the sale of non-essential Store FF&E prior to the Exclusion Deadline without further written notice or consent from Merchant. Upon receipt of written notice from the Merchant that Merchant is exercising the Exclusion Option, Agent and Merchant shall use commercially reasonable good faith efforts to agree upon an adjustment to the Store Guarantee, taking into consideration, among other things, Store FF&E that has been sold by Agent to third parties prior to receipt of such notice, costs and expenses then incurred by Agent with respect to the FF&E Sale (capped on a per Store basis at $5,000 for such option period), and the value, age, quantity, and quality of the Store FF&E to be excluded.<br><br>Provided the Agent pays the Store Guarantee in accordance with the Agreement, as amended, and orders of the Bankruptcy Court, Agent shall be entitled to retain all proceeds (net of applicable sales taxes) from the sale, transfer, or other disposition of the Store FF&E for Agent's sole and exclusive benefit free and clear of all liens, claims, encumbrances, and interests and shall have the right to transfer any Store FF&E to itself or its affiliates, in each case free of all liens, claims, encumbrances, and interests. Except with respect to Occupancy Expenses and the HAZMAT Expenses, Agent shall be responsible for the payment of all costs and expenses associated with the sale, transfer, or other disposition of the Store FF&E. Agent shall have the right to abandon any unsold Store FF&E without any liability to the Merchant or any other party.<br><br>In consideration of and effective upon payment by Agent of the Store Guarantee, the Agent shall have a first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon the Store FF&E and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of the Store FF&E (the "Agent Collateral") to secure the full payment and performance of all obligations of Merchant to Agent under the Agreement, as amended.<br><br>Upon entry of the Interim Order and payment of 50% of the Store Guarantee, the security interests and liens granted to the Agent with respect to the Agent Collateral shall be deemed properly perfected without the necessity of filing |

| | UCC-1 financing statements or any other documentation. Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Merchant), the Agent's security interests in and liens upon the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Interim Order, perfected, and (iii) senior to all other liens and security interests; provided, however, that (x) until entry of the Final Order and until the Merchant receives payment in full of the Store Guarantee, the security interests and liens granted to Agent hereunder shall be junior and subordinate in all respects to any existing security interests and liens in the Agent Collateral but solely to the extent and amount of the unpaid portion of the Store Guarantee, and (y) upon payment entry of the Final Order and payment in full of the Store Guarantee, all security interest or lien in the Store Collateral (other than the security interests and liens granted to the Agent) shall be transferred to the Store Guarantee. |
|---|---|

## RELIEF REQUESTED

11. By this Motion, the Debtor seeks the entry of (a) the Interim Order authorizing (i) the continuation of the Store Closing Sales in accordance with the Agreement and the Sale Guidelines, with such sales to be free and clear of all liens, claims, and encumbrances, and (ii) granting the related Store Closing Relief, and (b) the Final Order granting the Store Closing Relief on a final basis and authorizing the assumption of the Agreement.

## BASIS FOR RELIEF REQUESTED

### A. Assumption of the Agreement Is Authorized Under Section 365(a).

12. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The United States Court of Appeals for the Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

13. The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard. See In re AbitibiBowater Inc., 418 BR 815 (unpaginated) (Bankr. D. Del. Oct. 27, 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Indeed, "the sole issue is whether the rejection benefits the estate." In re HQ Global, 290 B.R. at 511.

14. The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. See In re Integrated Res., 147 B.R. at 656; see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attached to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor

in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate"); see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 42-43 (2d Cir. 1979); In re Riodizio, Inc., 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

15. Here, the Debtor has exercised its sound business judgment in determining that assumption of the Agreement is in the best interests of the Debtor and its estate, and accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. See, e.g., Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease. See, e.g., In re Philadelphia Newspapers, LLC, 424 BR 178, 182–83 (Bankr. E.D. Penn. Jan. 13, 2010).

16. As a key component of the Debtor's continuing efforts to preserve and maximize estate value, the Debtor has concluded, in its business judgment, that the assumption of the Agreement is beneficial to the Debtor's estate. Furthermore, after engaging in extensive, arms'-length negotiations with certain nationally recognized liquidators regarding the Store Closing Sales and conducting reasonable diligence, the Debtor determined that entering into the Agreement would provide the greatest return to the Debtor's estate for the Merchandise and

FF&E. Additionally, the Debtor believes that the terms set forth in the Agreement are fair and equitable and present the best path forward with respect to the Closing Stores.

17. In particular, the Agent's extensive expertise in conducting liquidation sales allows it to oversee and implement the Store Closing Sales, with the assistance of the Debtor's management, in an efficient and cost-effective manner. Assumption of the Agreement and the continuation of the Store Closing Sales at their current momentum will present tremendous cost savings that will certainly inure to the benefit of the Debtor's estate and all stakeholders. Accordingly, the Debtor has already dedicated substantial resources toward the Store Closing Sales.

18. Through October 30, 2015, the Store Closing Sales had generated approximately $17.3 million of sales proceeds for the Debtor.

19. If the Store Closing Sales are not permitted to go forward on an interim basis, and the Agreement is not ultimately assumed, the Debtor's estate would lose the benefit of the efforts that have already been expended by the Agent in commencing the Store Closing Sales. Any delay in conducting the Store Closing Sales would result in loss of value achieved and increased administrative expenses, including, but not limited to, additional rent payments resulting from the delay.

20. Therefore, the Debtor requests that the Court authorize the assumption of the Agreement.

**B. Sufficient Business Justification Exists for the Store Closing Sales Under Section 363(b).**

21. Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363(b) does not specify a standard

for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070–71 (2d Cir. 1983); In re Abbotts Dairies, Inc., 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp.); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in Abbotts Dairies); Dai-Icho Kangyo Bank v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999) (same).

22. As set forth above, the demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656.

23. Accordingly, similar store-closing or liquidation sales are routinely approved by courts in this district in chapter 11 cases involving retail debtors. See, e.g., Ames Dept. Stores, 136 B.R. at 359 (stating that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); see also In re Haggen Holdings, LLC, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015); In re RadioShack Corp., Case No. 15-15-10197 (KJC) (Bankr. D. Del. Feb. 6, 2015); In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014); In re Anchor Blue Holding Corp., Case No. 11-10110 (PJW) (Bankr. D. Del. Jan. 13, 2011); In re Samsonite Co. Stores, LLC, Case No. 09-13102 (PJW) (Bankr. D. Del. Sept. 10, 2009); In re Sportsman's Warehouse, Inc., Case No. 09-10990

(CSS) (Bankr. D. Del. Mar. 23, 2009); In re Goody's, LLC, Case No. 09-10124 (CSS) (Bankr. D. Del. Jan. 21, 2009).

24. The Debtor's decision to conduct the Store Closing Sales represents the best path forward to maximizing recoveries to the Debtor's estate with respect to the Merchandise and FF&E, is based upon its sound business judgment, and should thus be approved under section 363(b) of the Bankruptcy Code. The Agent, as a nationally recognized liquidation firm, has the experience necessary to assist the Debtor in monetizing the Merchandise and FF&E through an efficient and orderly process, and any interruption in the Store Closing Sales would harm the Debtor's ability to successfully monetize the Merchandise and FF&E. Absent such relief, the Closing Stores will impose a significant drain on the Debtor's liquidity. Upon the sale of the Merchandise and FF&E and the wind-up of the Closing Stores, the Debtor expects to realize an immediate benefit in terms of financial liquidity.

25. For the foregoing reasons, the Debtor requests that the Court approve the Debtor's continuation of the Store Closing Sales in accordance with the terms of the Agreement and the Sale Guidelines.

### C. The Sale of the Merchandise and FF&E Free and Clear of All Liens, Encumbrances, and Other Interests Is Authorized Under Bankruptcy Code Section 363(f).

26. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

27. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets and commencement of the Store Closing Sales "free and clear" of liens and interests. See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. See In re TWA Inc., 322 F.3d 283, 289 (3d Cir. 2003).

28. The Debtor submits that it is appropriate to sell the Merchandise and FF&E on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to the sale of the Merchandise and FF&E. In particular, the Debtor believes that at least section 363(f)(5) of the Bankruptcy Code will be met because the Debtor's prepetition secured lenders are secured by, among other things, the Merchandise and FF&E, and can be compelled to accept a money satisfaction of such interest. Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Merchandise and FF&E, the Debtor anticipates that it likewise will be able to satisfy one or more of the conditions set forth in section 363(f). The Debtor proposes that any liens, claims, and

encumbrances asserted against the Merchandise and FF&E be transferred to and attach to the amounts earned by the Debtor under the Store Closing Sales.

29. Accordingly, the Debtor proposes that section 363(f) authorizes the transfer and conveyance of the Merchandise and FF&E free and clear of any such claims, interests, liabilities, or liens

**D. The Court Should Grant a Lien to the Agent in Consideration of the Store Guarantee**

30. As noted above, pursuant to the Store Guarantee, the Agent will pay Merchant $1,697,500 (the "Store Guarantee"), to be paid as follows: (x) 50% one business day after entry of an interim order approving the transactions contemplated by the Agreement, as amended; and (y) 50% one business day after entry of a final order approving assumption of the Agreement. In consideration of and effective upon payment by Agent of the Store Guarantee, the Agent shall have a first priority, senior security interests in and liens (subject to the subordination provisions set forth herein) upon the Store FF&E and all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of the Store FF&E (the "Agent Collateral") to secure the full payment and performance of all obligations of Merchant to Agent under the Agreement.

31. To the extent such approval is required, approval of a lien to the Agent in the Agent Collateral is appropriate under sections 364(c) and (d) of the Bankruptcy Code, as the Debtor was unable to obtain the Store Guarantee on an unsecured basis, the provision of the Store Guarantee is necessary to help maximize the assets of the estate, any preexisting lienholder is adequately protected because such preexisting lien attaches to the Store Guarantee to the same extent and priority as existed on the Store FF&E, and the terms of the transaction with the Agent

are fair, reasonable and adequate under the circumstances. See In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test).

**E. The Court Should Approve the Proposed Sale Guidelines.**

32. As set forth in greater detail below, many Liquidation Laws (as defined below) require special and cumbersome licenses, waiting periods, time limits, and other procedures for store-closing and liquidation sales. Therefore, although the Debtor intends to comply fully with applicable state and local health, safety, and consumer-protection laws in connection with the Store Closing Sales, the Debtor seeks a waiver of compliance with the Liquidation Laws and requests the authority to conduct such sales in accordance with the Sale Guidelines.

33. The Debtor developed the Sale Guidelines with the intent to provide a means of controlling the administrative burdens on its estate that are associated with complying with the Liquidation Laws, while at the same time protecting the interests of its landlords and the applicable governmental agencies enforcing such laws. Moreover, the Sale Guidelines are in all material respects identical sale guidelines routinely approved by this Court, most recently in In re Haggen Holdings, LLC. E.g., Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) (approving sale guidelines, which in all material respects are identicial to the Sale Guidelines); Accordingly, the Debtor submits that the Sale Guidelines adequately address any concerns that its landlords or the governmental agencies may raise with respect to the Store Closing Sales and that, therefore, the requested relief below seeking the waiver of Liquidation Laws should be approved.

**F. Strict Compliance with the Liquidation Laws Should Be Waived.**

34. Certain states in which the Closing Stores are located have or may have licensing and other requirements governing the conduct of store-closing, liquidation, or other

inventory-clearance sales, including (but not limited to) state and local laws, statutes, rules, regulations, and ordinances related to store-closing and liquidation sales; establishing licensing, permitting, or bonding requirements; waiting periods; time limits; bulk sale restrictions; augmentation limitations that would otherwise apply to the Store Closing Sales; or consumer fraud laws, with the exception of deceptive-advertising laws (the "Liquidation Laws"). Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court-authorized, however, then a company need not comply with these Liquidation Laws.

35. The Debtor, therefore, requests that the Court authorize the Debtor to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Laws. Because the Debtor and its assets are subject to the Court's jurisdiction, see 28 U.S.C. § 1334, the Court will be able to supervise the Store Closing Sales. The Store Closing Sales are legitimate methods by which the Debtor can maximize the return from the sale of the Merchandise and FF&E for the benefit of its estate and creditors. Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

36. Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtor submits that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code. In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. See, e.g., Aloe v. Shenango Inc. (In re Shenango Grp., Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-

possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . . [A] state statute[ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").

37. While preemption of state law is not always appropriate, as when the protection of public health and safety is involved, see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.), 35 F.3d 1348, 1353–54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation. Id. at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Laws. See 11 U.S.C. § 105(a).

38. Here, section 363 of the Bankruptcy Code, which requires the Debtor to operate its business in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Laws because the Liquidation Laws constrain the Debtor's ability to marshal and maximize assets for the benefit of creditors. Similar relief has been granted in this and other bankruptcy cases in other jurisdictions. See, e.g., In re Haggen Holdings, LLC, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) (ordering that that the debtors were authorized to conduct store closing sales pursuant to the order and sale guidelines "without the necessity of further showing compliance" with liquidation laws); In re RadioShack Corp., Case No. Case No. 15-10197 (KJC) (Bankr. D. Del. Feb. 6, 2015) (ordering that that the debtors were authorized to conduct store closing sales in accordance with the order

"without the necessity of further showing compliance" with liquidation laws); In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that that the debtor was authorized to conduct store closing sales pursuant to the order and sale guidelines "without the necessity of further showing compliance" with liquidation laws); In re Boscov's, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Store Closing Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Store Closing Sales are conducted and advertised in compliance with this Order"); In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

39. Importantly, given the supervision of the Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sales. The Debtor only requests that the Court authorize the Debtor to conduct the Store Closing Sales without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, or satisfying any additional requirements with respect to advertising or conducting the Store Closing Sales as store-closings or similar-type sales. The Debtor fully intends to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

40. The Debtor also requests that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of Store Closing Sales, in the manner set forth in the proposed orders.

**G. The Court Should Waive Compliance with Any Restriction in the Leases.**

41. Certain of the Debtor's leases governing the Closing Stores contain or may contain provisions purporting to restrict or prohibit the Debtor from conducting store-closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. Ames Dep't Stores, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets"); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); In re Tobago Bay Trading Co., 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

42. In addition, courts in this district have held that restrictive lease provisions affecting store-liquidation sales in chapter 11 cases are unenforceable. See, e.g., In re Haggen

Holdings, LLC, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 15, 2015) (ordering that sale of merchandise be conducted notwithstanding any restrictive lease provisions); In re RadioShack Corporation, Case No. 15-10197 (KJC) (Bankr. D. Del. Feb. 6, 2015) (same); In re Coldwater Creek, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); In re Boscov's, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same). Thus, as a result of the above, and to the extent that such provisions or restrictions exist in any of the leases of the Closing Stores, the Debtor requests that the Court authorize the Debtor and the Agent to conduct any liquidation sales without interference by any landlords or other persons affected, directly or indirectly, by the liquidation sales.

### H. The Abandonment of Certain Property in Connection with the Store Closing Sales Is Justified.

43. Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, a debtor in possession "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." See Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (stating that a debtor "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim"); In re Grossinger's Assocs., 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995); see also Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Protection, 474 U.S. 494, 507, n.9 (1986) ("[A] trustee [in bankruptcy] may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards . . . . This exception to the abandonment power . . . is a narrow one."); In re Bryson, 53 B.R. 3, 4-5

(Bankr. M.D. Tenn. 1985) ("The effect of the abandonment is to remove the asset from the jurisdiction of the bankruptcy court.").

44. The Debtor intends to sell all Merchandise and should receive the Store Guarantee on account of the Store FF&E in exchange for the Agent's right to sell the Store FF&E for the Agent's sole and exclusive benefit. The Debtor and Agent acknowledge that not all of the Store FF&E may be sold, transferred or otherwise disposed of by the Agent. Accordingly, in the event that the Agent is unable to sell or dispose of any Merchandise or Store FF&E following the Store Closing Sales and exercises the Agent's right to abandon Store FF&E to the Debtor, or the Debtor determines that the costs associated with holding or selling certain Merchandise exceeds the proceeds that will be realized upon its sale or that such Merchandise is not sellable at all, it may be costly and burdensome to the Debtor's estate to retain such Merchandise or Store FF&E abandoned by the Agent. In addition, significant portions of the Debtor's inventory have limited shelf lives and therefore cannot be stored for extended periods of time. Thus, to the extent that the Agent does not sell any Merchandise or Store FF&E, the Debtor requests that it be authorized, but not directed, upon the conclusion of the Store Closing Sales or such later date as the Debtor may determine to abandon the same without incurring liability to any person or entity in order to maximize the value of the Debtor's assets and to minimize the costs to the estate. It is the Debtor's standard historical practice when closing stores to donate remaining inventory that cannot be sold to a local food pantry at the conclusion of the sale. Debtor requests that it be authorized, but not directed, upon the conclusion of the Store Closing Sales, to abandon remaining Merchandise by donating it to local food organizations.

45. Notwithstanding the foregoing, the Debtor and the Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtor's hardware, software, computers, cash registers, or similar equipment that are to be sold or abandoned.

**I. The Store Closing Sales Should Be Exempt from Any "Fast Pay" Laws.**

46. Certain states in which the Debtor operates have or may have laws and regulations that require the Debtor to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws"). In many cases, these laws require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. The sweeping nature of the Store Closing Sales contemplated by this Motion will result in a substantial numbers of employees being terminated during the Store Closing Sales.

47. As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies. Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

48. Under ordinary circumstances, the Debtor would have been able to pay individual store-level employees from the register at a store location upon termination and reconcile the payment amount after the fact. However, given the number of employees that will be terminated during the Sales, this will be impossible. Thus, it will be necessary to have the Debtor's payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check, and then prepare each such check for

mailing. With employee terminations on the scale necessitated by the Store Closing Sales, this process could easily take several days.

49. To be clear, the Debtor intends to pay its terminated employees as expeditiously as possible and under normal payment procedures. However, the requirements imposed by these state laws and regulations are unworkable in these extraordinary circumstances. If the Debtor is required to comply with these state laws and regulations, its efforts to wind down its operations and stem unnecessary payroll costs will be hampered tremendously. Indeed, if forced to comply, the Debtor will face the choice of (a) having to incur the costs of keeping employees "employed" after the conclusion of a Sale while payroll is prepared or (b) staging terminations to the detriment of the Debtor's estate. Both of these choices will provide no benefit to the Debtor's estate and will only increase the administrative costs of conducting the Store Closing Sales.

50. Accordingly, the Debtor respectfully submits that, in this instance, the Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and that, as such, the Debtor should be granted relief from their requirements. See, e.g., Coldwater Creek Inc., Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); Filene's Basement, LLC, Case No. 11-13511 (KJC) (Bankr. D. Del. Nov. 2, 2011) (same); In re Linens Holding Co., Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same); see also In re Borders Grp., Inc., Case No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (waiving "fast pay" laws and regulations in connection with approval of store closing sales); In re Linens Holding Co., Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (same).

**J. Appointment of a Consumer Privacy Ombudsman Is Unnecessary.**

51. Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code. The Debtor will not be selling or releasing personally identifiable information in the course of the Store Closing Sales. Therefore, appointment of a consumer privacy ombudsman is unnecessary.

## SATISFACTION OF BANKRUPTCY RULE 6003

52. Pursuant to Bankruptcy Rule 6003, any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code within 21 days of the Petition Date requires the Debtor to demonstrate that such relief "is necessary to avoid immediate and irreparable harm." There is no question that the Debtor's failure to continue to conduct the Store Closing Sales pursuant to the Agreement without interruption would likely result in immediate and irreparable harm to the Debtor's estate by detracting from, and potentially derailing, the Debtor's liquidation efforts that, as discussed above, are already well underway. Indeed, the Debtor believes that the sale of Merchandise will conclude within the next 13 days and the sale of Store FF&E will, ideally, be concluded November 30, 2015 if the value of the Debtor's assets is to be maximized. The Debtor pays rent of approximately $2.5 million per month for its operating stores. If the sale of inventory and FF&E is completed by November 30, 2015, the Debtor anticipates a significant number of its leased locations will be rejected prior to incurring December rent.

53. Moreover, as part of the Debtor's ability to maximize the value of the Store FF&E while simultaneously minimizing administrative occupancy expenses, the Debtor required the Agent to conclude the sale of the Store FF&E by November 30, 2015 and fund a

portion a portion of the Store Guarantee upon entry of the Interim Order. If the Interim Order is not immediately entered in connection with the initial hearing on this Motion, the Debtor will lose two critical benefits of the Agreement, as amended. First, the Debtor will not receive 50% of the Store Guarantee, which will negatively impact the Debtor's immediate cash flow needs and ability to operate in this chapter 11 case. Second, the Agent has advised the Debtor that the amount of the Store Guarantee and the Agent's willingness to incur costs and expenses directly related to the sale of the Store FF&E are contingent on immediate entry of the Interim Order. Thus, the Debtor seeks the emergency relief requested herein at the outset of this case.

54. For this reason and those set forth above, the Debtor respectfully submits that Bankruptcy Rule 6003 has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

55. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth throughout this Motion, any delay in the Debtor's ability to continue to conduct the Store Closing Sales without interruption would be detrimental to the Debtor, its creditors, and estate and would impair the Debtor's ability to optimize its business performance at this critical time as it begins the chapter 11 process.

56. For this reason and those set forth above, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Interim Order.

## NOTICE

57. Notice of this Motion shall be provided to: (i) the U.S. Trustee; (ii) the parties included on the Debtor's list of thirty (30) largest unsecured creditors, as identified in its chapter 11 petition; (iii) the Debtor's prepetition secured lenders; (iv) the Agent; and (v) all parties entitled to notice pursuant to Local Rule 9013-1(m). Due to the nature of the relief requested herein, the Debtor respectfully submits that no further notice of this Motion is necessary.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit A, granting, on an interim basis, (a) the Store Closing Relief, and (b) such other and further relief to the Debtor as the Court may deem proper, (ii) set a date for a Final Hearing on the Store Closing Relief sought in this Motion, (iii) establish objection and reply deadlines for the Final Hearing, and (iv) grant such other relief as the Court deems just and proper.

Dated: November 3, 2015
Wilmington, Delaware

COLE SCHOTZ P.C.

*/s/ Patrick J. Reilley*
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
David W. Giattino (No. 5614)
500 Delaware Avenue
Suite 1410
Wilmington, Delaware 19801

*Proposed Counsel to the Debtor and Debtor in Possession*