## <u>EXHIBIT 1</u>

**Combined Disclosure Statement and
Joint Chapter 11 Plan of Liquidation for Fresh & Easy, LLC**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| | : |
| In re: | : Chapter 11 |
| | : |
| FRESH & EASY, LLC,[1] | : Case No. 15-12220 (BLS) |
| | : |
| Debtor. | : |

**COMBINED DISCLOSURE STATEMENT AND
JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR FRESH & EASY, LLC**

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile:  302-652-3117

*Counsel for the Debtor and
Debtor in Possession*

**YOUNG CONAWAY
STARGATT & TAYLOR, LLP**
Robert S. Brady (No. 2847)
Michael M. Nestor (No. 3526)
Justin H. Rucki (No. 5304)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: 302-571-6600
Facsimile:  302-571-1253

*Special Counsel for Debtor and
Debtor in Possession*

Dated: February 21, 2017

**FOX ROTHSCHILD LLP**
Mette H. Kurth
Michael A. Sweet
1800 Century Park East
Suite 300
Los Angeles, CA 90067-1506
Telephone: 310-598-4150
Facsimile:  310-556-9828

-and-

L. John Bird (No. 5310)
919 North Market Street
Suite 300
Wilmington, DE 19801
Telephone: 302-654-7444
Facsimile:  302-656-8920

*Counsel for the Official Committee
of Unsecured Creditors*

---

[1]   The last four digits of the Debtor's federal taxpayer identification number are 8906.  The Debtor's mailing address is Howard Hughes Center, 6080 Center Drive, 6th Floor, Los Angeles, CA 90045.

i

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     DEFINITIONS AND CONSTRUCTION OF TERMS.........................................1

    A.    Definitions..................................................................................................... 1

    B.    Interpretation; Application of Definitions and Rules of Construction.................... 16

III.    BACKGROUND AND DISCLOSURES..............................................................16

    A.    The Debtor's Corporate Structure and Business...................................................... 16

        1.    The Debtor's Corporate Structure ............................................................ 16

        2.    Overview of the Debtor's Business ........................................................... 16

    B.    The Debtor's Prepetition Indebtedness ................................................................ 18

        1.    The Wells Fargo Facility ......................................................................... 18

        2.    Tesco Guaranty Debt .............................................................................. 19

        3.    Affiliated Unsecured Debt ....................................................................... 20

        4.    Other Unsecured Debt.............................................................................. 20

    C.    Events Precipitating the Chapter 11 Filing .......................................................... 20

    D.    The Chapter 11 Case ......................................................................................... 22

        1.    First Day Orders...................................................................................... 22

        2.    Interim Order Authorizing Post-Petition Financing ............................................ 23

        3.    Appointment of Committee ...................................................................... 23

        4.    Employment of Professionals and Advisors..................................................... 23

        5.    Sale of Assets.......................................................................................... 24

        6.    Rejection of Contracts and Unexpired Leases ................................................. 27

        7.    Claims Process and Bar Date.................................................................... 28

        8.    The Committee Litigation......................................................................... 31

        9.    Other Adversary Proceedings ................................................................... 33

        10. The FEFOS Master Lease Termination ........................................................ 36

        11. The Produce and Kitchen Facilities ........................................................... 37

        12. The Post-Petition Services Agreement ........................................................ 37

IV.     THE GLOBAL SETTLEMENT...........................................................................38

V.      TAX CONSEQUENCES OF THE PLAN ...........................................................44

VI.     CERTAIN RISK FACTORS TO BE CONSIDERED .........................................44

    A.    Risk Factors to Be Considered........................................................................... 44

        1.    The Plan May Not Be Accepted ............................................................... 44

        2.    The Plan May Not Be Confirmed .............................................................. 44

54567/0001-14098116v3

3.   Distributions to Holders of Allowed Claims Under the Plan ............................... 45

4.   Global Settlement May Not Be Approved........................................................... 45

5.   Conditions Precedent to Consummation of the Plan ........................................... 45

6.   Certain Tax Considerations................................................................................. 45

B.   Alternative Plan ........................................................................................................ 46

VII.   BEST INTERESTS AND FEASIBILITY........................................................................46

A.   Best Interests Test and Liquidation Analysis............................................................ 46

B.   Feasibility.................................................................................................................. 47

VIII.   SUMMARY OF DEBTOR'S ASSETS; SUMMARY OF TREATMENT OF CLAIMS
AND ESTIMATED RECOVERIES.................................................................................48

IX.   CONFIRMATION AND VOTING PROCEDURES .........................................................49

A.   Confirmation Procedures .......................................................................................... 49

1.   Confirmation Hearing ....................................................................................... 49

2.   Procedures for Objections.................................................................................. 49

3.   Requirements for Confirmation ......................................................................... 50

4.   Classification of Claims and Equity Interests.................................................... 50

5.   Impaired Claims or Equity Interests .................................................................. 50

6.   Eligibility to Vote on the Plan .......................................................................... 50

7.   Solicitation Notice ............................................................................................ 51

8.   Procedure/Voting Deadline and Opt-Out Election Deadline............................... 51

9.   Acceptance of the Plan...................................................................................... 52

10. Elimination of Vacant Class ............................................................................. 52

X.   TREATMENT OF UNCLASSIFIED CLAIMS................................................................52

A.   Supplemental Administrative Expense Bar Date........................................................ 52

B.   Administrative Claims ............................................................................................... 53

C.   PACA/PASA Claims ................................................................................................. 53

D.   WARN Act Liability.................................................................................................. 53

E.   Priority Tax Claims ................................................................................................... 54

F.   DIP Facility Claims................................................................................................... 54

G.   Payment of Statutory Fees ........................................................................................ 54

H.   Professional Fee Claims ............................................................................................ 54

1.   Final Fee Applications ....................................................................................... 54

2.   Substantial Contribution Compensation and Expenses Bar Date ........................ 55

XI.   CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .....................................55

XII.   TREATMENT OF CLAIMS AND EQUITY INTERESTS ..............................................55

iii

  A. Treatment of Claims ........................................................................................ 55

    1. Class 1 - Wells Fargo Secured Claim ................................................... 55

    2. Class 2 - Other Miscellaneous Secured Claims .................................... 56

    3. Class 3 – Priority Non-Tax Claims ....................................................... 56

    4. Class 4 – General Unsecured Claims .................................................... 57

    5. Class 5 – Subordinated Claims ............................................................. 57

    6. Class 6 – Equity Interests ...................................................................... 58

  B. Modification of Treatment of Claims and Equity Interests ...................................... 58

  C. Cramdown and No Unfair Discrimination ............................................................... 58

XIII. PROVISIONS REGARDING THE LIQUIDATING TRUST .......................................... 59

  A. Establishment and Administration of the Liquidating Trust ................................... 59

  B. Assets of the Liquidating Trust ................................................................................ 59

  C. Other Funds to be Transferred to the Liquidating Trust .......................................... 60

  D. Rights and Powers of the Liquidating Trust and the Liquidating Trustee ................ 60

  E. Liquidating Trust Interests ....................................................................................... 61

  F. Appointment of a Liquidating Trustee ...................................................................... 61

  G. Liquidating Trust Committee .................................................................................... 62

  H. Distributions to Holders of Allowed General Unsecured Claims ............................ 63

  I. Distributions to Holders of Administrative, Priority and Secured Claims .............. 64

  J. Requirement of Liquidating Trust ............................................................................ 64

  K. Accounts and Reserves ............................................................................................ 64

    1. Professional Fee Reserve ....................................................................... 64

    2. Administrative Claims Reserve ............................................................. 64

    3. WARN Reserve ..................................................................................... 65

    4. Other Reserves ...................................................................................... 65

    5. Exemption from Certain Transfer Taxes ............................................... 65

    6. Applicability of Section 1145 of the Bankruptcy Code ......................... 65

    7. Effectuating Documents; Further Transactions ..................................... 66

    8. Books and Records; Privilege Matters .................................................. 66

XIV. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN ......................... 67

  A. Method of Payment .................................................................................................. 67

  B. Distributions on Allowed Claims ............................................................................. 67

  C. Disbursing Agent ..................................................................................................... 67

  D. Objections to and Resolution of Claims ................................................................... 67

iv

E.  Claim Objection Deadline.........................................................................68

F.  No Distribution Pending Allowance.........................................................68

G.  Escrow of Cash Distributions .................................................................68

H.  Distributions After Allowance.................................................................68

I.  Investment of Segregated Cash and Property .........................................68

J.  Delivery of Distributions in General........................................................69

K.  Undeliverable and Unclaimed Distributions............................................69

L.  Escheatment ...........................................................................................70

M.  Minimum Distributions............................................................................70

N.  Fractional Dollars....................................................................................70

O.  Withholding and Reporting Requirements ..............................................70

P.  Setoffs ....................................................................................................71

Q.  Interest on Claims ...................................................................................71

R.  Disputed Claims Reserve........................................................................71

S.  Allocation of Distributions Between Principal and Interest .....................72

T.  Distribution Record Date ........................................................................72

U.  Claim Estimation ....................................................................................72

XV.  IMPLEMENTATION AND EFFECT OF CONFIRMATION OF THE PLAN...............72

A.  Means for Implementation of the Plan.....................................................72

1.  Funding of Liabilities and Distributions .........................................73

2.  Other Funds to be Transferred to the Liquidating Trust ..................73

3.  Corporate Action; Effectuating Documents; Further Transactions ....73

4.  Exemption from Securities Laws....................................................74

5.  Exemption Under Certain Taxes and Fees......................................74

XVI.  RELEASES, EXCULPATION, INJUNCTION AND BAR ORDER............................75

A.  Releases and Exculpation .......................................................................75

1.  Releases by the Debtor...................................................................75

2.  Consensual Third Party Releases by Certain Holders of Claims and Interests ....75

3.  Exculpation and Limitation of Liability ..........................................76

B.  Injunction ...............................................................................................77

C.  Bar Provision ..........................................................................................78

XVII.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES.........................................78

A.  Rejected Executory Contracts and Unexpired Leases .............................78

B.  Deadline for Filing Proofs of Claim Relating to Executory Contracts Rejected Pursuant to the Combined Plan and Disclosure Statement ......................79

XVIII. CAUSES OF ACTION ................................................................................................. 79

    A.    Retention of Causes of Action ............................................................. 79

    B.    Reservation of Rights ............................................................................ 80

XIX.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............................................................................................................ 80

    A.    Conditions Precedent to Confirmation ................................................. 80

    B.    Conditions Precedent to Effective Date ............................................... 80

    C.    Establishing the Effective Date ............................................................ 82

    D.    Waiver of Conditions ........................................................................... 82

XX.    RETENTION OF JURISDICTION ...................................................................... 82

    A.    Retention of Jurisdiction ...................................................................... 82

    B.    Retention of Non-Exclusive Jurisdiction by the Court ........................ 85

XXI.    MISCELLANEOUS PROVISIONS ..................................................................... 85

    A.    Amendments or Modifications of the Combined Plan and Disclosure Statement ........................................................................... 85

    B.    Severability of Plan Provisions ............................................................ 86

    C.    Successors and Assigns ........................................................................ 86

    D.    Revocation, Withdrawal or Non-Consummation ................................. 86

    E.    Supplements to Combined Plan and Disclosure Statement .................. 87

    F.    Binding Effect ...................................................................................... 87

    G.    Notices ................................................................................................. 87

    H.    Governing Law ..................................................................................... 87

    I.    Headings ............................................................................................... 88

    J.    Exhibits/Schedules ............................................................................... 88

    K.    Filing of Additional Documents ........................................................... 88

    L.    No Admissions ..................................................................................... 88

    M.    Successors and Assigns ........................................................................ 88

    N.    Reservation of Rights ........................................................................... 88

    O.    Implementation ..................................................................................... 88

    P.    Inconsistency ........................................................................................ 89

    Q.    Compromise and Settlement of Claims and Controversies ................... 89

    R.    Dissolution of the Committee ............................................................... 90

54567/0001-14098116v3

## EXHIBITS

Exhibit A       Settlement And Release Agreement

Exhibit B       Liquidating Trust Agreement

Exhibit C       Retained Causes Of Action

Exhibit D       Contracts To Be Assumed

---

**THE PLAN PROPONENTS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS COMBINED PLAN AND DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

---

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT FOR FRESH & EASY, LLC EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO  CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY.

---

**FOR EASE OF REFERENCE ONLY, AND WITH CERTAIN EXCEPTIONS, ARTICLES I THROUGH III HEREIN GENERALLY CONTAIN THE DISCLOSURE STATEMENT PROVISIONS AND ARTICLES IV THROUGH XXI HEREIN GENERALLY CONTAIN THE PLAN PROVISIONS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

---

I.
# INTRODUCTION[2]

Fresh & Easy, LLC, the debtor and debtor in possession in the above-captioned Chapter 11 Case, and the Official Committee of Unsecured Creditors  hereby propose the Combined Disclosure Statement (the "Disclosure Statement") and Joint Chapter 11 Plan of Liquidation for Fresh & Easy, LLC (the "Plan") pursuant to sections 1125 and 1129 of the Bankruptcy Code. The Debtor and the Committee are the proponents of the Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code.

The Combined Plan and Disclosure Statement provides for the Debtor's assets to be liquidated over time and for the proceeds of any assets already liquidated, or to be liquidated, to be distributed to Holders of Allowed Claims in accordance with the terms of the Combined Plan and Disclosure Statement and the priority of claims provisions of the Bankruptcy Code. The Combined Plan and Disclosure Statement also contemplates the creation of a trust, pursuant to the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, for the benefit of all Holders of Allowed General Unsecured Claims. Except as otherwise provided by order of the Court, distributions will occur on the Distribution Date or as soon thereafter as practicable and at various intervals thereafter.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Combined Plan and Disclosure Statement, the Plan Proponents expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement, one or more times, before its substantial consummation.

II.
# DEFINITIONS AND CONSTRUCTION OF TERMS

A.    **Definitions.**

As used in the Combined Plan and Disclosure Statement, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    **"503(b)(9) Claim"** means a Claim arising under section 503(b)(9) of the Bankruptcy Code against the Debtor, which Claims were to be Filed against the Debtor on or before the 503(b)(9) Claims Bar Date.

2.    **"503(b)(9) Claims Bar Date"** means February 26, 2016 at 5:00 p.m. (Pacific Time) as established by the PACA/PASA/503(b)(9) Bar Date Order.

3.    **"Administrative, Priority and Secured Claims Estimate"** means, as of the Effective Date, the face amount, exclusive of Professional Fee Claims, of all unpaid Claims that will be Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims.

---

[2]    Capitalized terms used in this Introduction shall have the meanings ascribed to such terms in Article II hereof.

1

4. **"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority in payment under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the Debtor (such as wages or salaries for services and payments for goods and other services and leased premises) and Claims by Governmental Units for taxes accruing after the Petition Date (but excluding Claims related to taxes accruing on or before the Petition Date); (b) Professional Fee Claims; (c) all fees and charges assessed against the Estate under 28 U.S.C. § 1930; (d) obligations designated as Administrative Claims pursuant to an order of the Court; and (e) 503(b)(9) Claims.

5. **"Administrative Claims Bar Date"** means February 19, 2016 at 5:00 p.m. (Pacific Time) for Administrative Claims (other than 503(b)(9) Claims and Professional Fee Claims) against the Debtor that arose, accrued or otherwise became due and payable at any time subsequent to the Petition Date but on or before December 31, 2015, as established by the Bar Date Order.

6. **"Administrative Claims Objection Deadline"** means the deadline for filing objections to any requests for payment of Administrative Claims, which deadline shall be one hundred twenty (120) days after the Effective Date, unless otherwise extended by order of the Court.

7. **"Administrative Claims Reserve"** means the reserve of Cash funded by the Debtor and maintained by the Liquidating Trust for the benefit of Holders of Allowed Administrative Claims (exclusive of Holders of Professional Fee Claims, the reserve for which Holders shall be the Professional Fee Reserve), Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims in an amount equal to the Administrative, Priority and Secured Claims Estimate.  For the avoidance of doubt, when setting this reserve amount, the Debtor and/or Liquidating Trust may take into consideration any amounts reserved by other parties on account of the same claims.

8. **"Affiliate"** means **"affiliate"** as defined in section 101(2) of the Bankruptcy Code.

9. **"Allowed"** means, when used in reference to a Claim within a particular Class, an Allowed Claim in the specified Class or of a specified type.

10. **"Allowed Claim"** means a Claim or any portion thereof (a) that has been allowed by a Final Order of the Court, (b) that has been Scheduled as a liquidated, non-contingent and undisputed Claim in an amount greater than zero in the Schedules, as the Schedules may have been amended with respect to such Claim on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Court, and that is not the subject of a Filed Proof of Claim, (c) that is the subject of a timely Filed Proof of Claim and either (i) no objection to its allowance has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Court or (ii) any objection to its allowance has been settled, waived through payment or withdrawn, or has been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount (x) in the Combined Plan and

2

Disclosure Statement or (y) after the Effective Date, by the Liquidating Trustee; provided, however, that with respect to an Administrative Claim, "Allowed Claim" means an Administrative Claim as to which a timely written request for payment has been made in accordance with applicable bar dates for such requests set by the Court (if such written request is required) in each case as to which (a) the Debtor or the Liquidating Trustee, as applicable, or any other party in interest (x) has not Filed an objection on or before the Administrative Claims Objection Deadline or the expiration of such other applicable period fixed by the Court or (y) has interposed a timely objection and such objection has been settled, waived through payment or withdrawn, or has been denied by Final Order, or (b) after the Effective Date, the Liquidating Trustee has allowed such Administrative Claim in a liquidated amount.  For purposes of computing Distributions under the Combined Plan and Disclosure Statement, a Claim that has been deemed "Allowed" shall not include interest, fees, costs or charges on such Claim from and after the Petition Date, except as provided in section 506(b) of the Bankruptcy Code or as otherwise expressly set forth in the Combined Plan and Disclosure Statement or as agreed to by the Liquidating Trustee.  Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.

11.    "**Avoidance Actions**" means any and all claims and causes of action of the Debtor arising under chapter 5 of the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549 and 550 thereof, or their state law analogs.

12.    "**Ballot**" means the ballot forms distributed with the Combined Plan and Disclosure Statement to Holders of Impaired Claims entitled to vote under Article IX herein in connection with the solicitation of acceptances of the Combined Disclosure Statement and Plan.

13.    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Case.

14.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms and the Local Rules, as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Case.

15.    "**Bar Date**" means, with respect to any particular Claim, the specific date set by the Court as the last day for Filing Proofs of Claim against the Debtor in the Chapter 11 Case for that specific Claim.

16.    "**Bar Date Order**" means the Order Pursuant to Sections 105, 501, 502, 503 and 1111(a) of the Bankruptcy Code, Bankruptcy Rules 2002 and 3003(c), and Local Rules 1009-2 and 2002-1(e), (I) Establishing Bar Dates for Filing Claims Against the Debtor and (II) Approving Form and Manner of Notice Thereof [Docket No. 457].

17.    "**Books and Records**" means any and all books and records of the Debtor, including any and all documents and any and all computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books

3

and records or data, along with books and records of the Debtor maintained by or in the possession of third parties, wherever located.

18.    "**Business Day**" means any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

19.    "**Cash**" means legal tender of the United States of America or equivalents thereof.

20.    "**Causes of Action**" means any and all claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and Claims, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case, through and including the Effective Date, that the Debtor and/or the Estate may hold against any Person or Entity, except those Persons and Entities released pursuant to Article XVI herein.  A non-exclusive list of retained Causes of Action is set forth on **Exhibit C** hereto.

21.    "**Chapter 11 Case**" means the chapter 11 case commenced by the Debtor and administered under case number 15-12220 (BLS) in the Court.

22.    "**Chapter 11 Individual Releases**" means the releases provided to the YFE Released Parties from any claims held by any holder of a claim against or interest in the Debtor in such holder's individual capacity (an "Individual Claim") unless such holder affirmatively opts out from granting the YFE Released Parties a release of an Individual Claim, as more fully described in Articles IV and XII herein.

23.    "**Claim**" means a claim against the Debtor, whether or not asserted, as such term is defined in section 101(5) of the Bankruptcy Code.

24.    "**Claimholder**" means the Holder of a Claim.

25.    "**Claims Agent**" means Epiq Bankruptcy Solutions, LLC, or any successor thereto.

26.    "**Claims Objection Deadline**" means the last day for filing objections to Claims (other than Disallowed Claims for which no objection or request for estimation is required), which day shall be ninety (90) days after the Effective Date, or such later date as may be ordered by the Court.

27.    "**Class**" means each category or group of Holders of Claims or Equity Interests that has been designated as a class in Articles VIII and XI herein.

28.    "**Collateral**" means any property or interest in property of the Debtor's Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not

4

subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

29.    "**Combined Plan and Disclosure Statement**" means this combined Disclosure Statement and Plan, including, without limitation, all exhibits, supplements, appendices and schedules thereto, either in present form or as the same may be altered, amended or modified from time to time.

30.    "**Committee**" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case.

31.    "**Confirmation**" means the entry of the Confirmation Order, subject to all conditions specified in Article XIX having been satisfied or waived pursuant to Article XIX.D.

32.    "**Confirmation Date**" means the date of entry of the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

33.    "**Confirmation Hearing**" means the hearing(s) before the Court to consider (i) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code; and (ii) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, and related matters pursuant to section 1128 of the Bankruptcy Code, as such hearing(s) may be adjourned or continued from time to time.

34.    "**Confirmation Order**" means the order entered by the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

35.    "**Consensual Third Party Releases**" means the releases set forth in Article XVI.A.2 herein.

36.    "**Consummation**" means the occurrence of the Effective Date.

37.    "**Contingent**" means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

38.    "**Court**" or the "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or such other court as may have jurisdiction over the Chapter 11 Case.

39.    "**Creditor**" means any Person or Entity that holds a Claim against the Debtor.

40.    "**CRO**" means Amir Agam, in his capacity as (i) financial advisor to the Debtor before the Petition Date, and (ii) Chief Restructuring Officer for the Debtor on and after the Petition Date.

41.    "**Debtor**" or "**Company**" means Fresh & Easy, LLC, a Delaware Limited Liability Company, f/k/a Y-Opco, LLC.

5

42.    "**DIP Facility Claim**" means a claim arising under or related to the Interim Order (I) Authorizing Debtor in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Granting Liens and Superiority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. § 364; (III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Credit Parties and Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2 [Docket No. 74] (the " Interim Order Authorizing Post-Petition Financing").

43.    "**Disallowed**" means, when used in reference to a Claim, a Claim or any portion thereof that (i) has been disallowed by a Final Order, (ii) is Scheduled at zero or as contingent, disputed or unliquidated and as to which no Proof of Claim has been Filed by the Bar Date or deemed timely Filed with the Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, (iii) is not Scheduled, and as to which (a) no Proof of Claim has been Filed by the Bar Date or deemed timely Filed with the Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, and (b) no request for payment of an Administrative Claim has been Filed by the Administrative Claims Bar Date or deemed timely Filed with the Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, or (iv) after the Effective Date, has been disallowed in a written agreement by and between the Liquidating Trustee and the Holder of such Claim.

44.    "**Disbursing Agent**" means (i) on or prior to the Effective Date, the Debtor, and (ii) after the Effective Date, the Liquidating Trustee; provided, however, that the Debtor or the Liquidating Trustee may, in its discretion, retain a third party to act as Disbursing Agent.

45.    "**Disputed**" means, when used in reference to a Claim, a Claim or any portion thereof that is neither an Allowed Claim nor a Disallowed Claim.  A Claim may be a Disputed Claim as a result of unresolved objections, set-offs, or potential Causes of Action related to the Claimant.

46.    "**Disputed Claim Amount**" means (i) if a liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (a) the liquidated amount set forth in the Proof of Claim relating to a Disputed Claim; (b) an amount agreed to by the Debtor or the Liquidating Trustee, as applicable, and the Holder of such Claim; or (c) if a request for estimation is Filed by any party, the amount at which such Claim is estimated by the Court; (ii) if no liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (a) an amount agreed to by the Debtor or the Liquidating Trustee, as applicable, and the Holder of such Claim or (b) the amount estimated by the Court with respect to such Disputed Claim; or (iii) if the Claim is a Disallowed Claim, zero.

47.    "**Disputed Claims Reserve**" means the reserve established and maintained by the Liquidating Trust pursuant to and in accordance with the terms of the Liquidating Trust Agreement for the payment of Disputed Claims that become Allowed Claims after the Effective Date.  The Disputed Claims Reserve shall be maintained by the Liquidating Trust in a segregated account.  For the avoidance of doubt, when setting this reserve amount, the

6

Debtor and/or Liquidating Trust may take into consideration any amounts reserved by other parties on account of the same claims.

48.     "**Distributions**" means the distributions to be made by the Disbursing Agent in accordance with the Combined Plan and Disclosure Statement of, as the case may be: (i) Cash or (ii) any other consideration or residual value distributed to Holders of Allowed Claims under the terms and provisions of the Plan.

49.     "**Distribution Date**" means the Effective Date or the date, occurring as soon as practicable after the Effective Date, on which the initial Distributions are made to Holders of Allowed Claims.

50.     "**Distribution Record Date**" means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions under the Combined Plan and Disclosure Statement on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order or any subsequent Court order.

51.     "**Effective Date**" means the first Business Day on which all conditions to the consummation of the Plan set forth in Article XIX.B hereof have been satisfied or waived in accordance with Article XIX.D.

52.     "**Effective Date Free Cash**" means all Cash of the Debtor as of the Effective Date, other than Cash required to fund the Administrative Claims Reserve, the Professional Fee Reserve, the Disputed Claim Reserve and the WARN Reserve.

53.     "**Entity**" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

54.     "**Equity Interests**" means the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person or Entity in the Debtor, including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, partnership interests in the Debtor's stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtor or obligating the Debtor to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated stock or a similar security.

55.     "**Estate**" means the estate of the Debtor created under section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case on the Petition Date.

56.     "**Executory Contract**" means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

7

57.    "**Exhibit**" means an exhibit attached to the Combined Plan and Disclosure Statement.

58.    "**Face Amount**" means (i) when used in reference to a Disputed or Disallowed Claim, the Disputed Claim Amount, and (ii) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

59.    "**FEFOS**" means FEFOS, LLC.

60.    "**FF&E**" means furniture, fixtures and equipment.

61.    "**File**," "**Filed**" or "**Filing**" means, respectively, file, filed or filing with the Court or its authorized designee in the Chapter 11 Case.

62.    "**Final Fee Applications**" means an application for final allowance of a Professional's aggregate fee and expense claim in connection with this Chapter 11 Case.

63.    "**Final Order**" means an order of the Court (x) as to which the time to appeal, petition for certiorari, or move for reargument, rehearing or new trial has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, rehearing or new trial shall then be pending; (y) as to which any right to appeal, petition for certiorari, reargue, rehear or retry shall have been waived in writing; or (z) in the event that an appeal, writ of certiorari, reargument, rehearing or new trial has been sought, as to which (i) such order of the Court shall have been affirmed by the highest court to which such order is appealed, (ii) certiorari has been denied as to such order, or (iii) reargument or rehearing or new trial from such order shall have been denied, and the time to take any further appeal, petition for certiorari or move for reargument, rehearing or new trial shall have expired without such actions having been taken.

64.    "**Fresh & Easy**" means the Debtor, Fresh & Easy, LLC, a Delaware Limited Liability Company.

65.    "**Fresh Foods**" means Fresh Foods, LLC, f/k/a Campus Opco, LLC.

66.    "**General Bar Date**" means February 19, 2016 at 5:00 p.m. (Pacific Time) for Claims arising or deemed to arise on or before the Petition Date, except any governmental unit claims, as established by the Bar Date Order.

67.    "**General Unsecured Claim**" means a Claim against the Debtor that is not an Administrative Claim, Priority Tax Claim, Miscellaneous Secured Claim, Priority Non-Tax Claim, or Subordinated Claim.

68.    "**Global Settlement**" has the meaning set forth in Article IV of the Plan.

69.    "**Governmental Unit**" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

8

70. "**Holder**" means an Entity holding a Claim, Equity Interest or Liquidating Trust Interest.

71. "**Impaired**" means, when used in reference to a Claim or Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72. "**Impaired Class**" means a Class of Claims or Equity Interests that is Impaired.

73. "**Indemnified Persons**" means the (i) Liquidating Trustee, (ii) Liquidating Trust Committee, and (iii) members of the Liquidating Trust Committee in their capacities as such, and (iv) with respect to any of the foregoing, any such Entity's current equity holders (including shareholders, partnership interest holders and limited liability company unit holders), affiliates, partners, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, together with their respective predecessors, successors and assigns (in each case, solely in their capacity as such).

74. "**Interim Approval and Procedures Order**" means the Order (A) Approving Disclosure Statement on an Interim Basis; (B) Scheduling Combined Hearing on Final Approval of the Disclosure Statement and Confirmation of Plan; (C) Establishing Deadlines and Procedures for (I) Filing Objections to Final Approval of the Disclosure Statement and Confirmation of Plan, (II) Claim Objections and (III) Temporary Allowance of Claims for Voting Purposes; (D) Determining Treatment of Certain Unliquidated, Contingent or Disputed Claims for Notice, Voting and Distribution Purposes; (E) Setting Record Date; (F) Approving (I) Solicitation Packages and Procedures for Distribution, (II) Form of Notice of Hearing on Confirmation and Related Matters and (III) Forms of Ballots; (G) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (H) Granting Related Relief [Docket No. 1900].

75. "**IRS**" means the Internal Revenue Service.

76. "**Lien**" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

77. "**Liquidating Trust**" means the trust described in Article XIII of the Combined Plan and Disclosure Statement to be established under Delaware trust law that shall effectuate the wind down of the Debtor and make Distributions pursuant to the terms of the Combined Plan and Disclosure Statement and Liquidating Trust Agreement.  With respect to any action required or permitted to be taken by the Liquidating Trust, the term includes the Liquidating Trustee or any other person authorized to take such action in accordance with the Liquidating Trust Agreement.

78. "**Liquidating Trust Agreement**" means the agreement, substantially in the form attached hereto as **Exhibit B**, establishing the Liquidating Trust in conformity with the provisions of the Combined Plan and Disclosure Statement, which shall be approved in the Confirmation Order and entered into by the Debtor, on behalf of the Liquidating Trust

beneficiaries, and the Liquidating Trustee on the Effective Date pursuant to the terms of the Combined Plan and Disclosure Statement.

79.    "**Liquidating Trust Assets**" means (i) the Liquidating Trust Claims, (ii) the Effective Date Free Cash, (iii) the membership interest in Fresh & Easy, LLC and (iv) all other assets of the Debtor as of the Effective Date, with the exception of liquor licenses (as addressed below); provided, however, that, except as otherwise provided herein, the Liquidating Trust Assets shall not include Cash required to fund the Administrative Claims Reserve, the Professional Fee Reserve, and the WARN Reserve.  For the avoidance of doubt, and to facilitate the sale and/or transfer of liquor licenses, all of the Debtor's rights, title and interests in liquor licenses shall be retained by Fresh & Easy, LLC.

80.    "**Liquidating Trust Claims**" means all Causes of Action.

81.    **"Liquidating Trust Committee"** means the committee created hereunder and appointed pursuant to the terms of the Liquidating Trust Agreement that shall provide oversight and direction to the Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement.

82.    "**Liquidating Trust Interests**" means the uncertificated beneficial interests in the Liquidating Trust representing the right of Holders of Allowed General Unsecured Claims to receive Distributions from the Liquidating Trust in accordance with Article XIII of the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

83.    "**Liquidating Trust Proceeds**" means the Cash proceeds generated by the Liquidating Trust after the Effective Date of the Plan.

84.    "**Liquidating Trust Termination Date**" has the meaning ascribed to such term in Article XIII of the Combined Plan and Disclosure Statement.

85.    "**Liquidating Trustee**" means Peter Kravitz of Province, Inc., or any successor appointed in accordance with the Liquidating Trust Agreement.

86.    "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

87.    "**Miscellaneous Asset Sale Order**" means the Order Authorizing and Approving Procedures for the Sale or Abandonment of Miscellaneous Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (II) Granting Certain Related Relief [Docket No. 288].

88.    **"Miscellaneous Secured Claim"** means a Claim (i) that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or (ii) that is subject to setoff under section 553 of the Bankruptcy Code and such right of setoff has been asserted by the holder of such right prior to the Confirmation Date in a properly Filed motion for relief from the automatic stay, to the extent of the value of the Claimholder's interest in the Estate's interest in

such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

89.     "**Objection(s)**" means any objection, application, motion, complaint or other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

90.     "**OCP Order**" means the Order Pursuant to 11 U.S.C. §§ 105(a), 327, 330, and 331, Fed. R. Bankr. P. 2014, and Del. Bankr. L.R. 2014-1 Authorizing the Employment and Payment of Professionals Used in the Ordinary Course of Business, *Nunc Pro Tunc* to the Petition Date [Docket No. 290].

91.     "**Official Bankruptcy Forms**" means the Official Bankruptcy Forms, prescribed by the Judicial Conference of the United States, the observance and use of which are required pursuant to Bankruptcy Rule 9009, as such forms may be amended, revised or supplemented from time to time.

92.     "**Opt-Out Election Deadline**" means April 17, 2017 at 4:00 p.m. (Pacific Time), the date and time by which all Ballots containing an election to opt-out of the Consensual Third Party Releases must be received by the Voting Agent in order to be considered, as set forth in the Interim Approval and Procedures Order.

93.     "**Ordinary Course Professionals**" or "**OCP**" means those professionals authorized to be retained and compensated by the Debtor pursuant to the **OCP Order.**

94.     "**PACA/PASA Bar Date**" means February 8, 2016 at 5:00 p.m. (Pacific Time) as established by the PACA/PASA/503(b)(9) Bar Date Order.

95.     "**PACA/PASA/503(b)(9) Bar Date Order**" means the Order (1) Pursuant to Sections 105(a), 363(b), 503(b), 1107(a) and 1108 of the Bankruptcy Code, Establishing Exclusive Procedures for the Assertion, Resolution and Satisfaction of Prepetition Claims Arising Under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act of 1921, and (2) Pursuant to Sections 105(a) and 503(b)(9) of the Bankruptcy Code, Establishing Exclusive Procedures for the Assertion, Resolution, Allowance and Satisfaction of Claims Arising Under Section 503(b)(9) of the Bankruptcy Code [Docket No. 472].

96.     "**PACA/PASA Claim**" means a Claim arising under the Perishable Agricultural Commodities Act and/or the Packers and Stockyards Act of 1921 ("PASA"), which were to be Filed against the Debtor on or before the PACA/PASA Claims Bar Date.

97.     "**PACA/PASA Escrow**" means the $3.7 million in funds originally reserved for the payment of PACA/PASA Claims pursuant to the Interim Order Authorizing Post-Petition Financing [Docket No. 74] and any remaining amounts of those funds still in reserve.

98.     "**Periodic Distribution Date**" means any date selected by the Liquidating Trustee, as approved by the Liquidating Trust Committee, for making a Distribution to Holders of Allowed Claims in accordance with Section [●] of the Liquidating Trust Agreement.

99.     "**Person**" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

100.    "**Petition Date**" means October 30, 2015, the date on which the Debtor Filed its petition for relief commencing the Chapter 11 Case.

101.    "**Plan Proponents**" means the Debtor and the Committee.

102.    "**Plan Supplement**" means the compilation(s) of documents and forms of documents, including any exhibits to the Plan not included herewith, that the Debtor shall File with the Court on or before the Plan Supplement Filing Date.

103.    "**Plan Supplement Filing Date**" means the date on which the Plan Supplement shall be Filed with the Court, which date shall be at least ten (10) days prior to the Voting Deadline or such other date as may be approved by the Court without further notice to parties in interest.

104.    "**Priority Claims**" means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

105.    "**Priority Non-Tax Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

106.    "**Priority Tax Claim**" means any Claim accorded priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

107.    "**Privilege**" means the attorney client privilege, work product protections or other immunities (including those related to common interests or joint defenses with other parties), or protections from disclosure of any kind held by the Debtor or its Estate.

108.    "**Professional**" means any professional employed by the Debtor or the Committee in the Chapter 11 Case pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code and any professionals seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code, other than Ordinary Course Professionals.

109.    "**Professional Fee Bar Date**" means the deadline for Filing all applications for Professional Fee Claims, which shall be forty-five (45) days after the Effective Date, as set forth in Article X hereof.

110.    "**Professional Fee Claim**" means a Claim of a Professional pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code for compensation or reimbursement of costs and expenses (including any success fees, transaction fees, or other

back-end fees) relating to services performed after the Petition Date and prior to and including the Effective Date.

111.    "**Professional Fee Estimate**" means (i) with respect to any Professional, a good-faith estimate of such Professional's anticipated accrued unpaid Professional Fee Claims as of the Effective Date to be provided by each Professional in writing to the Debtor prior to the commencement of the Confirmation Hearing, or in the absence of such a writing, to be prepared by the Debtor, and (ii) collectively, the sum of all individual Professional Fee Estimates.

112.    "**Professional Fee Order**" means the Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals [Docket No. 291].

113.    "**Professional Fee Reserve**" means the reserve of Cash funded by the Debtor (or the Liquidating Trust, if necessary) and maintained by Young Conaway Stargatt & Taylor, LLP for the benefit of Holders of Allowed Professional Fee Claims in an amount equal to the Professional Fee Estimate.

114.    "**Proof of Claim**" means any proof of claim (which must be Filed before the applicable Bar Date), which term shall include a request for payment of an Administrative Claim (other than 503(b)(9) Claims and Professional Fee Claims).

115.    "**Pro Rata**" means, at any time, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class, unless the Plan provides otherwise.

116.    "**Rejection Bar Date**" means, as defined in the Bar Date Order, the deadline by which a counterparty to a rejected Executory Contract or an Unexpired Lease of the Debtor must File a Proof of Claim for damages resulting from the rejection of such Executory Contract or Unexpired Lease by the Debtor, which deadline shall be the later of: (a) the General Bar Date; (b) thirty (30) days after the entry of an order by the Court authorizing such rejection; or (c) such other date, if any, as the Court may fix in the order authorizing such rejection. Notwithstanding the foregoing, if the rejection by the Debtor, pursuant to the Combined Plan and Disclosure Statement, of an Executory Contract or Unexpired Leases gives rise to a Claim, a proof of Claim must be filed with the Claims Agent, by no later than thirty (30) days after the later of (i) notice of entry of the Confirmation Order, or (ii) other notice that the Executory Contract or Unexpired Lease has been rejected. Any proofs of Claim not filed and served within such time periods will be forever barred from assertion against the Debtor and its Estate

117.    "**Release Consideration**" means the $2,500,000.00 of the Settlement Payment expressly earmarked solely for the Releasing Creditors (as defined in the Settlement Agreement), which Release Consideration shall be distributed on a Pro Rata basis to such Releasing Creditors.

118.    "**Released Parties**" means the (a) Debtor, (b) the current and former directors, officers and managers of the Debtor, (c) employees or agents of the Debtor, (d) attorneys, financial advisors, accountants, investment bankers, investment advisors, consultants, agents, representatives and other Professionals of the Debtor, (e) the CRO, (e) the Special Committee, and (f) the YFE Released Parties.

119.    **"Scheduled"** means, with respect to any Claim, the status and amount, if any, of that Claim as set forth in the Schedules.

120.    **"Schedules"** means the schedules of assets and liabilities, schedules of executory contracts and statement of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009 or any orders of the Court.

121.    **"Settlement Agreement"** means the Settlement and Release Agreement by and between the Debtor, the Committee, the YFE Parties and Yucaipa, as described in Article IV of the Plan.

122.    **"Settlement Payment"** has the meaning set forth in Article IV hereof.

123.    **"Special Committee"** means the committee comprised of two independent managers, Terrence Wallock and Richard E. Newsted (deceased November 5, 2015) (the "Independent Managers"), which subsequent to Mr. Newsted's death, was comprised solely of Terrence Wallock.

124.    **"Subordinated 510(b) Claim"** means any Claim subordinated pursuant to section 510(b) or 510(c) of the Bankruptcy Code, including pursuant to a Final Order of the Court.

125.    **"Substantial Contribution Claim"** means a Claim under subsections 503(b)(3), (b)(4) or (b)(5) of the Bankruptcy Code for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Case.

126.    **"Supplemental Administrative Claims Bar Date"** means the date that falls on the thirtieth (30th) day following the Effective Date for Administrative Claims (other than 503(b)(9) Claims and Professional Fee Claims), against the Debtor that arose, accrued or otherwise became due and payable at any time subsequent to December 31, 2015 but on or before the Effective Date, by which Holders of Administrative Claims shall File with the Court and serve on the Debtor or the Liquidating Trustee, as applicable, requests for payment, in writing, together with supporting documents, substantially complying with the Bar Date Order, the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

127.    **"Tax Code"** means the Internal Revenue Code of 1986, as amended.

128.    **"Unclaimed Distributions"** means any undeliverable or unclaimed Distributions.

129.    **"Unexpired Lease"** means a lease to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

130.    **"Unimpaired"** means, when used in reference to a Claim or a Class, a Claim or a Class that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

131.    **"USDA"** means the United States Department of Agriculture.

132.    **"UST"** means the United States Trustee for Region 3.

133.    **"UST Fees"** means fees payable pursuant to 28 U.S.C. § 1930.

134.    **"Voting Agent"** means Epiq Bankruptcy Solutions, LLC, or any successor thereto.

135.    **"Voting Deadline"** means April 17, 2017, at 4:00 p.m. (Pacific Time), the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted, as set forth by the Interim Approval and Procedures Order.

136.    **"WARN Act"** means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2100 *et seq.*

137.    **"WARN Adversary Proceedings"** means the Cote Adversary and the Chan Adversary (as defined herein) pending in the Court seeking to recover damages on account of alleged violations of the WARN Act and its California counterpart, California Labor Code §§ 1400 *et seq.*

138.    "**WARN Act Liability**" means any and all claims, damages or other liability arising from or relating to any actual or alleged violations involving the Debtor, YFE, or Yucaipa of the WARN Act and/or California Labor Code §§ 1400 *et seq.*

139.    **"WARN Litigation"** means the WARN Adversary Proceedings and any and all state court litigation alleging violations of the WARN Act and its California counterpart, California Labor Code §§ 1400 *et seq.*

140.    **"WARN Reserve"** means a cash reserve for the payment of any Allowed WARN Act Liability.  The WARN Reserve is separate from the Administrative Claims Reserve, as set forth in Article XIII.J herein.

141.    **"YFE"** means YFE Holdings, Inc.

142.    **"YFE Parties"** means YFE, Fresh Foods, FEFOS, Ronald W. Burkle, Ira L. Tochner, Robert P. Bermingham, and James W. Keyes.

143.    **"YFE Released Parties"** means YFE Parties and Yucaipa, together with each of their respective predecessors, successors, and current and former affiliates, members, partners, shareholders, officers, directors, managers, agents, employees, attorneys (including Gibson, Dunn & Crutcher, LLP), insurers, reinsurers, and representatives, including, but not limited to, Peter McPhee, Stephanie Bond, Steve Mortensen, Derex Walker, Henry Orren, Mary Kasper, Mark Orr, Tom Dahlen, Terrence Wallock, and Catherine Schneider.

144.    **"Yucaipa"** means The Yucaipa Companies, LLC.

15

B.     **Interpretation; Application of Definitions and Rules of Construction**

Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter.  Unless otherwise specified, all section, article, schedule or exhibit references in the Combined Plan and Disclosure Statement are to the respective section in, article of, schedule to, or Exhibit to the Combined Plan and Disclosure Statement.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in the Combined Plan and Disclosure Statement.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Plan and Disclosure Statement.  A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.  The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement.

III.
**BACKGROUND AND DISCLOSURES**

On the Petition Date, the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the Court, initiating this Chapter 11 Case.  After the Petition Date, the Debtor has continued in possession of its properties and has continued to wind down its business operations as a debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

A.     **The Debtor's Corporate Structure and Business**

1.     **The Debtor's Corporate Structure**

The Debtor is a Delaware limited liability company with YFE as its sole member.  The Debtor's affiliates include (i) non-debtor Fresh Foods and (ii) non-debtor FEFOS.

2.     **Overview of the Debtor's Business**[3]

The Debtor historically operated retail grocery stores in California, Nevada and Arizona that principally focused on offering high-quality, freshly prepared and ready-to-eat products.

The "Fresh & Easy" brand was founded in 2006 through affiliates of Tesco PLC ("Tesco"), a large grocery retailer based in the United Kingdom.  The entities then comprising the "Fresh & Easy" branded enterprise filed voluntary petitions for chapter 11 bankruptcy relief on September 30, 2013, in the Court, which cases were jointly administered through the lead

---

[3]     The information contained in Article III.A-C is from the Declaration of Amir Agam in Support of Chapter 11 Petition and First Day Motions [Docket No. 10].

case *In re: Fresh & Easy Neighborhood Market Inc., et al.,* Case No. 13-12569 (KJC) (the "Prior Chapter 11 Case").[4]

In accordance with a court-approved sale process and related bid procedures, the Debtor's parent company, YFE, won the right for it, or one or more of its designees, to purchase assets sufficient to allow it to operate (i) 167 operating stores and 14 "work in progress" or otherwise nonoperating stores; (ii) production facilities in Riverside, California including a separate meat facility (the "Meat Facility"), a fresh produce facility (the "Produce Facility") and a kitchen facility (the "Kitchen Facility," and collectively with the Meat Facility and the Produce Facility, the "Campus Facilities"), each housed in its own building, providing "Fresh & Easy" branded fresh food products; and (iii) a 680,000 square foot distribution facility (the "Distribution Facility") located near the Campus Facilities. An order approving the sale (the "Prior Sale") to YFE was entered on November 22, 2013.[5]

After the Prior Sale was approved, but prior to its closing, YFE formed two subsidiaries to serve as its designees, each a Delaware limited liability company with YFE as its sole member: (i) the Debtor; and (ii) Fresh Foods. After the closing, YFE formed a third subsidiary, FEFOS, which was also a Delaware limited liability company with YFE as its sole member.

As part of the Prior Sale, the real estate comprising the Meat Facility, the Produce Facility and the Kitchen Facility was transferred to Fresh Foods, and individual store leases were each transferred to Fresh & Easy. The Distribution Facility and fourteen (14) store locations were sold by the debtors in the Prior Chapter 11 Case to EM-50 UAV SLBCO LLC ("Fortress"), an entity formed by Fortress Investment Group LLC, and which served as YFE's designee in its purchasing rights. Fortress then entered into lease agreements with Fresh & Easy. Certain other real estate owned in fee simple was also transferred to Fresh & Easy directly, and was later transferred by Fresh & Easy to FEFOS pursuant to a Real Estate Purchase and Sale Agreement dated April 28, 2014, and effective as of such date (the "FEFOS Agreement").

Under the FEFOS Agreement, FEFOS received the real estate at 19 locations listed therein, but did not obtain any ownership of intellectual property, signage, furniture, fixtures, equipment or inventory at these locations, all of which remained with Fresh & Easy. Substantially contemporaneous with the FEFOS transaction, Fresh & Easy entered into a rent-free lease with FEFOS for certain of the properties for two years, terminable on thirty days' notice, but remained liable for the real property taxes relating to the properties sold to FEFOS.

Fresh Foods sold the Meat Facility to an affiliate of JBS S.A. ("JBS") in August, 2015. Thereafter, the Debtor continued to purchase product from the Meat Facility pursuant to that certain Meat Supply Agreement dated November 18, 2014, entered into by and between the Debtor and JBS. The Debtor also continued production operations at the Produce Facility and Kitchen Facility.

---

[4]    Certain of the facts set forth in this paragraph are from the Declaration of James Dibbo in Support of Chapter 11 Petitions and First Day Motions and Applications, filed at Docket No. 3 in the Prior Chapter 11 Case.

[5]    See Prior Chapter 11 Case, Docket No. 378.

17

In an effort to mitigate operational losses, the Debtor closed 56 stores in late March 2015. Approximately four months later, an additional 14 stores were closed, leaving the Debtor with 97 operating stores, 70 "dark" stores, 13 "work in process" stores, and the ongoing operation of the Distribution Facility.  Thereafter, but prior to the Petition Date, the Debtor affirmatively vacated a majority of the "dark" store locations by unequivocally surrendering possession to applicable landlords and successfully terminating its lease obligations with respect to 22 "dark" stores through three (3) negotiated terminations and 19 lease assignments.

The Debtor's revenue from its retail operations, excluding sales taxes and deducting for coupons, in the 12 months ending September 2015 was $653.3 million.

B.     **The Debtor's Prepetition Indebtedness**

The Debtor's prepetition debt structure primarily consisted of (i) prepetition secured lenders, including Wells Fargo Bank, National Association ("Wells Fargo") and capital lease lessors; (ii) a guaranty in favor of Tesco Treasury Services PLC, an affiliate of Tesco, unsecured by the Debtor but secured by certain property and cash held by Fresh Foods; (iii) unsecured debt owed to the Debtor's affiliates on account of intercompany loans made by the Debtor's affiliates to the Debtor; and (iv) other unsecured debt, including trade debt and claims of landlords for unpaid rent.

1.     **The Wells Fargo Facility**

On November 25, 2013, the Debtor (as lead borrower), Fresh Foods (as a borrower), and YFE (as guarantor) entered into that certain Credit Agreement with Wells Fargo as administrative agent and letter of credit issuer (the "Wells Fargo Facility").  After its formation, FEFOS later guaranteed the obligations owing under the Wells Fargo Facility pursuant to its execution of that certain Joinder Agreement dated March 19, 2015. The Wells Fargo Facility contains a stated maturity date of November 26, 2018.

The Wells Fargo Facility provided a credit line of up to $55 million, which could be borrowed in the form of: (i) revolving loans ("Committed Loans"); (ii) swing line revolving loans, subject to a sublimit of $10 million ("Swing Line Loans") and (iii) letters of credit (collectively, the "Wells Fargo LCs"). As of the Petition Date, approximately $23.4 million was outstanding for obligations owed on account of the Wells Fargo LCs. Credit extensions made under the Wells Fargo Facility were governed by a Borrowing Base consisting of advances against credit card receivables, inventory and pledged cash.  As of the Petition Date, the obligations owed under the Prepetition Credit Facility were fully cash collateralized.

The Wells Fargo Facility was secured by a first priority lien on substantially all personal property of the Debtor and Fresh Foods, subject to certain excluded property, which was the property of Fresh Foods and was instead subject to the lien of Tesco Treasury Services PLC, as discussed below. On October 22, 2015, by letter dated October 21, 2015, Wells Fargo declared an event of default under the Wells Fargo Facility. As a result of this event of default, Wells Fargo also declared a "Cash Dominion Event" (as defined in the Wells Fargo Facility) and imposed certain restrictions on the ability of the Debtor to transfer funds out of its bank accounts with Wells Fargo without the permission of Wells Fargo. As discussed below, Wells Fargo is

also the administrative agent for the Debtor's debtor-in-possession financing.  Since the Debtor began winding down its operations certain of the letter of credit holders have drawn their letters of credit.  In certain instances, the Debtor has negotiated partial draws of the letters of credit, resulting in return of cash collateral to the Debtor.  Since the Petition Date, approximately $4.7 million of cash collateral for the letters of credit has been returned to the Debtor from the Wells Fargo Facility.  As of January 1, 2017, Wells Fargo still holds approximately $0.5 million of cash collateral related to letters of credit.  In addition, Wells Fargo holds $250,000 and there is an additional $250,000 held by Young Conaway Stargatt & Taylor, LLP as reserves pursuant to the Wells Fargo Facility.

2.    **Tesco Guaranty Debt**

As a prerequisite to YFE's agreement to purchase those assets it acquired in the Prior Chapter 11 Case, Tesco Treasury Services PLC was obligated to provide YFE or its designee with a $120 million loan. On November 25, 2013, Fresh Foods (then named Campus Opco, LLC) executed a secured promissory note (as modified by later documents, the "Original Tesco Note") in favor of Tesco Treasury Services PLC representing the obligation to repay the $120 million borrowed thereunder.  As originally executed, the Original Tesco Note bore interest at five percent per annum, compounded quarterly and payable in cash on the last business day of each of March, June, September and December during the term of the Original Tesco Note; provided, however, that during the first four years of the note, Fresh Foods received the option of capitalizing interest accruing that quarter rather than immediately paying such interest when due, and any interest so capitalized would accrue at seven percent per annum.  The maturity date of the Original Tesco Note was the earlier of: (i) November 26, 2020 or (ii) the occurrence of certain events giving rise to a sale or change in control of any of the Campus Facilities or of Fresh Foods.

Pursuant to that certain Amended and Restated Secured Promissory Note dated as of August 6, 2015, amending and restating the Original Tesco Note (the "Tesco Secured Note"), Tesco Treasury Services PLC agreed to reduce the principal under the Original Tesco Note to $100 million in exchange for certain consideration, including the issuance of 180,000 shares of Series A preferred stock in YFE to Tesco Treasury Services PLC and an earlier maturity date, which  earlier date is the first to occur of: (i) May 29, 2018; or (ii) the closing of a sale on the remaining Campus Facilities.  The Tesco Secured Note was secured by a first-priority mortgage on each of the Produce Facility and Kitchen Facility (as modified, the "Tesco Mortgage"), including fixtures and equipment but subject to certain permitted liens, as detailed in the Tesco Secured Note, the Tesco Mortgage, and that certain Security Agreement dated November 25, 2013 (as later modified).  In August 2015, the Meat Facility was sold to JBS and a portion of the proceeds were used to pay down the Tesco Secured Note, reducing its balance to $75 million.  Prior to that sale, the Tesco Secured Note was secured by a mortgage on the Meat Facility, as well as the Produce Facility and Kitchen Facility.

The Tesco Secured Note is guaranteed by the Debtor and YFE through a guaranty dated November 25, 2013 and that certain Consent of Guarantor and Reaffirmation and Amendment of Guaranty dated August 6, 2015 (the "Tesco Guaranty"), but neither the Debtor nor YFE pledged an interest in any property to secure their respective guarantees.

19

3.    **Affiliated Unsecured Debt**

As of the Petition Date, the Debtor's books and records indicated that it owed its parent, YFE, approximately $89.8 million pursuant to a promissory note (the "YFE Closing Note") in the original principal amount of $80 million dated November 25, 2013, with an effective date of November 26, 2013 (including accrued interest at the rate of seven percent per annum, compounded annually).

On or about September 11, 2015, the Debtor executed a promissory note in favor of Fresh Foods in the initial amount of $4.15 million payable to Fresh Foods (the "Fresh Foods Note") in order to continue to fund the Debtor's prepetition operating losses and enable the Debtor to explore all restructuring alternatives. Per the terms outlined therein, the face amount of the Fresh Foods Note would increase as Fresh Foods made additional loans to the Debtor and if the Debtor elected to make in kind interest payments due under the Fresh Foods Note. Interest accrued at seven percent per annum under the Fresh Foods Note, payable in kind in arrears, compounding on the last day of each calendar quarter. The maturity date of the Fresh Foods Note was August 20, 2016. As of the Petition Date, the amount owed under the Fresh Foods Note was approximately $9.4 million.

On or about October 2, 2015, FEFOS advanced the Debtor approximately $4.9 million to fund the Debtor's operations so that the Debtor could continue to explore all restructuring alternatives and attempt to structure a sale of its assets.

4.    **Other Unsecured Debt**

As of the Petition Date, the Debtor's books and records reflected accounts payable due and owing in the amount of approximately $47.1 million on account of trade debt. Approximately $53.1 million in total unsecured, non-intercompany debt was due and owing as of the Petition Date, including amounts owed to the Debtor's landlords.

C.    **Events Precipitating the Chapter 11 Filing**

As evidenced by the Prior Chapter 11 Case and disclosures made in connection therewith, the debtors in the Prior Chapter 11 Cases were not profitable. Although the Debtor improved its operating performance by reducing its operating losses, and despite its best efforts to right-size its costs and implement sales and operational objectives, the Debtor was also unable to achieve profitability. In the two years prior to the Petition Date, the Debtor incurred substantial operational losses stemming from, among other things, onerous lease obligations, underperforming retail locations, and increased competition in the natural and organic fresh food industry in particular and the grocery retail industry in general. During this period and through the middle of October 2015, the Debtor, in regular consultation with its non-debtor affiliates who were funding the Debtor's losses prior to the Petition Date, explored many potential restructuring alternatives in hopes of consummating a going-concern transaction. The Debtor consulted with its legal and financial advisors, real estate professionals, and consultants to review possible strategies to help the Debtor achieve the primary goals of renegotiating burdensome leases (or altogether terminating such leases on favorable terms), preserving beneficial trade terms with vendors, and sufficiently streamlining operations to allow the Debtor to retain loyal customers,

20

attract new ones, and generate improved cash flows as its business model evolved.  In that regard, the Debtor's parent company, YFE, hired an investment banker, Moelis & Company, to obtain prepetition financing (including equity infusions) and to explore a potential sale of all or substantial parts of the Debtor's businesses. The Debtor later hired Imperial Capital, LLC to explore a potential sale of the Debtor's business and potential debtor-in-possession financing options. In addition, the Debtor hired certain real estate professionals and experts to help the Debtor renegotiate, terminate, sell, or assign burdensome leases. Unfortunately, this process did not produce any viable sources of financing or any third-party buyers within the timeframe in which the Debtor had the ability to fund its business.

When it became apparent that the Debtor would not be able to obtain additional funding to continue operations outside of a chapter 11 process and, therefore, did not have adequate liquidity to fund its ongoing operations, the Debtor, through its Special Committee, determined that a sale process pursuant to section 363 of the Bankruptcy Code was the most likely way to preserve the Debtor's viability as a going-concern.  To that end, the Special Committee, comprised of the two Independent Managers, appointed by the board of directors of the Debtor's sole equity holder, YFE, approved the pursuit of a going-concern sale, among other restructuring options, and marketing was conducted in conjunction therewith.  The Debtor was unable to locate a third party willing to fund the administrative costs of a sale process through a debtor-in-possession financing facility, and therefore the Debtor was forced to abandon its going-concern sale efforts in favor of wind-down initiatives implemented through store closing sales (the "Store Closing Sales").

The Debtor believed that commencing this Chapter 11 Case to allow for the conclusion of an efficient and orderly wind down process, sanctioned by the Court, represented the best way to maximize value for its stakeholders.  In furtherance of that process, the Debtor entered into an agreement with Hilco Merchant Resources, LLC ("Hilco") on or about October 20, 2015 to conduct the Store Closing Sales at all of its remaining open stores, and the Store Closing Sales commenced on October 23, 2015. The Debtor also began negotiating with its affiliates regarding a proposed settlement with general unsecured creditors that would: (i) enable the Debtor to complete the orderly wind down of its business and the liquidation of its assets; (ii) provide for the satisfaction of administrative claims; and (iii) propose a recovery for unsecured creditors. The Debtor also commenced negotiation of an agreement to sell its distribution center equipment with the intent of retaining DJM Realty Services, LLC ("DJM") and CBRE, Inc. ("CBRE"), jointly, to market its remaining leasehold interests.

54567/0001-14098116v3

D.    **The Chapter 11 Case**

The Debtor commenced this Chapter 11 Case on the Petition Date.  Following is a brief description of certain major events that have occurred during this Chapter 11 Case.

1.    **First Day Orders**

Subsequent to the Petition Date, the Debtor filed a number of motions and applications (collectively, the "First Day Motions") seeking certain "first day" relief.  The Interim Order Authorizing Post-Petition Financing is discussed separately below.  On or about November 5, 2015, the Court entered orders providing various first-day relief, including:[6]

a)    establishing procedures for resolving objections by utility companies and prohibiting utility companies from altering, refusing or discontinuing service [Docket No. 52]; Final Order entered December 3, 2015 [Docket No. 281];

b)    authorizing the Debtor to pay prepetition obligations incurred in the ordinary course of business in connection with liability, property, and other insurance programs, including payment of policy premiums and broker fees, and continuing insurance premium financing programs [Docket No. 55];

c)    authorizing the Debtor to pay certain prepetition taxes and fees and related obligations [Docket No. 57];

d)    authorizing the Debtor to honor certain prepetition obligations to its customers [Docket No. 59];

e)    authorizing the Debtor to pay prepetition wages, salaries and other compensation, including certain bonus payments; reimburse prepetition employee business expenses; contribute to prepetition employee benefit programs and continue such programs in the ordinary course; pay workers compensation obligations; continue payments for which prepetition payroll deductions were made;  pay all costs and expenses incident to the foregoing payment and contributions; and pay to third parties all amounts incident to the foregoing payments and contributions, and authorizing banks to honor and process check and electronic transfer requests related thereto [Docket No. 54]; and

---

[6]    The descriptions of the relief sought or obtained in the first day orders and in the Chapter 11 Case set forth herein are summaries only and reference should be made to the actual pleadings and orders for their complete content.

f)      authorizing continued use of existing bank accounts, cash management systems, and checks and business forms and waiving investment and deposit requirements of 11 U.S.C. 345(b) on an interim basis [Docket No. 56].

2.      **Interim Order Authorizing Post-Petition Financing**

On November 3, 2015, the Debtor filed a motion for entry of interim and final orders authorizing it to obtain postpetition financing and use cash collateral [Docket No. 18]. By the motion, the Debtor sought, among other things, to obtain secured, superpriority, debtor-in-possession financing with commitments in an aggregate principal amount up to $6.75 million. On November 6, 2015, the Court entered the Interim Order Authorizing Post-Petition Financing. Following entry of the Interim Order Authorizing Post-Petition Financing, certain Holders of PACA/PASA Claims filed objections to the motion, which were later withdrawn. [Docket Nos. 248, 251, 994, and 1014]. The UST, and following its formation, the Committee, raised certain informal objections to the proposed final order approving the post-petition financing (the "DIP Financing"), including the necessity for and reasonableness of the DIP Financing, the scope of certain releases contained in the Interim Order Authorizing Post-Petition Financing, and the reasonableness of various claims asserted by YFE related to, among other things, professional fees, asserted in connection with the DIP Financing. Because the Debtor has not required post-petition financing outside the ordinary course of business and has therefore not utilized the DIP Financing, the parties have agreed to numerous continuances of the hearing to consider final approval of the Interim Order Authorizing Post-Petition Financing and associated objection deadline. The Debtor intends to seek the Court's approval of a Final Order authorizing DIP Financing, which will, *inter alia* (a) acknowledge the fact that the Debtor has not drawn on any DIP Financing, (b) implement appropriate provisions on a final basis with respect to Wells Fargo, (c) eliminate YFE as a DIP lender retroactive to the Petition Date, and (d) provide for the release and waiver of certain YFE claims consistent with this Combined Plan and Disclosure Statement.

3.      **Appointment of Committee**

On November 10, 2015, the UST appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 101]. The members of the Committee as of that date were: DPI Specialty Foods, Inc., United Natural Foods West, Inc., Ignited, LLC, JBS USA, and Ryder Integrated Logistics. On November 18, 2016, the UST also appointed Empress Group and MJL Capital Partners, LLC to the Committee [Docket No. 165].

4.      **Employment of Professionals and Advisors**

a)      **Debtor's Professionals**

On November 20, 2015, the Court entered an order authorizing the Debtor to retain Amir Agam of FTI Consulting, Inc. ("FTI") as Chief Restructuring Officer and to utilize the services of other FTI personnel *nunc pro tunc* to the Petition Date (the "FTI Order") [Docket No. 192]. On December 3, 2015, the Court entered an order authorizing the Debtor to retain Young Conaway Stargatt & Taylor, LLP as its special corporate and transactional counsel [Docket No.

23

287] and, on December 15, 2015, it entered an order authorizing the Debtor to retain Cole Schotz P.C., as its bankruptcy counsel [Docket No. 371], both *nunc pro tunc* to the Petition Date.  On January 11, 2016, the Court entered an order authorizing the Debtor to retain Sheppard Mullin Richter & Hampton LLP as special counsel [Docket No. 456], which firm was subsequently replaced, and on June 29, 2016, the Court entered an order authorizing the Debtor to retain Kelley Drye & Warren LLP [Docket No. 1060] in its stead.

The Debtor has also retained ordinary course professionals in the Chapter 11 Case pursuant to the procedures set forth in the OCP Order.

> b)      **Retention of Claims and Noticing Agent and Administrative Agent**

By order entered November 5, 2015, the Court authorized the Debtor to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as its claims and noticing agent in the Chapter 11 Case [Docket No. 51].  Also, on November 20, 2015, the Court entered an order authorizing the Debtor to retain Epiq as its administrative advisor in the Chapter 11 Case [Docket No. 193].

> c)      **Committee's Professionals**

On December 12, 2015, the Court entered an order authorizing the Committee to retain Province, Inc., as its financial advisor [Docket No. 352] and Fox Rothschild as its bankruptcy counsel [Docket No. 353].  Additionally, on May 23, 2016, the Court entered an order authorizing the Committee to retain Reid Collins & Tsai LLP, as its special contingency-fee counsel for the purpose of pursuing certain claims against YFE, FEFOS, and related parties [Docket No. 953].  On September 7, 2016, the Court entered an order authorizing the Committee to retain Ask, LLP as its special contingency-fee counsel for the purpose of pursuing certain avoidance actions [Docket No. 1191].

> 5.      **Sale of Assets**

> a)      **Store Closing Sale**

As noted above, prior to the Petition Date, the Debtor retained Hilco as its exclusive agent for the liquidation sale of merchandise at the Debtor's retail locations.  On November 3, 2015, the Debtor filed an Emergency Motion for Interim and Final Orders (I) Authorizing the Continuation of Store Closing Sales in Accordance with the Disposition Agreement and Sale Guidelines, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances; (II) Authorizing the Assumption of the Disposition Agreement; and (III) Granting Related Relief [Docket No. 19], pursuant to which the Debtor sought, among other things, authority to continue the Store Closing Sales that had commenced prior to the Petition Date at its retail locations.  On November 5, 2015, the Court entered an interim order [Docket No. 53], and on November 24, 2015, the Court entered a final order [Docket No. 231] granting the Motion.  Under the terms of a Letter Agreement Governing Inventory Disposition, Hilco served as the exclusive agent to the Debtor for the purpose of conducting the sale of certain merchandise at the closing stores in accordance with the terms of the agreement and the procedures outlined in the store-closing sale guidelines.  In addition, Hilco conducted sales of FF&E.

The Store Closing Sales commenced on approximately October 23, 2015 and concluded on approximately November 13, 2015 and resulted in approximately $28.8 million in proceeds.

### b)    Sale of Leases

On November 13, 2015, the Debtor filed the Motion for Entry of: (I) Order (A) Establishing Bidding Procedures in Connection with an Auction of Nonresidential Real Property Leases; (B) Authorizing and Scheduling an Auction With Respect Thereto; (C) Approving Cure Procedures; and (D) Scheduling a Hearing With Respect to the Outcome of the Auction; and (II) Order (A) Approving Assumption and Assignment of Leases; and (B) Waiving Stay Provisions Pursuant to Bankruptcy Rule 6006(d) [Docket No. 124] (the "Global Sale Process").  In conjunction therewith, the Court entered an order on November 24, 2015, establishing a timeline for the submission of bids by parties interested in taking assignment of the Debtor's leases (such leases, the "Marketed Leases") and purchasing related assets, and scheduling an auction and sale hearing with respect thereto [Docket N. 230].  On December 7, 2015, the Court approved various agreements entered into by and between the Debtor and third party purchasers or landlords, as applicable, which constituted the respective highest and best offers—and in some instances only offers—submitted for certain Marketed Leases.

As detailed on the record at the December 7, 2015 hearing and in pleadings related thereto, the Debtor determined, in consultation with the Committee, to withhold certain leases from both the Global Sale Process and the Court-approved rejection process, notwithstanding that such leases (collectively, the "Withheld Leases") did not garner qualified bids by the bid deadline. The Withheld Leases were thoroughly evaluated by both the Debtor and the Committee's advisors.  As a result of that evaluation, the Withheld Leases were not rejected at that time because, in the Debtor's business judgment, value could be generated through further marketing efforts and an extended due diligence period. Accordingly, the Debtor continued to pay rent and related charges under the Withheld Leases pending a further determination regarding rejection or assignment.  The Debtor then entered into various agreements with landlords and third party purchasers regarding the Withheld Leases, and in some instances filed motions to reject Withheld Leases.

In total, during the Chapter 11 Case, as a result of the sale of certain leases, the assumption and assignment of certain leases, the termination of additional leases with landlord consent, and the rejection of other leases, the Debtor successfully disposed of more than 100 of its leased locations, resulting in over $11 million in proceeds and returned collateral.

### c)    Auction of Assets at the Distribution Center

On November 5, 2015, the Debtor filed a motion for entry of an order: (i) approving an Auction Agreement (the "Auction Agreement") by and between the Debtor and Industrial Assets Corp. and Maynard's Industries (1991), Inc. ( "IAC") with respect to the sale of certain of the Debtor's owned tractors, trailers, yard dogs, and material handling equipment located at the Debtor's Distribution Center; (ii) authorizing the sale and liquidation of the assets free and clear of all liens, claims, and encumbrances through IAC; and (iii) waiving the information requirements of Local Rule 2016-2.  Under the terms of the Auction Agreement, the sale was to commence no later than November 30, 2015 and terminate by December 31, 2015; provided,

however, that the sale term could be extended by IAC under certain circumstances until January 31, 2016.  On November 20, 2015, the Court granted the Motion, approved the Auction Agreement and authorized the sale of assets [Docket No. 190].

The Auction occurred on December 12, 2015 and resulted in over $5 million in proceeds.

### d)    Sale of Miscellaneous Assets

To facilitate the sale and abandonment of miscellaneous assets and to minimize unnecessary administrative expenses, the Debtor sought, and obtained a Court Order [Docket No. 288] (the "Miscellaneous Asset Sale Procedures Order"), authorizing and approving procedures for the sale or abandonment of miscellaneous assets free and clear of liens, claims, interests, and encumbrances.  The Miscellaneous Asset Sale Procedures Order permits the sale of the miscellaneous assets in any individual transaction or series of related transactions to a single buyer or group of related buyers within certain dollar thresholds.  Absent written objection in accordance with the notice requirements of the Miscellaneous Asset Sale Procedures Order, the Debtor was authorized to immediately consummate a proposed sale in accordance with the terms of the underlying contract or other document without further Court order.

During the Chapter 11 Case, the Debtor has sold various miscellaneous assets and abandoned certain miscellaneous assets in accordance with the Miscellaneous Asset Sale Procedures Order.  [See e.g. Docket Nos. 764, 1022 and 1215].  As of January 1, 2017, the Debtor had sold approximately $375,000 in miscellaneous assets pursuant to the Miscellaneous Asset Sale Procedures Order.[7]

### e)    Sale of Intellectual Property

On February 25, 2016, the Debtor filed a motion for an order authorizing the Debtor to employ and retain Hilco IP Services, LLC d/b/a Hilco Streambank ("Hilco Streambank") to provide intellectual property disposition services *nunc pro tunc* to February 24, 2016 [Docket No. 628] and on March 15, 2016, the Court approved the motion [Docket No. 697].

As a result of a fairly extensive process and bid deadline extension, Hilco Streambank received an offer to purchase one of the Debtor's wine brands, which sale has been consummated.  In addition, on December 22, 2016, the Debtor filed a motion for entry of an order approving a purchase and sale agreement with Wild Oats Marketing LLC for the sale of certain intellectual property for $100,000 [Docket No. 1735].  Oracle America, Inc. filed a reservation of rights requesting the Court deny the motion solely to the extent it sought authorization for the Debtor to assume and assign any Oracle agreement [Docket No. 1766].  The motion is scheduled for hearing on February 16, 2017.

---

[7]    With respect to the sale of certain liquor licenses, the purchase price is held in escrow until the approval of the transfer of the liquor license by the Liquor License Department, and, as a result, many of such reported sale amounts have not been realized by the Debtor.

f) **Sale of Corporate FF&E**

On February 25, 2016, Debtor's Motion for Entry of an Order: (I) Approving the Auction Agreement by and between the Debtor and Great American Global Partners, LLC with respect to the Sale of Certain of the Debtor's Property Located at the Debtor's Corporate Headquarters and Data Center; (II) Authorizing the Sale and Liquidation of Such Assets through Public Auction; and (III) Waiving One or More of the Information Requirements of Local Rule 2016-2 [Docket No. 629] (the "Corporate FF&E Sale Motion"), was filed with the Court. On March 15, 2016, the Court entered an order granting the Corporate FF&E Sale Motion and authorizing the Debtor to execute and deliver, and consummate and implement, the sale of the assets pursuant to the terms set forth in the auction agreement [Docket No. 698] (the "Corporate FF&E Sale Order"). On May 26, 2016, a Final Auction Report containing the results of the auction conducted pursuant to the Corporate FF&E Sale Order was filed with the Court reflecting net proceeds to the Debtor in the amount of $51,113.00 [Docket No. 974]. On August 23, 2016, a Second Final Auction Report containing the results of the auction conducted pursuant to the Corporate FF&E Sale Order for property located at the Debtor's data center was filed with the Court reflecting net proceeds to the Debtor in the amount of $42,535.00 [Docket No. 1151].

g) **Sale of Equipment**

On February 25, 2016, the Debtor filed a motion for entry of an order, *inter alia*, (i) authorizing the disposition of the Debtor's retired, used, end-of-life, and surplus IT and communications equipment (collectively, the "Equipment") located at Itek Services, Inc., 25501 Arctic Ocean Drive, Lake Forest, California, pursuant to the terms of an Asset Disposition Services Agreement by and between the Debtor and HiTech Assets, Inc.; (ii) approving the terms of that agreement; (iii) waiving the information requirements of Local Rule 2016-2, to the extent such requirements are applicable; and (iv) granting related relief [Docket No. 630]. On March 15, 2016, the Court entered an order granting the motion [Docket No. 701]. Pursuant to the agreement, the Debtor receives 50% of gross sales generated by assets resold by HiTech. As of December 2016, the Debtor had received $ 28,615.06 in sale proceeds. HiTech's sale of the Equipment on consignment is ongoing.

6. **Rejection of Contracts and Unexpired Leases**

The Debtor has rejected numerous executory contracts and unexpired leases, both of personal property and real property, including nonresidential real property.

On November 13, 2015, the Debtor filed a motion [Docket No. 124] seeking, among other things, entry of an order approving procedures for rejecting unexpired leases and subleases of nonresidential real property and to abandon any personal property remaining on the premises to the leases or subleases. On November 24, 2015, after notice and a hearing, the Court entered the requested order [Docket No. 230]. Before those procedures expired, the Debtor used such procedures to reject many unexpired leases [Docket Nos. 241, 243, 244, 360, 361, and 362].

In addition, the Debtor has filed standalone motions for approval of the rejection of executory contracts [Docket Nos. 135, 424, 633, 883, and 975], and the Court has entered orders granting those motions [Docket Nos. 321, 502, 699, 960, and 1061].

7.      **Claims Process and Bar Date**

a)      **Section 341(a) Meeting of Creditors**

On December 3, 2015, the UST commenced the meeting of creditors in the Chapter 11 Case conducted pursuant to section 341(a) of the Bankruptcy Code.  The meeting was adjourned to, and concluded on, January 14, 2016.

b)      **Schedules and Statements**

On December 29, 2015, the Debtor filed its Schedules [Docket Nos. 410 and 411], which were amended on February 3, 2016 [Docket Nos. 557 and 558].  Among other things, the Schedules set forth the claims of known creditors against the Debtor as of the Petition Date, based upon the Debtor's books and records.  The Debtor retains the right to amend the Schedules during the pendency of the Chapter 11 Case.

c)      **Bar Dates**

On January 11, 2016, the Court entered the Bar Date Order [Docket No. 457] establishing the following Bar Dates for filing Claims against the Debtor:

**General Bar Date**.  All persons and entities, except any governmental unit, holding or asserting a Claim against the Debtor that arose (or is deemed to have arisen) on or before the Petition Date, excluding any 503(b)(9) Claims, were required to file a Proof of Claim form so that it was actually received by the Claims Agent on or before February 19, 2016 at 5:00 p.m. (Pacific Time).

**Governmental Bar Date**.  All Governmental Units holding or asserting a Claim against the Debtor that arose (or is deemed to have arisen) on or before the Petition Date were required to file a Proof of Claim form so that it was actually received by the Claims Agent on or before April 27, 2016 at 5:00 p.m. (Pacific Time).

**Administrative Claims Bar Date**.  All persons or entities holding or asserting a Claim arising under sections 503(b)(1) through (8) and 507(a)(2) of the Bankruptcy Code against the Debtor that arose, accrued or otherwise become due and payable at any time subsequent to the Petition Date but on or before December 31, 2015 (the "Initial Administrative Claims Period") were required to file a Proof of Claim form so that is was actually received by the Claims Agent on or before February 19, 2016 at 5:00 p.m. (Pacific Time).

**Amended Schedules Bar Date**.  If the Debtor amends its Schedules to change the amount, nature, classification or characterization of a Claim, or to schedule a new Claim, the affected claimant may dispute the amount, nature, classification or characterization of the Scheduled Claim by filing a Proof of Claim form with respect to the Scheduled Claim, so that the Proof of Claim form is actually received by the Claims Agent on or before the later of (i) the General Bar Date or (ii) twenty-one (21) days from the date of the notice that is served alerting the

28

affected creditor of the amendment to the Schedules. If the Debtor amends the Schedules with respect to the claim of a governmental unit, the affected governmental unit shall be permitted to dispute the amount, nature, classification or characterization of the Scheduled Claim by filing a Proof of Claim form with respect to the Scheduled Claim, so that the Proof of Claim form is actually received by the Claims Agent on or before the later of (i) the Governmental Bar Date or (ii) twenty-one (21) days from the date of the notice that is served alerting the affected governmental unit of the applicable amendment to the Schedules.

**Rejection Bar Date**. If the Debtor rejects any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, all persons or entities holding or asserting a Claim arising from such rejection (a "Rejection Damage Claim") must file a Proof of Claim form so that it is actually received by the Claims Agent on or before the later of: (i) the General Bar Date or (ii) thirty (30) days after entry of any order authorizing the rejection of such executory contract or unexpired lease; provided, however, that persons or entities asserting claims with respect to contracts or leases that are not Rejection Damage Claims were required to file Proof of Claim forms on account of such claims by the General Bar Date.

d)      **Claim Objections**

The Claims Agent received approximately 1,091 Proofs of Claim in response to the General Bar Date and 203 Proofs of Claim in response to the Administrative Claims Bar Date, including late filed claims. The Debtor and the Committee have commenced a review and analysis of Claims filed in the Chapter 11 Case, and have filed objections to certain claims and resolved others. The Debtor anticipates that it, the Committee, and the Liquidating Trustee will file additional objections to claims.

e)      **PACA/PASA Claims**

1. The PACA/PASA Order and Claims Process

On January 13, 2016, the Court entered the PACA/PASA/503(b)(9) Bar Date Order. Pursuant to the PACA/PASA/503(b)(9) Order, any supplier or seller asserting a PACA/PASA Claim was required to file a notice of assertion of a PACA/PASA Claim (the "PACA/PASA Claim Notice") so that it was actually received by the Claims Agent on or before the PACA/PASA Bar Date.

The Claims Agent received 79 PACA/PASA Claim Notices. On March 9, 2016, the Debtor filed a Notice of Filing of PACA/PASA Valid Claim Report and Amended PACA/PASA Disputed Claim Report [Docket No. 671] (the "PACA Report") allowing 31 PACA/PASA Claims in the amount of $2,070,757.31, and objecting to 44 PACA/PASA Claims in the amount of $1,509,048. All Disputed PACA/PASA Claims have been resolved and all allowed PACA/PASA Claims have been satisfied.

29

2.   The USDA PACA Investigation

In March 2016, the PACA Division of the USDA conducted a disciplinary investigation against the Debtor for alleged violations of section 2(4) of PACA for failure to make full payment promptly to certain sellers.  The Debtor cooperated with the USDA investigation, including providing requested information.  Following completion of the investigation in May 2016, the USDA informally notified the Debtor that it intended to file a complaint against the Debtor for failure to make full payment promptly to approximately 23 sellers in violation of section 2(4) of PACA, plus penalties.  On December 14, 2016, the USDA filed a complaint with the Secretary of Agriculture against the Debtor for failure to make full payment promptly to 23 sellers for 380 lots of perishable agricultural commodities in violation of PACA, in the total amount of $201,468.29 (the "PACA Amount").  Although the Debtor maintains that it resolved and satisfied all timely submitted PACA/PASA claims in accordance with the terms of the PACA/PASA Order, in order to avoid the expense, protracted litigation, and distraction associated with the complaint, the Debtor, with the authorization of the Bankruptcy Court [Docket No. 1755], agreed to enter into a consent order (the "Consent Order") with the USDA.  Pursuant to the terms of the Consent Order, which has been executed by the parties and approved by the USDA Administrative Judge, the Debtor will pay the PACA Amounts plus a $30,000 penalty.  Funds for payment are currently held in PACA/PASA Escrow.

f)      **503(b)(9) Claims**

Also pursuant to the PACA/PASA/503(b)(9) Bar Date Order, any person or entity asserting a 503(b)(9) Claim was required to file a Proof of Claim so as to be actually received by the Claims Agent on or before the 503(b)(9) Bar Date.

The Claims Agent received approximately 191 Proofs of Claim asserting 503(b)(9) Claims.

On April 20, 2016, the Debtor, in consultation with the Committee, filed its Notice of Filing of (1) a Report of Allowed 503(b)(9) Claims and (2) Objections to Disputed 503(b)(9) Claims (the "Section 503(b)(9) Report") [Docket No. 847].  By the Section 503(b)(9) Report, the Debtor allowed 95 503(b)(9) Claims in the total amount of $3,063.186 and objected to approximately 96 503(b)(9) Claims in the total amount of approximately $3,345,463.

g)      **The Purported WARN Class Claims**

The Debtor filed an objection [Docket No. 1216] to three proofs of claim, filed as class proofs of claim (the "Class Claims"), alleging liability for violations of the WARN Act and its California counterpart, California Labor Code §§ 1400-1409.  The Class Claims collectively assert approximately $21.6 million as Administrative or Priority Claims against the Debtor [Docket No. 1216].  The objection to the Class Claims is currently pending before the Court.  As noted in Article III.D.9 below, the Debtor disputes any liability related to the WARN Litigation and the Class Claims.  The purported Class Claims will be resolved in conjunction with the settlement of the WARN Litigation as discussed in Article III.D.9.

### 8.    **The Committee Litigation**

#### a)    **The Committee Investigation**

Following its appointment, the Committee commenced an informal investigation and inquiry into potential estate claims relating to the transfer of the Debtor's fee-owned real estate to FEFOS for no consideration and other potential insider claims.  As a result of the preliminary responses they received, on February 5, 2016 the Committee filed The Official Committee of Unsecured Creditor's Motion for Entry of an Order Requiring Certain Entities to Provide Information Pursuant to Bankruptcy Rule 2004 [Docket No. 568] seeking expedited discovery from the Debtor and YFE related to its investigation of, among other things, the Debtor's financial condition, the actions of its various insiders and affiliates, matters of corporate governance, duties of care and loyalty, and the transfer of at least $40 million in real estate assets from the Debtor to FEFOS and various other intercompany claims among the Debtor and YFE. The Court entered two orders granting the Committee's motion and requiring certain entities to provide information pursuant to Bankruptcy Rule 2004 [Docket Nos. 659 and 787].  The Committee also obtained Court orders requiring Ernst & Young and Grant Thornton to provide information in support of its investigation.  [See Docket Nos. 808 and 809]  On March 3, 2016, and April 6, 2016, respectively, the Court entered the Order Approving Stipulation Regarding Production of Information Pursuant to Bankruptcy Rule 2004 by YFE Holding [Docket Nos. 659 and 787].

#### b)    **Mediation**

Following the completion of discovery, the Committee, on behalf of the Debtor, and former officers, directors and other insiders or affiliates of the Debtor, including, but not limited to, Ronald W. Burkle, Robert P. Bermingham, James Keyes, Steven Mortensen, Peter McPhee, Ira Tochner, FAEMF, LLC, FEFOS, YFE, and Yucaipa (collectively, the "Mediation Parties") agreed to a mediation with Kenneth M. Klee (the "Mediator") with respect to all matters pending between the Mediation Parties, including, without limitation, the disputes set forth in the Stipulation By and Among the Official Committee of Unsecured Creditors, the Debtor, and YFE Regarding Selection of Mediator [Docket No. 887, Ex. A].  On May 2, 2015, the Court entered an Order approving Kenneth M. Klee as mediator [Docket No. 891].  On May 19, 2016, a mediation session occurred.  The mediation was unsuccessful.

#### c)    **The Committee Motion for Derivative Standing**

On May 31, 2016, the Committee filed a motion seeking standing, on behalf of the Debtor, to assert the claims and objections alleged in the Committee Complaint (as discussed below) arguing: (i) the Committee had alleged colorable claims and objections that would benefit the estate; and (ii) the Debtor was prohibited by the Interim Order Authorizing Post-Petition Financing from pursuing, such claims and objections and, therefore, had not pursued such claims [Docket No. 987].  On June 20, 2016, the Debtor filed a limited objection to the motion [Docket No. 1038].  On July 7, 2016, the Court entered an Order granting the motion for derivative standing to pursue claims on behalf of the Debtor [Docket No. 1068].

d)        **The Committee Complaint**

On May 31, 2016, the Committee, asserting claims derivatively on behalf of the Debtor, filed an action (the "Committee Complaint") against YFE, Fresh Foods, FEFOS, Ronald W. Burkle, Ira L. Tochner, Robert P. Bermingham, and James W. Keyes (collectively, the "Defendants"), titled Official Committee of Unsecured Creditors v. YFE Holdings, et al. [Adv. Proc. 16-50993-BLS, Adv. Proc. Docket No. 1].  The Committee Complaint alleges, among other things: (i) breach of fiduciary duty and corporate waste against YFE, Ronald Burkle, Ira Tochner, Robert Bermingham, and James Keyes (the "YFE Directors," and collectively, with YFE, the "D&O Targets"); (ii) aiding and abetting and breach of fiduciary duty against Mr. Burkle and Mr. Tochner; (iii) actual fraudulent transfer against FEFOS and YFE; (iv) constructive fraudulent transfer against FEFOS and YFE; and (v) equitable subordination against FEFOS, YFE, and Fresh Foods.  The Complaint also seeks the recharacterization of YFE's claim from debt to equity and asserts objections to claims filed or scheduled on behalf of YFE, FEFOS, and Fresh Foods.[8]

e)        **The Committee's Motion for Temporary Restraining Order**

Following the initial mediation, the Committee requested that all parties enter into a mutual stand-still agreement while they continued negotiations and sought to schedule a second mediation session with the insurance carriers' participation.  The Defendants, however—having previously transferred some of the proceeds from the sale of fee-owned properties from FEFOS to YFE—declined to agree to refrain from further transfers of the fee-owned real estate or its proceeds.  Concerned that the Defendants intended to divert additional funds from FEFOS (a real estate holding company) to be used for other purposes, contemporaneously with the filing of the Committee Complaint, the Committee filed an Ex Parte Motion for Temporary Restraining Order ("TRO") and Motion for Preliminary Injunction requesting that the Court enter a TRO, on an ex parte basis, enjoining FEFOS and YFE from: (i) transferring any of the Fee-Owned Stores (as defined in the Committee Complaint), except as approved in advance by the Committee; (ii) transferring any proceeds from the sale of the Fee-Owned Stores, except as necessary to pay any reasonable expenses in the ordinary course of business or as approved in advance by the Committee; and (iii) commingling any proceeds from the sale of the Fee-Owned Stores with any other funds, except as approved in advance by the Committee. [Adv. Proc. No. 16-50993-BLS, Adv. Proc. Docket No. 2].

On the same date, the Court granted an ex parte TRO and: (i) immediately enjoined FEFOS from: (a) transferring any of the Fee-Owned Stores, except as approved in advance by the Court; (b) transferring any proceeds from the sale of the Fee-Owned Stores, except as necessary to pay any reasonable expenses in the ordinary course of business or as approved in advance by the Court; and (c) commingling any proceeds from the sale of the Fee-Owned Stores with any other funds, except as approved in advance by the Court; (ii) immediately enjoined YFE from: (a) transferring any funds received from FEFOS since January 2016, except as approved in advance by the Court; and (b) commingling any such funds with any other funds,

---

[8]     Robert P. Bermingham and James W. Keyes are members of the Board of Managers of the Debtor.

except as approved in advance by the Court; (iii) scheduled a preliminary injunction hearing for June 13, 2016 at 10:00 a.m. [Adv. Proc. No. 16-50993-BLS, Adv. Proc. Docket No. 3].

On June 17, 2016, the Court entered an Order approving a stipulation by and among the Committee, the Debtor, YFE and FEFOS that, *inter alia*, maintained the TRO and adjourned the hearing on the motion for the preliminary injunction to September 15, 2016.  [Adv. Proc. No. 16-50993; Adv. Proc. Docket Nos.17 and 23].  On December 29, 2016, the Court entered an Order approving a stipulation by and among the Committee, the Debtor and the YFE Parties regarding modification and maintenance of the TRO [Adv. Proc. No. 16-50993; Adv. Proc. Docket No. 29].  The hearing on the substance of the preliminary injunction has been adjourned to a date to be determined.

### f)    The Second Mediation

On August 11, 2016, the original Mediation Parties, together with the Debtor's Director and Officer insurance carriers, participated in a second mediation session, with Jed Melnick, Esquire serving as mediator.  Although after a full day of mediation, no agreement was reached among the parties, the mediator continued to facilitate discussions among the Mediation Parties and the D&O insurance carriers, and as a result of these efforts, the parties reached an agreement in principal.  The parties will seek approval of a settlement, the terms of which are discussed in Article IV, the Global Settlement, below.

### g)    The Committee's Standing to Pursue Preference Actions

On August 16, 2016, the Committee filed a Certification of Counsel and Proposed Order Seeking Approval of a Stipulation By and Among The Official Committee of Unsecured Creditors and the Debtor for Leave, Standing, and Authority to Pursue, Prosecute, and Resolve Certain Preference Actions on Behalf of the Estate and Granting Related Relief [Docket No. 1138] with respect to roughly 400 avoidance actions unrelated to the YFE litigation.  A list of those avoidance actions was filed with the Court under seal [Docket No. 1141].  On September 9, 2016, the Committee filed a proposed amended order for the Court's consideration [Docket No. 1201], and on September 12, 2016, the Court entered the amended order approving the Stipulation [Docket No. 1204].  The Committee, through special contingency-fee counsel, has issued demand letters with respect to a majority of the preference actions.  To the extent the Committee was unable to resolve consensually such demands with the defendants, the Committee initiated adversary actions.  More specifically, in December 2016, the Committee filed 307 preference complaints, with a gross amount demanded of $30,968,042.44.  There can be no guarantee or projection of the actual amount to be recovered with respect to preference complaints.

### 9.    <u>Other Adversary Proceedings</u>

### a)    WARN Adversary Proceedings

Currently pending before the Court are two WARN Adversary Proceedings seeking damages on account of alleged violations of the WARN Act and its California counterpart, California Labor Code §§ 1400-1409.  A summary of the WARN Adversary Proceedings is set

forth below.  In addition, there is also state court litigation pending against the Debtor alleging violations of the WARN Act, and certain former employees have filed proofs of claim asserting claims under the WARN Act (the "Employee Proofs of Claim").  The Debtor disputes any liability related to the WARN Litigation and the WARN Proofs of Claims (as defined below).

*Guadalupe Cote, on Behalf of Herself and All Others Similarly*
*Situated v. Fresh & Easy, et al., Adv. Proc. No.15-51906 (BLS)*

On November 22, 2015, Guadalupe Cote ("Cote") filed a complaint on behalf of herself and a purported class of similarly situated former employees of the Debtor against YFE, Yucaipa and the Debtor (the "Cote Adversary").  The complaint seeks to recover damages on account of alleged violations of the WARN Act, and its California counterpart, California Labor Code §§ 1400-1409.  Cote also filed a proof of claim in the amount $6,679,942 on behalf of herself and similarly situated former employees of the Debtor (the "Cote Class Claim") and a proof of claim in her individual capacity for $7,808.22 (the "Cote Individual Claim" and together with the Cote Class Claim, the "Cote Claims," and together with the Class Claims and the Employee Proofs of Claim, the "WARN Proofs of Claim").  No discovery has taken place in the action.

On February 3, 2016, the Debtor filed a motion to compel arbitration of the Cote Claims on an individual basis, expunge the Cote Class Claim, and stay the Cote Adversary until completion of arbitration (the "Cote Motion to Compel") [Adv. Proc. Docket No. 25].

On February 17, 2016, Cote opposed the Cote Motion to Compel [Adv. Proc. Docket No. 35] and, on February 29, 2016, Cote filed a motion for appointment of interim class counsel and dismissal of the Chan Action (the "Cote Appointment Motion") [Adv. Docket No. 43].  Cote also requested oral argument on Chan's Motion to Adjourn Briefing on Plaintiffs' Motion for Appointment of Interim Class Counsel ("Oral Argument Request") [Adv. Proc. Docket No. 53].

On June 2, 2016, the Court entered a Memorandum Order (the "Cote Decision") [Adv. Proc. Docket No. 63] (i) granting the Cote Motion to Compel; (ii) denying the Cote Appointment Motion; and (iii) denying the Oral Argument Request.  The effect of the Cote Decision was that the Cote Adversary would not be able to proceed on a class basis, but instead would be arbitrated individually with the Employee Proofs of Claim.

On September 20, 2016, the Debtor objected to, and sought to strike, the Cote Class Claim on the grounds that Cote did not seek Bankruptcy Court permission to file a class proof of claim as required by the Bar Date Order.  On October 20, 2016, the Court heard argument on the objection, and took the matter under submission.  The matter is pending before the Court.

On October 17, 2016, Cote filed a Motion for Reconsideration of the Court's June 2, 2016 Order granting the Cote Motion to Compel, and on November 1, 2016, the Debtor filed an opposition to the motion.  The motion is pending before the Court.

*Diana Chan, Individually and on Behalf of All Others Similarly Situated v. Fresh & Easy, LLC, et al., Adv. Proc. No.15-51897 (BLS)*

On November 12, 2015, Diana Chan ("Chan") filed a putative class action complaint against the Debtor and non-debtor defendants Yucaipa and YFE (the "Chan Adversary"), alleging violations of the WARN Act, and its California counterpart, California Labor Code §§ 1400-1409.  The Chan Adversary asserts claims and a putative class essentially identical to the Cote action.

On January 25, 2016, the Debtor filed a motion to compel arbitration of the claims asserted by Chan and to stay the Chan Adversary until completion of arbitration (this motion was duplicative of the motion to compel arbitration filed in the Cote Adversary, which was granted by the Court).  On February 18, 2016, Chan opposed the motion [Adv. Docket No. 34] and the Debtor replied on February 16, 2016 [Adv. Proc. Docket No. 36].  On October 11, 2016, the Court denied the Chan Motion to Compel [Adv. Proc. Docket No. 70].

On October 24, 2016, the Debtor appealed the order denying the Chan Motion to Compel to the U.S. District Court for the District of Delaware [Adv. Proc. Docket No. 72] (the "Chan Appeal").  The Chan Appeal, Case No.16-cv-00990 (GMS), is currently pending before the Honorable Gregory M. Sleet and was referred to mediation, as discussed below.

b)    **Mediation and Settlement of the WARN Adversary Proceedings**

On January 10, 2017, the Debtor, the Committee, Yucaipa, YFE, Chan and Cote mediated the WARN Adversary Proceedings before Chief Magistrate Judge Mary Pat Thynge and reached a settlement of the WARN Litigation (memorialized in a signed Memorandum of Understanding), subject to the execution of a comprehensive settlement agreement and Bankruptcy Court approval and other material terms and conditions.  Under the terms of the proposed settlement, the Debtor, Yucaipa and YFE (the "WARN Defendants") will pay the total gross sum of $2.2 million with allocation payment among the three entities to be determined by the three entities (and which includes all payments related to the settlement, including but not limited to attorneys' fees and costs, payroll taxes, and enhancement payments) (the "WARN Settlement Fund"), as full and complete payment for resolution of the WARN Adversary Proceedings and two state court cases. The cost of administering the settlement is to be paid by the WARN Defendants.  Among other things, the settlement requires dismissal of the WARN Adversary Proceedings, two state court actions, the WARN Proofs of Claim, and an unfair labor practice charge filed by Cote with the National Labor Relations Board.  In addition, the finalization of the settlement is expressly contingent on the resolution of two additional cases (one filed in California state court against the WARN Defendants, and one filed in federal district court in California against Yucaipa and YFE only) asserting WARN Act Liability, at the WARN Defendants' sole discretion and to their satisfaction or the WARN Defendants have the option of voiding the settlement in its entirety.  Upon resolution of these matters, the parties expect to file a motion to approve the proposed settlement.

c)       **Other Actions**

*Darlene Lewis, on Behalf of Herself and All Others Similarly
Situated v. Fresh & Easy, LLC and DOES 1 through 25, Adv.
Proc. No.16-50030 (BLS)*

On January 13, 2016, Darlene Lewis ("Lewis") filed a motion for class certification ("Motion for Class Certification") [Docket No. 466] and a motion for order applying Fed. R. Bankr. P. 7023, pursuant to Fed. R. Bankr. P. 9014(c), to Motion for Class Certification (the "Rule 23 Motion" and together with the Motion for Class Certification, the "Lewis Motions") [Docket No. 467].  On February 11, 2016, the Debtor filed an opposition to the Lewis Motions [Docket No. 575].

On February 17, 2016, Lewis, on behalf of herself and all others similarly situated, filed a Class Action Complaint for Determination of Amount and Priority of Claims and Violations of Nevada and Arizona Compensation, Wages, and Hours Statutes, Adv. Proc. No. 16-50030 (BLS) (the "Lewis Adversary"), seeking unspecified damages and other relief based on the Debtor's alleged failure to pay accrued and unused paid time off ("PTO") to former employees in Arizona and Nevada.

At a March 3, 2016 hearing, the Court orally denied the Rule 23 Motion and also found that because Rule 23 did not apply, the Court need not rule on the Motion for Class Certification.

Following several months of arm's length negotiations, the Debtor and Lewis' counsel reached an agreement to settle all PTO claims filed by former employees of the Debtor in Arizona and Nevada as a class, and to seek certification of this class for settlement purposes.  Under the settlement, all proofs of claim for unpaid PTO are resolved in exchange for priority claims in the amount of 33.3% of the value of each claim per the Debtor's records, in addition to an unsecured claim of $10,000 for Lewis as the Class Representative, attorneys' fees in an amount equal to 50% of the amount paid to class members, and costs not to exceed $3,500.  The amount of priority claims is not to exceed $50,000.  On November 8, 2016, the Debtor and Lewis filed the Joint Motion for an Order to (I) Approve Settlement Agreement, (II) Grant Class Certification for Settlement Purposes Only, (III) Appoint Class Counsel and Class Representative, (IV) Approve the Form and Manner of Notice Procedures, (V) Schedule a Fairness Hearing, (VI) Finally Approve the Settlement After the Fairness Hearing, and (VII) Grant Related Relief [Docket No. 1336], seeking approval of class certification and a proposed class action settlement that (i) resolves all proofs of claim seeking accrued and unused PTO filed by former employees of the Debtor in Arizona and Nevada, and (ii) the Lewis Adversary Proceeding.  On November 29, 2016, the Court entered an order granting the joint motion and scheduling the "Fairness Hearing" for March 29, 2017.

10.       **The FEFOS Master Lease Termination**

Prior to the Petition Date, the Debtor and FEFOS entered into that certain Lease Agreement, dated April 28, 2014 (the "FEFOS Master Lease"), pursuant to which FEFOS leased to the Debtor 19 retail stores in Arizona, California and Nevada.  As of the Petition Date, the Debtor operated 8 of the stores and the remaining 11 stores were closed and not operating.  The

FEFOS Master Lease provides that "[e]ither party shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the other party" (the "Termination Provision").  On December 4, 2015, the Debtor and FEFOS entered into a Stipulation and Agreed Order with Respect to Termination of the FEFOS Master Lease and Relief from the Automatic Stay, as Needed, to Implement Such Termination [Docket No. 315] (the "Stipulation and Agreed Order"), which was approved by the Court on December 7, 2015 [Docket No. 322].  The Stipulation and Agreed Order provided, *inter alia*, that the FEFOS Master Lease shall be terminated and of no further force and effect, upon or by either party, effective as of November 30, 2015, provided that FEFOS waived claims for CAM and rent that came due following execution of the agreement, and that the Debtor had until December 30, 2015 to complete the sale of its FF&E located at the Stores and the Debtor and/or their agents would be provided with access to the Stores to review, inspect and sell its FF&E.

### 11.    **The Produce and Kitchen Facilities**

Pre-petition, the Debtor conducted certain food production operations at facilities owned by Fresh Foods including a produce facility, a kitchen, and prior to its sale to JBS, a meat facility (the "Food Production Facilities").  Similar to the Debtor's arrangement with FEFOS regarding the FEFOS owned stores, the Debtor paid no rent to Fresh Foods, but was responsible for all operating expenses at these facilities.  However, unlike the FEFOS owned stores: (i) certain equipment at these facilities was owned by Fresh Foods; and (ii) the arrangement with Fresh Foods for use of the Food Production Facilities and related equipment was never documented through a lease (or any other formal documentation).  As the Debtor commenced winding down its operations, it completed food production at these facilities and shut down its operations in a responsible manner.  As of January 15, 2016, the Debtor returned these facilities to Fresh Foods (except for the meat facility which is now owned by JBS) and from that date forward it was no longer responsible for expenses incurred at these facilities.

### 12.    **The Post-Petition Services Agreement**

Prior to the Petition Date, on November 23, 2013, Tesco Stores Limited ("TSL") and YFE entered into a Transitional Services Agreement and related amendments (the "TSA") that provided for, among other things, the provision of certain transition services by TSL to affiliates of YFE in exchange for the payment of certain service charges by YFE.  The Debtor was a recipient of the services provided by and through the TSA.

The pre-petition cost of the TSA was approximately $500,000 per month.  After significant negotiation and operating temporarily under a post-petition extension agreement, on or about February 19, 2016, the Debtor and TSL entered into the Second Post-Petition Services Agreement (the "Second Services Agreement"), which was approved by the Court on March 2, 2016 [Docket No. 654], that provided, among other things, that: (i) TSL would provide the Debtor certain services through March 31, 2016 at significantly reduced cost; (ii) the Debtor and its estate, successors and assigns released and discharged TSL and its affiliates from claims and causes of actions, and (iii) except as expressly provided in the Second Services Agreement, TSL and its affiliates would not seek recovery from the Debtor, its estate or its employees, officers and directors on account of any claims that it may have had against the Debtor; provided, however, that nothing contained in the Second Services Agreement prevented TSL or its

affiliates from filing proofs of claim in the Chapter 11 case with the understanding that such claims should not be considered allowed for purposes of voting on any chapter 11 plan or for distributions under such plan.  TSL and its affiliates did not waive any claims against, or agree not to seek recoveries from, the Debtor's affiliates.  Consequently, the Plan does not provide for any Distribution to TSL or its affiliates, and any vote cast on the Plan by TSL or its affiliates shall not be counted.

IV.
**THE GLOBAL SETTLEMENT**

The Combined Plan and Disclosure Statement reflects and incorporates the negotiated settlement (the "Global Settlement"), as noted above, between the Debtor, the Committee, the YFE Parties and Yucaipa (each a "Party" and collectively, the "Settlement Parties"), which was reached following extensive and arm's length negotiations, including two separate mediation proceedings, between the Settlement Parties.  The Global Settlement is memorialized in a Settlement and Release Agreement (the "Settlement Agreement"), attached hereto as **Exhibit A** in a redacted form, which is incorporated by reference and constitutes a material part of the Plan.  In addition, this Combined Plan and Disclosure Statement constitutes a motion, pursuant to Bankruptcy Rule 9019, and sections 105 and 1123 of the Bankruptcy Code, to approve the Global Settlement and the Settlement Agreement.

The complete terms of the Global Settlement are included in the Settlement Agreement. To the extent there are any inconsistencies between the summary of the Settlement provided herein and the Settlement Agreement, the terms of the Settlement Agreement shall control.  The salient terms of the Settlement Agreement are as follows:[9]

- The Settlement Agreement and releases contained therein are not effective unless and until the Court enters a Final Order (as defined in the Settlement Agreement).

- No later than fifteen (15) business days after the Committee provides YFE with written notice of the Settlement Effective Date (as defined in the Settlement Agreement), the YFE Parties (and/or their insurers) shall make payment in the total amount of $21,500,000 in consideration of the Settlement Agreement and the Chapter 11 Individual Releases (the "Settlement Payment") by wire transfer to the Debtor.[10]

- The Plan shall provide that $2,500,000 (the "Release Consideration") of the Settlement Payment shall be expressly earmarked solely for those general unsecured creditors who do not opt-out (the "Releasing Creditors") of the Chapter

---

[9]   Capitalized terms used in Article IV but not otherwise defined shall have the meanings set forth in the Settlement Agreement or the Combined Plan and Disclosure Statement, as applicable.

[10]   The proposed Settlement Payment, along with the value of claim releases to be provided by the YFE Parties, is subject to the following tiered contingency fee:  (a) 10% of the amount of "Gross Recoveries" up to $15 million; (b) 25% of the amount of "Gross Recoveries" from $15 million to $30 million; and (c) 33.3% of the amount of "Gross Recoveries" over $30 million.  See Docket Nos. 907 and 953.

11 Individual Releases provided in the Settlement Agreement and to be incorporated into the Plan, which Release Consideration shall be distributed on a Pro Rata basis to such Releasing Creditors.

- Upon the Debtor's receipt of the Settlement Payment, the Debtor, the Committee, and the Debtor's bankruptcy estate on behalf of themselves, and each of their predecessors, successors, affiliates, each and every member of the Committee, current and former members, partners, shareholders, officers, directors, managers, agents, employees, consultants, attorneys, and representatives, fully release and forever discharge the YFE Released Parties (as defined in the Settlement Agreement), from any and all claims, causes of action, damages, debts, liabilities, obligations, promises, and agreements, of any nature whatsoever, known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or derivative, that are related to the Debtor, the Committee, or the Bankruptcy Case, including, but not limited to, all claims asserted in or that could have been asserted in, and those that are related to, or contingent upon, the Adversary Proceeding (as defined in the Settlement Agreement) and any claims in any way related to the operation of the Debtor's business and related entities, including Fresh Foods and FEFOS, and any claims or assertions made by the Committee in correspondence to the YFE Released Parties or its insurers, including, but not limited to, that correspondence sent by Eric Madden of Reid Collins & Tsai LLP dated March 24, 2016, and April 8, 2016. For the absence of doubt, each and every member of the Committee agrees it shall not "opt-out" of the Agreement, and shall be bound by the release provision set forth in Section 7 of the Settlement Agreement.

- Upon the Debtor's receipt of the Settlement Payment and the Committee's dismissal with prejudice of the Adversary Proceeding, the YFE Releasing Parties, fully release and forever discharge the Debtor, the Committee, and the Debtor's bankruptcy estate, together with each of their predecessors, successors, affiliates, and current and former members, partners, shareholders, officers, directors, managers, agents, employees, attorneys, and representatives, from any and all claims, causes of action, damages, debts, liabilities, obligations, promises, and agreements, of any nature whatsoever, known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or derivative, related to the Debtor, the Committee, or the Bankruptcy Case, including, but not limited to, all claims asserted in or that could have been asserted in, and those that are related to, or contingent upon, the Adversary Proceeding and any claims in any way related to the operation of the Debtor's business and related entities, including Fresh Foods and FEFOS. The releases in this paragraph include, but are not limited to, the following:

  a.    Any claims in the Bankruptcy Case filed by or scheduled on behalf of any of the YFE Parties, including: (i) the nonpriority unsecured claim in the amount of $89,462,027.00 (plus any accrued interest

or fees) scheduled on behalf of YFE; (ii) the nonpriority unsecured claim in the amount of $9,415,096.00 (plus any accrued interest or fees) scheduled on behalf of Fresh Foods; (iii) the nonpriority unsecured claim in the amount of $4,902,183.00 (plus any accrued interest or fees) scheduled on behalf of FEFOS; (iv) the priority unsecured claim in an unknown amount (plus any accrued interest or fees) scheduled on behalf of James W. Keyes; (v) the nonpriority unsecured claim in the amount of $438,065.39 (plus any accrued interest or fees) scheduled on behalf of Fresh & Easy Campus Produce Cut Fruit, to the extent that such entity is owned or controlled by any of the YFE Parties; and (vi) the nonpriority unsecured claim in the amount of $596,057.02 (plus any accrued interest or fees) scheduled on behalf of Fresh & Easy Kitchen-Kitchen SC, to the extent that such entity is owned or controlled by any of the YFE Parties;

b.   Any claims in the Bankruptcy Case filed by or scheduled on behalf of Yucaipa;

c.   Any claims arising from or relating to any fees or expenses incurred by the YFE Parties in connection with the Bankruptcy Case, including in connection with any debtor-in-possession financing for the Debtor (the "DIP Financing"), and including any legal fees incurred by Gibson, Dunn & Crutcher, LLP, and other counsel; provided that upon entry of the Approval Order, any obligations of the YFE Parties in connection with the DIP Financing shall be terminated;

d.   Any claims by any of the YFE Parties relating to their employment by the Debtor, including any claims for unpaid wages, severance, indemnity or expense reimbursement;

e.   Any claims or liability by the YFE Parties, including based on contribution or indemnity, arising from or relating to any of the following agreements: (i) the Secured Promissory Note dated November 25, 2013, and as subsequently amended and restated, made by Fresh Foods in favor of Tesco Treasury Services, PLC; (ii) the Guaranty dated November 25, 2013, and as subsequently reaffirmed, made by the Debtor to guarantee the obligations under the foregoing promissory note; and (iii) the Transitional Services Agreement dated November 13, 2013, and as subsequently amended and modified, entered into between YFE and Tesco Stores Limited;

f.   Any claims or liability by the YFE Parties, including based on contribution or indemnity, arising from or relating to any of the

40

following: (i) the Consulting Services Agreement dated November 25, 2013, entered into between YFE and FAEMF, LLC; (ii) any services provided by FAEMF, LLC to YFE or the Debtor; and (iii) any services provided by Yucaipa to YFE or the Debtor;

g.     Any claims or liability by the YFE Parties, including based on contribution or indemnity, arising from or relating to any of the following: (i) any guaranties of store leases entered into by YFE or the Debtor; and (ii) the Debtor's use of any property owned or leased by YFE, FEFOS or Fresh Foods;

h.     Any claims arising from or relating to any of the accounts receivable listed in the schedule attached to the Settlement Agreement as Exhibit A;

i.     Any claims arising from or relating to any of the deposits, tax payments, insurance refunds, letters of credit or retainers listed on the schedule attached to the Settlement Agreement as Exhibit B;

j.     Any claims or liability, including based on contribution or indemnity, arising from or relating to the Trademark License Agreement dated April 3, 2014, entered into between Yucaipa and the Debtor; and

k.     Any claims or liability by the YFE Parties, including based on contribution or indemnity, arising from or relating to any actual or alleged violations involving the Debtor of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. and/or California Labor Code § 1400 *et seq*., subject to the Debtor's obligations under Paragraph 5 of the Settlement Agreement.

•     Pursuant to the Settlement Agreement, the Committee is required to request that the Approval Order contain a provision (the "Bar Provision") barring any person or entity (a "Barred Person") from commencing, prosecuting, asserting, or maintaining certain claims as set forth in Section 1(d) of the Settlement Agreement.

•     The Settlement Agreement contains certain other confidential provisions that are to be filed under seal.

### *The Settlement is in the Best Interests of the Estate*

The Settlement Agreement is subject to approval by the Court under Bankruptcy Rule 9019(a). Pursuant to Bankruptcy Rule 9019(a), the Bankruptcy Court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interests of the estate. *See In re Marvel Entm't Grp., Inc.*, 222

41

B.R. 243, 249 (D. Del 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (citation omitted); *Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 92 (Bankr D. Del. 2005) ("the bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable").

Courts traditionally favor compromises to minimize the effects and costs of litigation and expedite administration of the debtor's estate. *See Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'") (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *In re Penn Central Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979) ("The Court has recognized that '(i)n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.'") (quoting *Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

Approval of a proposed settlement is within the "sound discretion" of the bankruptcy court. *See In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D. Pa. 1986). Bankruptcy courts maintain wide discretion to approve settlements under Bankruptcy Rule 9019. *See In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (approving a settlement pursuant to Bankruptcy Rule 9019 between the creditors' committee and the debtor's DIP lender, finding the DIP lender's carve-out of $1.6 million from its lien for the exclusive benefit of the debtor's unsecured creditors did not violate the Bankruptcy Code).

In considering the approval of a proposed settlement under Bankruptcy Rule 9019, the bankruptcy court should not substitute its judgment for that of the debtor. *See In re Neshaminy*, 62 B.R. at 803. Nor is the court required to conduct a mini-trial or rule on multiple questions of law or fact; instead, the court should analyze whether the proposed settlement falls below the lowest point in the range of reasonableness. *See In re World Health Alternatives, Inc.*, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted); *In re Key3Media Grp., Inc.,* 336 B.R. 93 (stating that the settlement need only be above "the lowest point in the range of reasonableness") (citation omitted). *See also In re Sea Containers Ltd.*, 2008 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008); *Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 180 (3d Cir. 2015); *Mangano v. Warriner (In re ID Liquidation One, LLC)*, 555 Fed. App'x 202, 205–07 (3d Cir. 2014); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983).

The Third Circuit has enumerated the following four-factor test to determine whether a settlement should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of creditors." *In re Martin*, 91 F.3d at 393; *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006). Each of these four factors weighs in favor of approving the Settlement Agreement.

Absent the settlement, litigation of the Committee's claims will be a complex, lengthy and expensive process requiring costly expert analysis and testimony, extensive motion practice and a potentially long and expensive trial and possible appeals. The likelihood of success of such litigation, and the collection of any judgment, is uncertain. Consequently, distributions to creditors will be uncertain and delayed absent approval of the settlement.

The paramount interest of Debtor's creditors will be best served by the Settlement Agreement. The proposed settlement provides an immediate and substantial monetary recovery on the disputed claims. More specifically, the proposed settlement eliminates more than $104 million in claims against the Debtor's estate by the YFE Parties, thereby reducing the aggregate amount of unsecured claims by approximately one-half and effectively doubling the projected distributions to other unsecured creditors, while simultaneously increasing cash for distribution by over $21 million. The proposed settlement also allows the Plan Proponents to collaboratively bring the bankruptcy case to an orderly and efficient conclusion.

In summary, the Plan Proponents believe that approval of the Global Settlement is the best way to ensure a prompt resolution of the Chapter 11 Case, provides sufficient funds to consummate the Plan, allows for the wind down of the Debtor's estate, ensures that funds will be provided to the Liquidating Trust for the benefit of holders of Allowed Claims, and is in the best interests of creditors. Accordingly, the Plan Proponents believe that, under applicable standards, the Bankruptcy Court can and should approve the Global Settlement embodied in the Plan.

### The Court Should Approve the Bar Provision

This Court has the authority to approve the Bar Provision pursuant to section 105(a) of the Bankruptcy Code. *See In re Tribune Co.*, 464 B.R. 126, 176 (Bankr. D. Del. 2011) ("Bankruptcy courts have authority to enter settlement bar orders."). A contribution and indemnity bar order is a material component of the Settlement Agreement. In fact, the Settlement Agreement expressly requires the Committee to seek approval of the Bar Provision. Contribution and indemnity bar orders facilitate settlement because "[d]efendants buy little peace through settlement unless they are assured that they will be protected against codefendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation." *Munford v. Munford, Inc. (In re Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir. 1996) (alterations in original) (quotations omitted). In addition, the Bar Provision also serves the strong public policies in favor of settlement and the equitable apportionment of damages among tortfeasors. *See Johnson v. United Airlines,* 784 N.E.2d 812, 821 (Ill. 2003). Finally, the Bar Provision assists in preserving assets for the benefit of the Debtor's creditors because, without it, for example, (a) the YFE Parties may not have settled, or (b) the creditors' recoveries may be diluted by claims for indemnification and contribution asserted by the YFE Parties.

In consideration of all these factors, the Plan Proponents respectfully request that the Court approve the Settlement Agreement, including the Bar Provision, pursuant to Bankruptcy Rule 9019.

43

V.
## TAX CONSEQUENCES OF THE PLAN

The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Equity Interests.  The Plan Proponents do not offer an opinion as to the federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Combined Plan and Disclosure Statement.

**EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE PLAN.  THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL ADVICE TO ANY CREDITOR, INTEREST HOLDER OR OTHER PARTY IN INTEREST.**

VI.
## CERTAIN RISK FACTORS TO BE CONSIDERED

A.    **Risk Factors to Be Considered**

**The Plan and its implementation are subject to certain risks, including, but not limited to, the risk factors set forth below.  Prior to voting on the Plan, each Holder of a Claim entitled to vote should carefully consider the risk factors described below, as well as all of the information contained in this Combined Plan and Disclosure Statement, including the Exhibits hereto, before deciding whether to vote to accept or reject the Plan.**

These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.  No representations concerning or related to the Debtor, the Chapter 11 Case, or the Combined Plan and Disclosure Statement are authorized by the Court or the Bankruptcy Code, other than as set forth in this Combined Plan and Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Combined Plan and Disclosure Statement that are other than as contained herein, should not be relied upon by you in arriving at your decision.

1.    **The Plan May Not Be Accepted**

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Thus, while the Plan Proponents believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite number of Classes entitled to vote on the Plan.

2.    **The Plan May Not Be Confirmed**

Even if the Holders of Claims who are entitled to vote accept the Plan, the Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Combined Plan and Disclosure Statement.  Section 1129 of the Bankruptcy Code requires, among other things, that the value of Distributions to dissenting Holders of Claims or Equity Interests may not be less than the value such Holders would receive if the Debtor were liquidated under chapter 7

44

of the Bankruptcy Code.  Although the Plan Proponents believe the Plan meets such requirements, there can be no assurance the Court will reach the same conclusion.

### 3. **Distributions to Holders of Allowed Claims Under the Plan**

On the Effective Date, each Holder of an Allowed General Unsecured Claim will, by operation of the Combined Plan and Disclosure Statement, receive its Pro Rata share of the Liquidating Trust Interests.  Liquidating Trust Interests will be reserved for Holders of Disputed General Unsecured Claims and issued by the Liquidating Trust to, and held by the Liquidating Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims.  A substantial amount of time may elapse between the Effective Date and the receipt of Distributions because of the time required to achieve final resolution of Disputed Claims.

### 4. **Global Settlement May Not Be Approved**

There can be no assurance that the Global Settlement which is incorporated into the Plan, and provides for sufficient funds to consummate the Plan, will be approved by the Court.  Any denial or modification of the terms of the proposed Global Settlement could endanger or materially delay the ultimate consummation of the Plan.

### 5. **Conditions Precedent to Consummation of the Plan**

The Combined Plan and Disclosure Statement provides for certain conditions that must be satisfied (or waived) prior to its confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  There can be no assurance that any or all of the conditions in the Combined Plan and Disclosure Statement will be satisfied (or waived).  Any delay in effectiveness of the Plan could result in, among other things, increased Administrative Claims that could endanger the ultimate consummation of the Plan.

### 6. **Certain Tax Considerations**

As noted above, there are tax considerations, risks and uncertainties associated with consummation of the Plan.  Each Holder of a Claim or Equity Interest is urged to consult with such Holder's tax advisors concerning the federal, state, local, foreign and other tax consequences of the Plan.

54567/0001-14098116v3

B.    **Alternative Plan**

If the Plan is not confirmed, the Debtor, the Committee or any other party in interest could attempt to formulate a different plan.  However, the additional costs, all of which would constitute Administrative Claims, may be so significant that one or more parties in interest could request that the Chapter 11 Case be converted to chapter 7.  Accordingly, the Plan Proponents believe that the Plan enables creditors to realize the best return under the circumstances.

VII.
**BEST INTERESTS AND FEASIBILITY**

A.    **Best Interests Test and Liquidation Analysis**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either: (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  Under the Plan, Classes 4, 5 and 6 are Impaired.  Classes 5 and 6 will not receive or retain any property under either the Plan or in a chapter 7 liquidation.

To determine if the Plan is in the best interests of the Impaired Classes in the Plan, the present value of the distributions from the proceeds of the liquidation of the Debtor's assets and properties, after subtracting the amounts attributable to the foregoing claims, is then compared with the value of the property offered to each such class under the Plan.  The Plan provides for the orderly liquidation of the Debtor's remaining assets in a manner similar to what would occur in a chapter 7 liquidation.

Because the majority of the Debtor's assets, apart from Causes of Action, have already been liquidated to Cash, the value of any Distributions if the Debtor's Chapter 11 Case was converted to a case under Chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Plan.  This is because conversion of the Chapter 11 Case to a chapter 7 case would require the appointment of a chapter 7 trustee, and in turn, the chapter 7 trustee would likely retain new professionals.  The "learning curve" that the trustee and new professionals would be faced with comes with potential additional costs to the Estate and with a delay compared to the timing of Distributions under the Plan (and prosecution of Causes of Action).  This learning curve would apply to the Debtor's remaining wind down efforts, the Claims filed against the Debtor, and Causes of Action that remain to be pursued, which are both complex and represent substantial potential recoveries.  In addition, a chapter 7 trustee would be entitled to statutory fees based on the Distributions to creditors of assets that were actually liquidated during the pendency of the Chapter 11 Case.  Accordingly, a portion of the cash currently available for Distribution to Holders of Claims, including unsecured creditors, would instead be paid to the chapter 7 trustee.  Finally, the distributions of Cash from the estate to creditors could be delayed for several years until the chapter 7 case was fully administered, whereas it is anticipated that the Liquidating Trustee will make initial Distributions to Holders of Allowed Claims as soon as practicable after the Effective Date followed by periodic interim distributions pending final disposition of the Liquidating Trust.  The Debtor and the Committee believe that in a chapter 7 liquidation, it is likely the total net after tax liquidation proceeds

46

would be less than the proceeds under the Plan and the present value of that distribution would be further reduced by the delay in the distribution.

As a result, the Plan Proponents believe that the Estate would have fewer funds to be distributed, and that such distributions may be delayed, in a hypothetical chapter 7 liquidation than if the Plan is confirmed, and therefore Holders of Claims in all Impaired Classes (other than potentially Class 5 and 6) will recover less in the hypothetical chapter 7 case. The determination of the hypothetical proceeds from the sale of assets in a chapter 7 liquidation is an uncertain process involving numerous assumptions and therefore there can be no assurance of the proceeds likely to be distributed in such a process or the timing of distributions.

B.     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. As set forth herein, the Debtor commenced this Chapter 11 Case to allow for an efficient and orderly wind down process and the Combined Plan and Disclosure Statement provides for the liquidation of the Debtor for the benefit of Creditors and the transfer of the Debtor's remaining assets, after Distributions to or reserves for Holders of Allowed Secured, Administrative, and Priority Claims, to the Liquidating Trust for the benefit of Holders of Allowed General Unsecured Claims. The Debtor will not be conducting any business operations after the Effective Date.

As such, provided that the Plan is confirmed and consummated, the Estate will not be subject to future reorganization or liquidation. Accordingly, the Plan Proponents believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

54567/0001-14098116v3

VIII.
# SUMMARY OF DEBTOR'S ASSETS; SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

The following chart provides a summary of treatment of each Class of Claims (other than Administrative, PACA/PASA, WARN Act Liability, Priority Tax and DIP Facility Claims) and an estimate of the recoveries of each class.  The treatment provided in this chart is for information purposes only and is qualified in its entirety by Articles XI and XII of the Plan.

| Class | Estimated Allowed Claims[11] | Treatment | Estimated Recovery to Holders of Allowed Claims[12] |
|---|---|---|---|
| Class 1: Wells Fargo Secured Claim | $0 | Unimpaired Not Entitled to Vote Deemed to Accept | 100% |
| Class 2: Other Miscellaneous Secured Claims | $0 - $300,000[13] | Unimpaired Not Entitled to Vote Deemed to Accept | 100% |
| Class 3: Priority Non-Tax Claims | $50,000 - $150,000 | Unimpaired Not Entitled to Vote Deemed to Accept | 100% |
| Class 4:[14] General Unsecured Claims<br><br>Class 4A: General Unsecured Claims<br><br>Class 4B: General Unsecured Claims of Releasing Creditors | $103 - 115 million[15] | Impaired Entitled to Vote | 14 - 26% |
| Class 5: Subordinated Claims | $0 | Impaired Deemed to Reject Not Entitled to Vote | No Distribution |

---

[11]   These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by the creditors in proofs of claim or otherwise.  The Debtor has not completed its analysis of Claims in the Chapter 11 Case and objections to such Claims have not been fully litigated.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[12]   The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Case.  As set forth in footnote 11 above, the actual amount of Allowed Claims may be greater or lesser than estimated.  Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually Allowed in the Chapter 11 Case, the outcome of any litigation, including any causes of action that are being pursued, and the cash received from monetizing remaining assets.

[13]   This estimate does not include Claims that the Debtor anticipates will be satisfied by collateral held by Creditors.

[14]   The aggregate estimated Allowed Claims in Classes 4A and 4B is $103-115 million; the aggregate estimated recovery of Classes 4A and 4B is 14-26%, and Classes 4A Class 4B are impaired and entitled to vote on the Plan.  No breakdown between Classes 4A and 4B can be estimated until such Creditors submit Ballots indicating their opt-out elections. The aggregate estimated recovery percentage includes the Release Consideration.  Holders of Claims in Class 4A who make an opt-out election will forego any Distribution from the $2.5 million Release Consideration and, consequently, may receive less than the estimated recovery as a result of the allocation of the Release Consideration to Holders of Allowed Claims in Class 4B.

[15]   This estimate of General Unsecured Claims does not include any Claims asserted by Tesco, TSL or related entities.  As noted in Article III, TSL has agreed not to seek recovery on its claims from the Debtor.  No claims from the YFE Parties are included in this estimate.

54567/0001-14098116v3

| Class 6:<br>Equity Interests | $0 | Impaired<br>Deemed to Reject<br>Not Entitled to Vote | Cancelled –<br>No Distribution |
|---|---|---|---|

## IX.
## CONFIRMATION AND VOTING PROCEDURES

### A.    Confirmation Procedures

#### 1.    Confirmation Hearing

A hearing before the Honorable Brendan Linehan Shannon, Chief Judge, has been scheduled for **April 27, 2017 at 11:00 a.m. (prevailing Eastern Time)** at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801 to consider: (i) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code; and (ii) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code (the "Confirmation Hearing").  The Confirmation Hearing may be adjourned from time to time by the Court without further notice, except for an announcement of such adjourned date made at the Confirmation Hearing and the filing of a notice of adjournment with the Court.

#### 2.    Procedures for Objections

Any objection to the final approval of the Disclosure Statement and confirmation of the Plan must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Responses and objections, if any, to the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; and (iii) be filed with the Court and served so as to **be actually received on or before 4:00 p.m. (prevailing Eastern Time) on April 17, 2017** by (a) the Debtor, Fresh & Easy LLC, Howard Hughes Center, 6080 Center Drive, 6th Floor, Los Angeles, CA 90045; Attn: Amir Agam, CRO (amir.agam@fticonsulting.com); (b) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801, Attn: Norman L. Pernick, Esq. (npernick@coleschotz.com); (c) special counsel to the Debtor, Young Conaway Stargatt and Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Michael Nestor, Esq. (mnestor@ycst.com); (d) counsel to the Committee, Fox Rothschild LLP, 1800 Century Park East, Suite 300, Los Angeles, CA 90067-1506, Attn: Mette H Kurth, Esq. (mkurth@foxrothschild.com) and Fox Rothschild, LLP, 919 North Market Street, Suite 300, P.O. Box 2323, Wilmington, DE 19899-2323, Attn: L. John Bird, Esq. (jbird@foxrothschild.com); (e) counsel to Wells Fargo, Riemer & Braunstein, LLP, Three Center Plaza, Boston, MA 02108, Attn: Donald E. Rothman, Esq. (drothman@riemerlaw.com) and Womble Carlyle Sandridge & Rice PLLC, 222 Delaware Avenue, Suite 1501, Wilmington, DE 19801, Attn: Morgan L. Patterson, Esq. (mpatterson@wcsr.com); (f) counsel to YFE and FEFOS, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, CA 90071-3197, Attn: Robert A. Klyman, Esq. (rklyman@gibsondunn.com) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Robert J. Stearn, Jr., Esq. (stearn@rlf.com); and (g) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Hannah Mufson McCollum, Esq.

49

(Hannah.McCollum@usdoj.gov).  Unless an objection is timely filed and served, it may not be considered by the Court.

### 3.    **Requirements for Confirmation**

The Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among the requirements for confirmation in this Chapter 11 Case is that the Plan be: (i) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; and (ii) feasible. The Court must also find that:

> a.    the Plan has classified Claims and Equity Interests in a permissible manner;
>
> b.    the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and
>
> c.    the Plan has been proposed in good faith.

### 4.    **Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code requires the Plan place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class.  The Plan creates separate Classes to deal respectively with secured claims, unsecured claims, and equity interests.  The Debtor believes that the Plan's classifications place substantially similar Claims or Equity Interests in the same Class, and thus, meets the requirements of section 1122 of the Bankruptcy Code.

### 5.    **Impaired Claims or Equity Interests**

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving a payment or Distribution under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests treated in such Class.  The Holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  The Holders of Claims or Equity Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Plan are deemed to reject the Plan and do not have the right to vote.

### 6.    **Eligibility to Vote on the Plan**

Unless otherwise ordered by the Court, only Holders of Claims in Class 4 may vote on the Plan.  In order to vote on the Plan, you must hold a Claim in Class 4 and have timely filed a proof of Claim or have a Claim that is identified on the Schedules that is not listed as disputed, unliquidated, contingent or as zero or unknown in amount, or be the Holder of a Claim that is Allowed or has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

7.    **Solicitation Notice**

All Holders of Claims in Class 4 will receive, among other documents: (i) Notice of (A) Interim Approval of the Disclosure Statement and (B) Combined Hearing to Consider Final Approval of the Disclosure Statement and Confirmation of the Joint Chapter 11 Plan of Liquidation for Fresh & Easy, LLC, and the Objection Deadline Related Thereto (the "Confirmation Hearing Notice"); (ii) a form of Ballot with an opt-out election provision in order to exercise the right to opt-out of the releases set forth in Article XVI of the Plan; and (iii) a copy of the Combined Plan and Disclosure Statement.

All other creditors and parties in interest are not entitled to vote on the Plan and will only receive:  (i) the Confirmation Hearing Notice, and (ii) a non-voting notice containing (a) the website address, http://dm.epiq11.com/fre, where parties in interest may download electronic copies of the Combined Plan and Disclosure Statement and other pleadings related to the Chapter 11 Case, (b) the email address, tabulation@epiqsystems.com, at which parties in interest may request copies of the Combined Plan and Disclosure Statement, Ballot, and related documents; and (c) a telephone number, 646-282-2500, through which parties in interest can request paper copies of the Combined Plan and Disclosure Statement, Ballot, and other pleadings.

8.    **Procedure/Voting Deadline and Opt-Out Election Deadline**

In order for your Ballot (including your opt-out election) to count, you must: (i) complete, date and properly execute the Ballot, and (ii) properly deliver the Ballot to the Voting Agent by either mail, messenger or overnight courier at the following address:  if by first class mail, Fresh & Easy, LLC – Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, P.O. Box 4422, Beaverton, OR 97076-4422; and if by hand delivery or overnight courier, Fresh & Easy, LLC – Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 10300 SW Allen Blvd, Beaverton, OR 97005.

**Holders of Claims in Class 4 who do not want to provide the releases set forth in Article XVI herein must affirmatively indicate so by checking the "opt-out" box on the Ballot.  Holders of Claims in Class 4 who make an "opt-out" election will forego any Distribution from the $2.5 million Release Consideration.**

The Voting Agent must ACTUALLY RECEIVE Ballots on or before **April 17, 2017 at 4:00 p.m. (Pacific Time)** (the "Voting Deadline" and "Opt-Out Election Deadline," respectively).  Except as otherwise ordered by the Court, you may not change your vote or election once a Ballot is submitted to the Voting Agent.

Any Ballot that is timely received from a party entitled to vote, that contains sufficient information to permit the identification of the party casting the Ballot, and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan; provided, however, that the following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:  (a) any Ballot received after the Voting Deadline (unless extended by the Plan Proponents); (b) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (c) any Ballot cast by a person or entity that does not hold a

51

claim in a class that is entitled to vote to accept or reject the Plan; (d) any Ballot cast for a claim scheduled as contingent, unliquidated or disputed or as zero or unknown in amount and for which no timely Rule 3018(a) Motion has been filed; (e) any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and rejection, of the Plan; (f) any Ballot that casts part of its vote in the same class to accept the Plan and part to reject the Plan; (g) any form of Ballot other than the official form sent by the Voting Agent, or a copy thereof; (h) any Ballot received that the Voting Agent cannot match to an existing database record; (i) any Ballot that does not contain an original signature; (j) any Ballot that is submitted by facsimile, email or by other electronic means; or (k) any Ballot sent only to the Chief Restructuring Officer or the Plan Proponents or their respective professionals and not the Voting Agent.

9.    **Acceptance of the Plan**

As a Creditor, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (i.e., more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan.  At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan.  The Plan Proponents urge that you vote to accept the Plan.

**YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY RETURN YOUR BALLOT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND TO LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

10.    **Elimination of Vacant Class**

Any Class or sub-Class of Claims or Equity Interests that does not contain, as of the date of commencement of the Confirmation Hearing, at least one Holder of an Allowed Claim or Equity Interest, or at least one Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Plan and Disclosure Statement for all purposes, including for purposes of: (i) voting on the acceptance or rejection of the Plan; and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

X.
**TREATMENT OF UNCLASSIFIED CLAIMS**

A.    **Supplemental Administrative Expense Bar Date**

Requests for payment of Administrative Claims (other than Professional Fee Claims and 503(b)(9) Claims) against the Debtor that arose, accrued or otherwise became due and payable at any time subsequent to December 31, 2015 but on or before the Effective Date (the "Supplemental Administrative Claims Period") must be filed with the Court and served on the Debtor or Liquidating Trustee, as applicable, no later than the Supplemental Administrative Claims Bar Date (e.g., the thirtieth day following the Effective Date).  Holders of Administrative Claims that arose, accrued or otherwise become due during the Supplemental Administrative Claims Period that do not file requests for the allowance and payment thereof on or before the Supplemental Administrative Claims Bar Date shall forever be barred from asserting such

52

Administrative Claims against the Debtor or its Estate.  Unless the Debtor or the Liquidating Trust, as applicable, or any other party in interest objects to an Administrative Claim by the Administrative Claims Objection Deadline, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that the Debtor or the Liquidating Trust, as applicable, or any other party in interest objects to an Administrative Claim, and the Administrative Claim is not otherwise resolved, the Court shall determine the Allowed amount of such Administrative Claim.

B.    **Administrative Claims**

On or as soon as reasonably practicable after the later of: (i) the Distribution Date; or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, the Holder of an Allowed Administrative Claim (other than a Professional Fee Claim) will receive, in full satisfaction of such Allowed Administrative Claim: (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim; or (b) such other treatment as to which such Holder and the Plan Proponents or the Liquidating Trustee, as applicable, have agreed upon in writing.

C.    **PACA/PASA Claims**

All Allowed PACA/PASA Claims have been satisfied in full in cash in accordance with the procedures set forth in the PACA/PASA/503(b)(9) Bar Date Order and, in certain instances, by separate orders of this Court, and/or the consent order entered between the Debtor and the USDA.  All requests for payment of PACA/PASA Claims that were not filed by the PACA/PASA Bar Date in accordance with the PACA/PASA procedures set forth in the PACA/PASA/503(b)(9) Bar Date Order shall be denied, barred, discharged and enjoined as untimely as established by the PACA/PASA/503(b)(9) Bar Date Order.  Further, any claim or cause of action challenging the PACA/PASA/503(b)(9) Bar Date Order and the PACA/PASA procedures contained therein, including the resolution of such claims, and the Debtor's payment of PACA/PASA Claims, is hereby barred and enjoined.

D.    **WARN Act Liability**

For the purpose of satisfying Article XIV hereof, the WARN Reserve shall be established on account of any and all WARN Act Liability.  The WARN Reserve shall be used to satisfy WARN Act Liability, including the contemplated settlement discussed in Article III.D.9 hereof. The establishment of a WARN Reserve shall be a reserve for potential distribution purposes only.  The establishment of the WARN Reserve shall not be construed in any manner to determine, or have any affect whatsoever on, the validity, priority or amount of the asserted WARN Act Liability or claims asserted in the WARN Litigation and all of the parties' rights with respect thereto are expressly reserved.  The establishment of the WARN Reserve shall be without prejudice to any and all defenses, counterclaims, rights, claims and interests that the Debtor may have with respect to any asserted WARN Act Liability under applicable bankruptcy and non-bankruptcy law.

E.        **Priority Tax Claims**

On or as soon as reasonably practicable after the later of: (i) the Distribution Date; or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, the Holder of an Allowed Priority Tax Claim will receive, in full satisfaction of such Allowed Priority Tax Claim: (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Tax Claim; or (b) such other treatment as to which such Holder and the Plan Proponents or the Liquidating Trustee, as applicable, have agreed upon in writing.

F.        **DIP Facility Claims**

In the event the DIP Facility has not terminated prior to the Confirmation Hearing, an order terminating the DIP Facility (the "DIP Termination Order") shall be presented to the Court at the Confirmation Hearing.  Within 30 days of the entry of the DIP Termination Order (the "DIP Termination Date"), Wells Fargo shall return to the Debtor all cash that was collateralizing any letters of credit and all other remaining reserves held by Wells Fargo.  All letters of credit issued on behalf of the Debtor by Wells Fargo will be deemed terminated as of the Effective Date and will be of no further force or effect.  If a DIP Termination Order is entered prior to the Confirmation Hearing Date, Class 1 shall be eliminated.

G.        **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code, to the extent unpaid through the Effective Date, shall be paid in Cash within seven (7) Business Days after the Effective Date.  From and after the Confirmation Date through the closing of the Chapter 11 Case, all fees payable pursuant to section 1930 of title 28 of the United States Code, plus any interest under 37 U.S.C. § 3717, shall be paid by the Debtor (if prior to the Effective Date) or the Liquidating Trustee (if after the Effective Date).

H.        **Professional Fee Claims**

1.        **<u>Final Fee Applications</u>**

All final requests for payment of a Professional Fee Claim (the "Final Fee Applications") must be filed no later than forty-five (45) days after the Effective Date; <u>provided</u>, <u>however</u>, that (i) any professional who may receive compensation or reimbursement of expenses pursuant to the OCP Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Court review or approval, pursuant to the OCP Order; and (2) pursuant to the FTI Order, Amir Agam, as CRO, and FTI, shall not be required to File a Final Fee Application unless seeking success fees, transaction fees or other back-end fees.   Objections, if any, to Final Fee Applications of such Professionals must be filed and served on the Liquidating Trustee, the requesting Professional, and the UST no later than twenty (20) days from the date on which each such Final Fee Application is served and filed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the Allowed amounts of such Professional Fee Claims will be determined by the Court.

2.      **Substantial Contribution Compensation and Expenses Bar Date**

Any Person or Entity that wishes to make a Substantial Contribution Claim based on facts or circumstances arising after the Petition Date must File an application with the Clerk of the Court, on or before the Supplemental Administrative Claims Bar Date, and serve such application on the Debtor or the Liquidating Trust, as applicable, and the UST and as otherwise required by the Court and the Bankruptcy Code, or be forever barred from seeking such substantial contribution claim.  Objections, if any, to a Substantial Contribution Claim must be filed no later than the Administrative Claims Objection Deadline, unless otherwise extended by Order of the Court.

XI.
**CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

Claims, other than Administrative Claims, Priority Tax Claims, and DIP Lender Claims are classified for all purposes, including voting, confirmation and distribution pursuant to the Combined Plan and Disclosure Statement, as follows:

| Class | Type | Treatment | Voting Status |
|---|---|---|---|
| 1 | Wells Fargo Secured Claim | Unimpaired | Not Entitled to Vote Deemed to Accept |
| 2 | Other Miscellaneous Secured Claims | Unimpaired | Not Entitled to Vote Deemed to Accept |
| 3 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote Deemed to Accept |
| 4A | General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | General Unsecured Claims of Releasing Creditors | Impaired | Entitled to Vote |
| 5 | Subordinated Claims | Impaired | Deemed to Reject Not Entitled to Vote |
| 6 | Equity Interests | Impaired | Deemed to Reject Not Entitled to Vote |

XII.
**TREATMENT OF CLAIMS AND EQUITY INTERESTS**

A.      **Treatment of Claims**

1.      **Class 1 - Wells Fargo Secured Claim**

a)      **Classification**

Class 1 consists of the Wells Fargo Secured Claim.

55

b)      **Impairment and Voting**

Class 1 is Unimpaired by the Plan. The Holder of a Class 1 Wells Fargo Secured Claim is deemed to have accepted the Plan, and thus is not entitled to vote to accept or reject the Plan.

c)      **Treatment**

There is no remaining outstanding indebtedness related to the Wells Fargo Secured claim.  The termination of the DIP Facility is detailed in the treatment of the DIP Facility Claims.  In the event the Court enters a DIP Termination Order prior to the Confirmation Hearing, which, *inter alia* (a) acknowledges that the Debtor has not drawn on any DIP Financing, (b) implements appropriate provisions on a final basis with respect to Wells Fargo, and (c) eliminates YFE as a DIP lender retroactive to the Petition Date, Class 1 shall be deemed unnecessary and eliminated.

2.      **Class 2 - Other Miscellaneous Secured Claims**

a)      **Classification**

Class 2 consists of all Other Miscellaneous Secured Claims.

b)      **Impairment and Voting**

Class 2 is Unimpaired by the Plan.  Holders of a Class 2 Other Miscellaneous Secured Claims are deemed to have accepted the Plan, and thus are not entitled to vote to accept or reject the Plan.

c)      **Treatment**

On or as soon as reasonably practicable after the later of: (i) the Distribution Date; or (ii) the date a Class 2 Other Miscellaneous Secured Claim becomes an Allowed Secured Claim, at the option of the Debtor or the Liquidating Trustee, as applicable, the Holder of such Class 2 Other Miscellaneous Secured Claim will receive, in full satisfaction of such Allowed Secured Claim: (i) Cash from the Debtor equal to the value of such Secured Claim; (ii) a return of the Holder's Collateral securing the Secured Claim and payment of any interest required under section 506(c) of the Bankruptcy Code; (iii) such other treatment rendering such Claim Unimpaired; or (iv) such other treatment as to which such Holder and the Plan Proponents or the Liquidating Trustee, as applicable, have agreed upon in writing.  Each Miscellaneous Secured Claim receiving treatment under this provision shall be deemed to be in a separate Class for classification, Voting and Distribution purposes.

3.      **Class 3 – Priority Non-Tax Claims**

a)      **Classification**

Class 3 consists of Priority Non-Tax Claims.

54567/0001-14098116v3

b) **Impairment and Voting**

Class 3 is Unimpaired by the Plan.  Holders of a Class 3 Priority Non-Tax Claim are deemed to have accepted the Plan, and thus are not entitled to vote to accept or reject the Plan.

c) **Treatment**

Except to the extent that a Holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor before the Distribution Date or agrees to a less favorable treatment, as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) thirty (30) days after such date that the Claim becomes an Allowed Priority Non-Tax Claim, each Allowed Priority Non-Tax Claim will receive, in full satisfaction, discharge, exchange and release of such Allowed Priority Non-Tax Claim, Cash equal to the full amount of the Allowed Priority Non-Tax Claim.

4. **Class 4 – General Unsecured Claims**

a) **Classification**

Class 4 consists of General Unsecured Claims.

b) **Impairment and Voting**

Class 4 is Impaired.  Holders of Allowed General Unsecured Claims in Class 4 are entitled to vote to accept or reject the Plan.

c) **Treatment**

**Class 4A - General Unsecured Claims:** On the Effective Date, each Holder of an Allowed General Unsecured Claim in **Class 4A**, who elects to opt-out of the Consensual Third Party Releases set forth in Article XVI.A.2 herein, and therefore does not grant the Consensual Third Party Releases, including the Chapter 11 Individual Releases, will receive, on account of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Interests.

**Class 4B** - **General Unsecured Claims of Releasing Creditors:** On the Effective Date, each Holder of an Allowed General Unsecured Claim in **Class 4B**, who elects **not** to opt-out of the Consensual Third Party Releases set forth in Article XVI.A.2 herein, and therefore consents to the Consensual Third Party Releases, including the Chapter 11 Individual Releases, will receive, on account of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Interests, **plus** its Pro Rata share of the Release Consideration.

5. **Class 5 – Subordinated Claims**

a) **Classification**

Class 5 consists of all Subordinated Claims.

54567/0001-14098116v3

b)      **Impairment and Voting**

Class 5 is Impaired.  Because Holders of Subordinated Claims will receive no Distribution under the Plan, Class 5 shall be deemed to have voted to reject the Plan.

c)      **Treatment**

On the Effective Date, Subordinated Claims shall not receive or retain any Distribution or property on account of such Subordinated Claims.  Holders of Class 5 Claims shall receive no Distribution under the Plan.

6.      **Class 6 – Equity Interests**

a)      **Classification**

Class 6 consists of Equity Interests.

b)      **Impairment and Voting**

Class 6 is Impaired.  Because Holders of Equity Interests will receive no Distribution under the Plan, Class 6 shall be deemed to have rejected the Plan.

c)      **Treatment**

On the Effective Date, all Equity Interests shall be deemed without monetary value as a result of the insolvency of the Debtor, and all Equity Interests will be cancelled, annulled and extinguished without any further action by the Debtor, the Liquidating Trustee or any other entity, and each Holder thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Equity Interests.

B.      **Modification of Treatment of Claims and Equity Interests**

The Plan Proponents reserve the right to modify the treatment of any Allowed Claim or Equity Interest in any manner adverse only to the Holder of such Claim or Equity Interest at any time after the Effective Date upon the consent of the Holder of the Claim or Equity Interest whose Allowed Claim or Equity Interest, as the case be, is being adversely affected.

C.      **Cramdown and No Unfair Discrimination**

In the event that any impaired Class of Claims or Equity Interests rejects the Plan or is deemed to have rejected the Plan, the Debtor hereby requests, without any delay in the occurrence of the Confirmation Hearing or Effective Date, that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief.

XIII.
## PROVISIONS REGARDING THE LIQUIDATING TRUST

A.     **Establishment and Administration of the Liquidating Trust**

1.      On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, among other things, (i) investigating and, if appropriate, pursuing Liquidating Trust Claims; (ii) administering and pursuing the Liquidating Trust Assets; (iii) resolving all Disputed Claims and any Claim objections pending as of the Effective Date; (iv) prosecuting any objections to Claims that the Liquidating Trustee deems appropriate and resolving such objections; (v) making Distributions from the Liquidating Trust to Holders of Allowed Claims as provided for in the Plan and/or the Liquidating Trust Agreement; (vi) exercising such other powers as necessary or prudent to carry out the provisions of the Plan and the Liquidating Trust Agreement; and (vii) taking such other actions as may be necessary or appropriate to effectuate the Plan and the Liquidating Trust Agreement.

2.      Upon execution of the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized to take all steps necessary to complete the formation of the Liquidating Trust.  The Liquidating Trust shall be administered by the Liquidating Trustee in accordance with the Liquidating Trust Agreement.

3.      It is intended that the Liquidating Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4 and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code.  In furtherance of this objective, the Liquidating Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the Liquidating Trust.  All Liquidating Trust Assets held by the Liquidating Trust on the Effective Date shall be deemed for federal income tax purposes to have been distributed by the Debtor on a Pro Rata basis to Holders of Allowed General Unsecured Claims and then contributed by such Holders to the Liquidating Trust in exchange for the Liquidating Trust Interests.  All Holders of Allowed General Unsecured Claims have agreed to use the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as established by the Liquidating Trustee for all federal income tax purposes.  The beneficiaries under the Liquidating Trust shall be treated as the deemed owners of the Liquidating Trust.  The Liquidating Trust shall be responsible for filing information on behalf of the Liquidating Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

B.     **Assets of the Liquidating Trust**

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtor shall transfer and assign to the Liquidating Trust all of its right, title and interest in and to all of the Liquidating Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Holders of Liquidating Trust Interests as set forth in the Plan and the expenses of the Liquidating Trust as set forth herein and in the Liquidating Trust Agreement.  Thereupon, the Debtor shall not have any interest in or with respect to the Liquidating Trust Assets.

C.      **Other Funds to be Transferred to the Liquidating Trust**

Pursuant to Article XIII of the Combined Plan and Disclosure Statement, on or before the Effective Date, the Debtor shall transfer to the Liquidating Trust Cash in the amount of the Administrative, Priority and Secured Claims Estimate, which Cash shall be used by the Liquidating Trustee to fund the Administrative Claims Reserve.

Pursuant to Article XIII of the Combined Plan and Disclosure Statement, on the Effective Date, the Debtor shall transfer to the Liquidating Trust Cash remaining in the WARN Reserve, which Cash shall be used by the Liquidating Trust to satisfy any and all remaining WARN Act Liability.

D.      **Rights and Powers of the Liquidating Trust and the Liquidating Trustee**

1.      The Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, and the right to: (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (ii) prosecute, settle, abandon or compromise any Liquidating Trust Claims; (iii) make Distributions contemplated by the Plan and the Liquidating Trust Agreement; (iv) establish and administer any necessary reserves that may be required, including the Disputed Claims Reserve and the Administrative Claims Reserve; (v) object to Disputed Claims and, without Court approval, settle, compromise, withdraw or resolve in any manner such objections; and (vi) employ and compensate professionals (including professionals previously retained by the Debtor and/or the Committee), provided, however, that any such compensation shall be made only out of the Liquidating Trust Assets and Liquidating Trust Proceeds.  In addition, the Liquidating Trustee is authorized and empowered, and shall be responsible for (i) terminating the Fresh & Easy 401(k), including, but not limited to, filing all applicable forms required by the IRS, ERISA, the 401(k) and/or applicable nonbankruptcy law, and providing all applicable notices to plan participants; (ii) filing all federal, state and local tax returns on behalf of the Debtor; (iii) cooperating with the purchasers of liquor licenses (and the designated escrow holder) to whom the Debtor sold, assigned, transferred or conveyed it's rights, title and interests in and to certain liquor licenses, for the transfer of said liquor license; and (iv) taking all other actions required under the Plan to complete the liquidation, dissolution and wind-up of the Debtor.

2.      The Liquidating Trustee has full authority to take any steps necessary to administer the Liquidating Trust Agreement, including without limitation, the duty and obligation to liquidate Liquidating Trust Assets, to make Distributions therefrom in accordance with the provisions of the Plan and to pursue, settle or abandon any Liquidating Trust Claims, all in accordance with the Liquidating Trust Agreement.

60

E.     **Liquidating Trust Interests**

1.     On the Effective Date, each Holder of an Allowed General Unsecured Claim shall, by operation of the Plan, receive its Pro Rata share of the Liquidating Trust Interests.  Liquidating Trust Interests shall be reserved for Holders of Disputed General Unsecured Claims and issued by the Liquidating Trust to, and held by the Liquidating Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims.  No other entity shall have any interest, legal, beneficial or otherwise, in the Liquidating Trust Assets upon the assignment and transfer of such assets to the Liquidating Trust.

2.     As set forth in the Liquidating Trust Agreement, Distributions from the Liquidating Trust on account of Liquidating Trust Interests shall be made from the Liquidating Trust Assets and Liquidating Trust Proceeds after paying, reserving against or satisfying, among other things, the operating and administrative expenses of the Liquidating Trust, including but not limited to all costs, expenses and obligations incurred by the Liquidating Trustee (or professionals who may be employed by the Liquidating Trustee in administering the Liquidating Trust) in carrying out their responsibilities under the Liquidating Trust Agreement, or in any manner connected, incidental or related thereto.

3.     The Liquidating Trust Interests shall be uncertificated and shall be nontransferable except upon death of the Holder or by operation of law.  Holders of Liquidating Trust Interests, in such capacity, shall have no voting rights with respect to such interests.  The Liquidating Trust shall have a term of five (5) years from the Effective Date, without prejudice to the rights of the Liquidating Trust Committee to authorize the Liquidating Trustee to extend such term conditioned upon the Liquidating Trust not becoming subject to the Securities Exchange Act of 1934 (as now in effect or hereafter amended) (the "Liquidating Trust's Termination Deadline").

F.     **Appointment of a Liquidating Trustee**

1.     The initial Liquidating Trustee shall be Peter Kravitz of Province, Inc. or such other person as mutually acceptable to the Committee and Debtor.  The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be as of the Effective Date.  The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and Liquidating Trust Agreement.

2.     The Liquidating Trustee shall not be obligated to obtain a bond but may do so, in his sole discretion, in which case the expense incurred by such bonding shall be paid by the Liquidating Trust.

3.     The Liquidating Trustee and the members of the Liquidating Trust Committee and their professionals shall be exculpated and indemnified pursuant to and in accordance with the terms of the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

G. **Liquidating Trust Committee**

1. **Creation of Liquidating Trust Committee and Procedures Related Thereto**

The Liquidating Trust Committee shall consist of not less than two (2) members, which shall be appointed by the Committee.  The Debtor or the Committee shall File a notice on a date that is not less than ten (10) days prior to the Confirmation Hearing designating the Persons or Entities that have been selected to serve on the Liquidating Trust Committee.  Each member of the Liquidating Trust Committee shall be entitled to vote on all matters in accordance with the terms of the Liquidating Trust Agreement.  Members of the Liquidating Trust Committee shall receive a flat fee of $[●]  as compensation, and shall be entitled to reimbursement of reasonable expenses.

2. **Standing of the Liquidating Trust Committee**

The Liquidating Trust Committee shall have independent standing to appear and be heard in the Court as to any matter relating to the Plan, the Liquidating Trust Agreement or the Estate, including any matter as to which the Court has retained jurisdiction pursuant to Article XI of the Plan.

3. **Function and Duration of the Liquidating Trust Committee**

The Liquidating Trust Committee shall have the rights and responsibilities set forth in the Plan and the Liquidating Trust Agreement, including instructing and supervising the Liquidating Trustee with respect to its responsibilities under the Plan and the Liquidating Trust Agreement.  The Liquidating Trust Committee shall remain in existence until such time as the final Distributions under the Liquidating Trust Agreement have been made, as set forth more fully in the Liquidating Trust Agreement.

4. **Indemnification of Liquidating Trustee and Liquidating Trust Committee**

The Indemnified Persons shall be held harmless and shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the Liquidating Trust, Liquidating Trust Committee or Liquidating Trustee (as applicable), except those acts that are determined by Final Order of the Court to have arisen out of their own intentional fraud, willful misconduct or gross negligence.  Each Indemnified Person shall be entitled to be indemnified, held harmless and reimbursed for fees and expenses including, without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that Person's or Entity's actions or inactions regarding the implementation or administration of the Plan, or the discharge of their duties under the Plan or Liquidating Trust Agreement, except for any actions or inactions that are determined by Final Order of the Court to have arisen from intentional fraud, willful misconduct or gross negligence.  Any Claim of the Indemnified Persons to be indemnified, held harmless or reimbursed shall be satisfied solely from the Liquidating Trust Assets, Liquidating Trust Proceeds and any applicable insurance coverage.

### 5.    Recusal of Liquidating Trust Committee Members

A Liquidating Trust Committee member shall recuse itself from any decisions or deliberations regarding actions taken or proposed to be taken by the Liquidating Trustee with respect to the Claims, Causes of Action or rights of such Liquidating Trust Committee member, the entity appointing such Liquidating Trust Committee member, or any affiliate of the foregoing.

### H.    Distributions to Holders of Allowed General Unsecured Claims

1.    Initial Distributions.  On the Distribution Date, the Liquidating Trustee shall make, or shall make adequate reserves in the Disputed Claims Reserve for, the Cash Distributions required to be made under the Combined Plan and Disclosure Statement to Holders of Allowed General Unsecured Claims.  The Liquidating Trustee shall not make any Distributions of Liquidating Trust Assets to the beneficiaries under the Liquidating Trust unless the Liquidating Trustee retains and reserves in the Disputed Claims Reserve such amounts as are required under Article XIII of the Combined Plan and Disclosure Statement.

2.    Interim Distributions.  The Liquidating Trust Committee shall make interim Distributions of Cash in accordance with the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement to Holders of Liquidating Trust Interests if the Liquidating Trust Committee deems it appropriate in its sole discretion; provided, however, that the Liquidating Trust will not be required to make a distribution if doing so would leave the Trust without sufficient Available Trust Cash to maintain the value of the Assets or to meet Trust liabilities, or if the Trustee decides such distribution would be administratively burdensome.

3.    Final Distributions.  The Liquidating Trust shall be dissolved and its affairs wound up and the Liquidating Trustee shall make the final Distributions, upon the earlier of: (i) the expiration of the Liquidating Trust's Termination Deadline as it may be extended from time to time, and (ii) that date when, (A) in the reasonable judgment of the Liquidating Trustee, substantially all of the assets of the Liquidating Trust have been liquidated and there are no substantial potential sources of additional Cash for Distribution; and (B) there remain no substantial Disputed Claims.  The date on which the Liquidating Trustee determines that all obligations under the Plan and Liquidating Trust Agreement have been satisfied is referred to as the "Liquidating Trust Termination Date."  On the Liquidating Trust Termination Date, the Liquidating Trustee shall, to the extent not already done, request that the Court enter an order closing the Chapter 11 Case.

Upon dissolution of the Liquidating Trust, if the Liquidating Trustee reasonably determines that any remaining Liquidating Trust Assets are insufficient to render a further distribution practicable, or exceed the amounts required to be paid under the Plan, the Liquidating Trustee shall transfer such remaining funds to a charitable institution selected by the Liquidating Trustee, which charitable institution shall be qualified as a not-for-profit corporation under applicable federal and state laws.

I.      **Distributions to Holders of Administrative, Priority and Secured Claims**

On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date an Administrative Claim, Priority Tax Claim, Priority Non-Tax Claim or Secured Claim becomes an Allowed Claim, the Liquidating Trustee shall make the Distributions required to be made under the Plan to Holders of Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims subject to the limitations set forth in Section [●] of the Liquidating Trust Agreement.

J.      **Requirement of Liquidating Trust**

The Liquidating Trust's formation documents shall require that financial statements or similar reports of the Liquidating Trust be sent to all Holders of Liquidating Trust Interests on an annual basis.

K.      **Accounts and Reserves**

1.      **Professional Fee Reserve**

On or before the Effective Date, the Debtor shall transfer to Young Conaway Stargatt & Taylor LLP ("YCS&T") Cash in the Amount of the Professional Fee Estimate, which Cash shall be used to fund the Professional Fee Reserve.  The Cash so transferred shall not be used for any purpose other than to pay Allowed Professional Fee Claims.  YCS&T (i) shall segregate and shall not commingle the Cash held in the Professional Fee Reserve and (ii) subject to the terms and conditions of the Combined Plan and Disclosure Statement shall pay each Professional Fee Claim of a Professional employed by the Debtor or the Committee, on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim.  After all Professional Fee Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by YCS&T, any remaining Cash in the Professional Fee Reserve shall become a Liquidating Trust Asset and YCS&T shall remit the remaining Cash to the Liquidating Trust as soon as practical. Notwithstanding any other provision in the Plan, in the event the Cash held in the Professional Fee Reserve is insufficient to satisfy the Allowed Professional Fee Claims, the Liquidating Trust shall fund the Cash necessary to satisfy any shortfall.  Only Professionals employed in the Chapter 11 Case by the Debtor or the Committee shall be entitled to payment from the Professional Fee Reserve.

The Professionals employed by the Debtor and the Committee, as applicable, shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing and prosecution of Final Fee Applications, from the Professional Fee Reserve.  Any time or expenses incurred in the preparation, filing and prosecution of Final Fee Applications shall be disclosed by each Professional in its final fee application and shall be subject to approval of the Court.

2.      **Administrative Claims Reserve**

On or before the Effective Date, the Debtor shall transfer to the Liquidating Trust Cash in the Amount of the Administrative, Priority and Secured Claims Estimate (reducing such reserve for any amounts held by creditors or other parties to satisfy those claims), which Cash shall be

used by the Liquidating Trustee to fund the Administrative Claims Reserve.  The Cash so transferred shall not be used for any purpose other than to pay Allowed Administrative Claims (except Professional Fee Claims, which shall be paid from the Professional Fee Reserve) Allowed Priority Claims, and Secured Claims.  The Liquidating Trustee (i) shall segregate and shall not commingle the Cash held in the Administrative Claims Reserve and (ii) subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, shall pay each Administrative Claim (except Professional Fee Claims, which shall be paid from the Professional Fee Reserve) and Priority Claim on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim.  After all Administrative Claims (except Professional Fee Claims), Priority Claims and Secured Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Liquidating Trust, any remaining Cash in the Administrative Claims Reserve shall become a Liquidating Trust Asset.

3. **WARN Reserve**

If, as of the Effective Date, funds remain in the WARN Reserve, the Debtor shall transfer to the Liquidating Trust the WARN Reserve for the purposes of satisfying any and all remaining WARN Act Liability.  The Liquidating Trustee (i) shall segregate and shall not commingle the WARN Reserve; and (ii) the WARN Reserve shall be subject to the terms and conditions of the Plan and Settlement Agreement.  Any remaining Cash in the WARN Reserve after all Allowed WARN Claims are satisfied shall become a Liquidating Trust Asset.

4. **Other Reserves**

The Liquidating Trust shall establish and administer any other necessary reserves that may be required under the Combined Plan and Disclosure Statement or Liquidating Trust Agreement, including the Disputed Claims Reserve.

5. **Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Combined Plan and Disclosure Statement shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents without the payment of any such tax or governmental assessment.

6. **Applicability of Section 1145 of the Bankruptcy Code**

Under section 1145 of the Bankruptcy Code, the issuance of the Liquidating Trust Interests under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities.  If the Liquidating Trustee determines, with the advice of counsel, that the Liquidating Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Liquidating

Trustee shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

### 7.        **Effectuating Documents; Further Transactions**

The Liquidating Trustee, subject to the terms and conditions of the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 8.        **Books and Records; Privilege Matters**

#### a)        **Transfer of Debtor's Books and Records**

On or before the Effective Date, the Debtor shall transfer its Books and Records to the Liquidating Trust.

#### b)        **Destruction of Records**

Effective the first (1st) year anniversary of the Effective Date, the CRO and FTI Consulting Inc. shall not be required to maintain any records related to Fresh & Easy LLC in physical and/or electronic form, including but not limited to (a) physical copies of documents; (b) data from the computers and/or laptops, (c) data from servers used to store information, and (d) data from computers, laptops, and servers that are duplicative of records otherwise available in either physical or electronic form or are already publicly available and may dispose of any such records related to Fresh & Easy, LLC at their discretion.

#### c)        **Transfer of Evidentiary Privileges; Document Requests**

Notwithstanding anything to the contrary herein, on the Effective Date, the Liquidating Trustee shall succeed to the evidentiary privileges, including attorney-client privilege, formerly held by the Debtor.  Privileged communications may be shared among the Liquidating Trustee and the Liquidating Trust Committee without compromising the privileged nature of such communications, in accordance with the "joint interest" doctrine.

Accordingly, to the extent that documents are requested from current counsel to the Debtor by any Person or Entity, after the Effective Date, only the Liquidating Trustee shall have the ability to waive such attorney-client or other privileges.  In addition, current counsel to the Debtor shall have no obligation to produce any documents currently in its possession as a result of or arising in any way out of its representation of the Debtor unless: (i) the Person or Entity requesting such documents serves its request on the Liquidating Trustee; (ii) the Liquidating Trustee consents in writing to such production and any waiver of the attorney-client or other privilege such production might cause; and (iii) the Liquidating Trustee or the Person or Entity requesting such production agrees to pay the reasonable costs and expenses incurred by current counsel for the Debtor in connection with such production.

54567/0001-14098116v3

XIV.
## PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

A.    **Method of Payment**

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or an electronic wire.

B.    **Distributions on Allowed Claims**

Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date or become Allowed Claims thereafter shall be made by the Disbursing Agent pursuant to the terms and conditions of the Plan and the Liquidating Trust Agreement. Notwithstanding any other provision of the Combined Plan and Disclosure Statement to the contrary, no Distribution shall be made on account of any Allowed Claim or portion thereof that: (i) has been satisfied after the Petition Date; (ii) is listed in the Schedules as Contingent, unliquidated, Disputed or in a zero amount, and for which a Proof of Claim has not been timely Filed; or (iii) is evidenced by a Proof of Claim that has been amended by a subsequently Filed Proof of Claim.

C.    **Disbursing Agent**

The Disbursing Agent shall make all Distributions required under the Plan, subject to the terms and provisions of the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.  If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent shall receive, without further Court approval, reasonable compensation from the Liquidating Trust for distribution services rendered pursuant to the Combined Plan and Disclosure Statement and reimbursement of reasonable out-of-pocket expenses.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties.  The Disbursing Agent shall be authorized and directed to rely upon the Debtor's books and records and the Liquidating Trust's representatives and professionals in determining Allowed Claims entitled to Distributions under the Combined Plan and Disclosure Statement in accordance with the terms and conditions of the Combined Plan and Disclosure Statement.

D.    **Objections to and Resolution of Claims**

Subject to the terms and conditions of the Liquidating Trust Agreement, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Liquidating Trust shall have the authority to: (1) File, withdraw or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Court; provided, however, that the objection to and settlement of Professional Fee Claims shall not be subject to this Article, but rather shall be governed by Article XIII.J.  In the event that any objection Filed by the Debtor or the Committee remains pending as of the Effective Date, the Liquidating

Trustee shall be deemed substituted for the Debtor or the Committee, as applicable, as the objecting party.

The Liquidating Trust shall be entitled to assert all of the Debtor's rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization and/or equitable subordination and counter-claims with respect to Claims.

E.    **Claim Objection Deadline**

Except with respect to Professional Fee Claims and Administrative Claims, all objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline; provided, however, the Claims Objection Deadline may be extended by the Court upon motion and notice. Notice of any motion for an order extending the Claims Objection Deadline shall be required to be given only to those Persons or Entities that have requested notice in the Chapter 11 Case in accordance with Bankruptcy Rule 2002.

F.    **No Distribution Pending Allowance**

Notwithstanding any other provision of the Combined Plan and Disclosure Statement or the Liquidating Trust Agreement, no payment or Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Plan.

G.    **Escrow of Cash Distributions**

On any date that Distributions are to be made under the terms of the Combined Plan and Disclosure Statement, the Liquidating Trustee shall deposit in one or more segregated accounts, Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto. The Liquidating Trustee shall also segregate any interest, dividends or proceeds of such Cash. Such Cash together with any interest, dividends or proceeds thereof, shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

H.    **Distributions After Allowance**

Payments and Distributions to Holders of Disputed Claims that ultimately become Allowed Claims shall be made in accordance with provisions of the Liquidating Trust Agreement that govern Distributions to Holders of Allowed General Unsecured Claims (Section [●] of the Liquidating Trust Agreement).

I.    **Investment of Segregated Cash and Property**

To the extent practicable, the Liquidating Trustee may invest any Cash or other property segregated on account of a Disputed Claim, undeliverable Distribution, or any proceeds thereof: (i) in a manner that will yield a reasonable net return taking into account the safety of the investment; or (ii) in any manner permitted by section 345 of the Bankruptcy Code; provided, however, that the Liquidating Trustee shall be under no obligation to so invest such Cash or

proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash, other property or proceeds.

J.       **Delivery of Distributions in General**

Except as provided herein, distributions to Holders of Allowed Claims shall be made by the Disbursing Agent: (i) at the addresses set forth on the respective Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtor has been notified of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

In making Distributions under the Combined Plan and Disclosure Statement, the Disbursing Agent may rely upon the accuracy of the Claims register maintained by the Claims Agent in the Chapter 11 Case, as modified by any Final Order of the Court disallowing Claims in whole or in part.

K.       **Undeliverable and Unclaimed Distributions**

If the Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address and such Holder provides sufficient evidence of such address as may be requested by the Disbursing Agent, at which time all missed Distributions shall be made to such Holder without interest, subject to the time limitations set forth below.  Amounts in respect of undeliverable Distributions made by the Disbursing Agent shall remain in the possession of the Disbursing Agent until the earlier of: (i) such time as a distribution becomes deliverable; or (ii) such undeliverable distribution becomes an unclaimed distribution pursuant to Article XIV of the Combined Plan and Disclosure Statement.  The Disbursing Agent shall segregate and, with respect to Cash, deposit in a segregated account designated as an unclaimed Distribution reserve, undeliverable and unclaimed Distributions for the benefit of all such similarly-situated Persons or Entities until such time as a Distribution becomes deliverable or is claimed, subject to the time limitations set forth below.

Any Holder of an Allowed Claim that does not assert a claim pursuant to the Combined Plan and Disclosure Statement for an undeliverable or unclaimed Distribution within three (3) months after the date such Distribution was returned undeliverable shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Debtor and its Estate, the Liquidating Trustee, the Liquidating Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its or their property.   In the case of undeliverable or unclaimed Distributions on account of Administrative Claims, Priority Tax Claims or Priority Non-Tax Claims, any Cash otherwise reserved for undeliverable or unclaimed Distributions shall revert to the Administrative Claims Reserve.  In the case of undeliverable or unclaimed Distributions on account of Liquidating Trust Interests, any Cash otherwise reserved for undeliverable or unclaimed Distributions shall revert

to the Liquidating Trust, and all title to and all beneficial interests in the Liquidating Trust Assets represented by any such undeliverable Distributions shall revert to and/or remain in the Liquidating Trust and shall be distributed in accordance with Article XIV of the Liquidating Trust Agreement and the Plan.  The reversion of such Cash to the Administrative Claims Reserve or the Liquidating Trust, as applicable, shall be free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be treated in accordance with the terms of the Plan and the Liquidating Trust Agreement.  Nothing contained in the Plan or the Liquidating Trust Agreement shall require the Debtor, the Liquidating Trust, the Liquidating Trustee or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

L.      **Escheatment**

Notwithstanding any State escheatment law, any State that was entitled to file a Claim in its own right in connection with claims for property that had been deemed abandoned and had escheated to the State prepetition, but failed to comply with the Bar Date and file a Proof of Claim, will be forever barred from assertion of such Claim against the Debtor and its Estate.

M.      **Minimum Distributions**

The Liquidating Trust, as Disbursing Agent, shall not be required to make any distribution to a Holder of an Allowed Claim of less than fifty dollars ($50.00) on account of such Allowed Claim.  If a Holder of an Allowed Claim would be entitled to receive less than $50 as of the time of a particular distribution, but would be entitled to receive more than $50 in combination with later distributions, the Liquidating Trust, as Disbursing Agent, shall combine such distribution with later distributions so that the Holder may eventually be entitled to a distribution of at least $50 in value.

N.      **Fractional Dollars**

Any other provision of the Combined Plan and Disclosure Statement notwithstanding, the Disbursing Agent shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

O.      **Withholding and Reporting Requirements**

In accordance with section 346 of the Bankruptcy Code and in connection with the Combined Plan and Disclosure Statement and all Distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority.  The Disbursing Agent shall be authorized to take any and all actions necessary and appropriate to comply with such requirements.

All Distributions hereunder shall be subject to withholding and reporting requirements. As a condition of making any Distribution under the Plan, each Entity holding an Allowed Claim is required to provide any information necessary in writing, including returning W-9 (or W-8, if

applicable) statements, to effect the necessary information reporting and withholding of applicable taxes with respect to Distributions to be made under the Plan as the Disbursing Agent may request.  The Disbursing Agent shall be entitled in its sole discretion to withhold any Distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Disbursing Agent to such Holder of an Allowed Claim, which timeframe shall not be less than thirty (30) days.  The Distribution to any Holder of an Allowed Claim that fails to timely respond to the Disbursing Agent shall be treated as an undeliverable or unclaimed Distribution pursuant to Article XIV of the Combined Plan and Disclosure Statement.

Notwithstanding any other provision of the Combined Plan and Disclosure Statement, each Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such Distribution.

P.      **Setoffs**

Subject to the terms and conditions of the Liquidating Trust Agreement, the Debtor and/or the Liquidating Trust may, but shall not be required to, set off against any Claim and the payments or other Distributions to be made under the Plan on account of the Claim, claims of any nature whatsoever that the Debtor may have against the Holder thereof, provided that any such right of setoff that is exercised shall be allocated, first, to the principal amount of the related Claim, and thereafter to any interest portion thereof, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor and/or the Liquidating Trust of any such claim that the Debtor may have against such Holder.

Q.      **Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

R.      **Disputed Claims Reserve**

On the Distribution Date and on each subsequent Periodic Distribution Date, the Liquidating Trust shall withhold on a Pro Rata basis from property that would otherwise be distributed to Holders of General Unsecured Claims entitled to Distributions under the Combined Plan and Disclosure Statement on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of such Disputed General Unsecured Claims would be entitled under the Plan if such Disputed Claims were allowed in their Disputed Claim Amount.  The Liquidating Trust may request, if necessary, estimation for any Disputed General Unsecured Claim that is contingent or unliquidated, or for which the Liquidating Trust determines to reserve less than the Face Amount.  If the Liquidating Trust elects not to request such an estimation from the Court

with respect to a Disputed General Unsecured Claim that is contingent or unliquidated, the Liquidating Trust shall withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such General Unsecured Claim by the Liquidating Trust.  If practicable, the Liquidating Trust shall invest any Cash that is withheld as the Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment, in accordance with Section [●] of the Liquidating Trust Agreement.  Nothing in the Plan, the Disclosure Statement or the Liquidating Trust Agreement shall be deemed to entitle the Holder of a Disputed General Unsecured Claim to postpetition interest on such Claim, however.

### S.      Allocation of Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### T.      Distribution Record Date

The Disbursing Agent shall have no obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date.  Instead, the Disbursing Agent shall be entitled to recognize and deal for all purposes under the Combined Plan and Disclosure Statement with only those record Holders stated on the official Claims register or the Debtor's Books and Records, as applicable, as of the close of business on the Distribution Record Date.

### U.      Claim Estimation

In order to effectuate distributions pursuant to this Plan and avoid undue delay in the administration of the Chapter 11 Case, the Debtor (if on or prior to the Effective Date) and the Liquidating Trustee (if after the Effective Date), after notice and a hearing (which notice may be limited to the holder of a such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of (i) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim(s), (ii) such Claim for claim allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, the Bankruptcy Court shall determine (i) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

## XV.
## IMPLEMENTATION AND EFFECT OF CONFIRMATION OF THE PLAN

### A.      Means for Implementation of the Plan

In addition to the provisions set forth elsewhere in the Combined Plan and Disclosure Statement, the following shall constitute the means for implementation of the Plan:

1.      **Funding of Liabilities and Distributions**

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtor shall transfer and assign to the Liquidating Trust all of its right, title and interest in and to all of the Liquidating Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Holders of Liquidating Trust Interests as set forth in the Plan and the expenses of the Liquidating Trust as set forth herein and in the Liquidating Trust Agreement.  Thereupon, the Debtor shall not have any interest in or with respect to the Liquidating Trust Assets.

2.      **Other Funds to be Transferred to the Liquidating Trust**

Pursuant to Article XIII of the Plan, after all Allowed Professional Fee Claims are paid by Young Conaway Stargatt & Taylor LLC from the Professional Fee Reserve, any remaining Cash in the Professional Fee Reserve shall be transferred to the Liquidating Trust as soon as practical and become a Liquidating Trust Asset.

Pursuant to Article XIII of the Plan, on or before the Effective Date, the Debtor shall transfer to the Liquidating Trust Cash in the amount of the Administrative, Priority Claims, and Secured Claims Estimate, which Cash shall be used by the Liquidating Trustee to fund the Administrative Claims Reserve.

3.      **Corporate Action; Effectuating Documents; Further Transactions**

a)      **Corporate Action**

On the Effective Date, the directors, officers, members and managers of Fresh & Easy LLC shall be deemed to have resigned, except for Michael J. Brewer of Alcohol Beverage Consulting Service, who shall continue to serve as the Chief Licensing Officer for the sole and limited purpose of maintaining, selling, and/or otherwise disposing of the Company's liquor licenses.  Upon such resignations, the Liquidating Trust shall become the sole member of and the managing member of Fresh & Easy, LLC, the Liquidating Trustee shall serve as an officer and director of Fresh & Easy, LLC and the Amended and Restated Limited Liability Company Agreement shall be, and is deemed to be, amended and restated to reflect the foregoing.

b)      **Continued Corporate Existence**

Fresh & Easy, LLC shall continue to exist after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the Amended and Restated Limited Liability Company Agreement of Fresh & Easy, LLC, as last amended effective as of July 8, 2015, and in effect prior to the Effective Date, as amended, and in accordance with any and all such other documents as may be necessary to satisfy the provisions of this Combined Plan and Disclosure Statement and the Bankruptcy Code.  The Debtor's continued existence is limited to facilitating the sale, assignment, transfer, conveyance and delivery of liquor licenses held by the Debtor. The Liquidating Trustee, acting pursuant to the terms and conditions of the Liquidating Trust Agreement, shall be authorized to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to

73

effectuate and further evidence the terms and conditions of this Combined Plan and Disclosure Statement.

### c) Deemed Authorization

On the Effective Date, all matters and actions provided for under the Combined Plan and Disclosure Statement that would otherwise require approval of the directors and officers, or members or managers of the Debtor shall be deemed to have been authorized and to be effective in all respects as provided herein and shall be taken without any requirement for further action by the directors and officers, or members and managers of the Debtor. The Debtor is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.

### d) Dissolution of the Debtor

After the Effective Date, at the discretion of the Liquidating Trustee in consultation with the Liquidating Trust Committee, the Liquidating Trust shall be authorized to take all actions necessary to effect the dissolution of the Debtor, without the need for any further Bankruptcy Court action or approval.

### 4. Exemption from Securities Laws

Under section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Liquidating Trust under the Combined Plan and Disclosure Statement shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities.

### 5. Exemption Under Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, the making or assignment of any lease or sublease, or the making or delivery of any instrument or transfer from a Debtor to the Liquidating Trust, or to any other Person pursuant to the Combined Plan and Disclosure Statement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of  any such tax or governmental assessment and to accept for filing and recordation any of the forgoing instruments or other documents without the payment of any such tax or governmental assessment. Without limiting the forgoing, any issuance, transfer or exchange of a security or any making or payment of any and all transfer taxes (including but not limited to any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the consummation of the Combined Plan and Disclosure Statement and the Plan Documents) pursuant to sections 1146(a), 505(a), 106 and 1141 of the Bankruptcy Code.

XVI.

**RELEASES, EXCULPATION, INJUNCTION AND BAR ORDER**

A.    **Releases and Exculpation**

      1.    **Releases by the Debtor**

**Pursuant to the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, and any Person or Entity seeking to exercise the rights of the Debtor's Estate, including, without limitation, any successor to the Debtor, any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code or the Liquidating Trust, whether pursuing an action derivatively or otherwise, shall be deemed to forever release, waive and discharge all liabilities, claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, right to equitable remedies, rights to payment, or Claims whatsoever (other than for fraud, willful misconduct or gross negligence) in connection with or related to the Debtor, the Chapter 11 Case, the Store Closing Sales or the Combined Plan and Disclosure Statement (other than the rights of the Debtor and the Liquidating Trustee to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Confirmation Date, against (a) the CRO, the Debtor's and Committee's Professionals and the Debtor's and Committee's Court-retained agents, including, but not limited to FTI Consulting, Inc., (b) the Special Committee, (c) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) and (b); provided, however, that the release described in this paragraph shall not be a waiver of any defense, offset or objection to any Claim Filed against the Debtor and its Estate by any Person or Entity.**

      2.    **Consensual Third Party Releases by Certain Holders of Claims and Interests**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (a) all Holders of Claims (except Holders of Claims in Class 4A who timely exercised their opt-out election to such releases set forth herein) and (b) all Holders of Interests shall be deemed to forever release, waive and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action and liabilities of any nature whatsoever in connection with or related to the Debtor, the Chapter 11 Case, and/or the Combined Plan and Disclosure Statement, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Effective Date (other than the rights of a Creditor holding an Allowed Claim to enforce the obligations under the Confirmation Order and the Plan); provided, however, that nothing in this section shall**

75

operate as a release, waiver or discharge of any causes of action or liabilities unknown to such person as of the Petition Date arising out of gross negligence, willful misconduct, fraud or criminal acts of any such released party as determined by a Final Order.

       3.      **Exculpation and Limitation of Liability**

Except as otherwise specifically provided in the Combined Plan and Disclosure Statement, none of (a) Debtor, (b) the current and former directors, officers and managers of the Debtor, (c) employees or agents of the Debtor, (d) attorneys, financial advisors, accountants, investment bankers, investment advisors, consultants, agents, representatives and other Professionals of the Debtor, (e) the CRO, (f) the Special Committee, (g) the Committee and its Professionals and, solely in their respective capacities as members or representatives of the Committee, each member of the Committee, or (h) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (g) shall have or incur, and each is hereby released and exculpated from, any liability, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively in law or equity to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Case, the Store Closing Sales, assets sales, the negotiation and implementation of the Settlement Agreement, the formulation, negotiation or implementation of the Combined Plan and Disclosure Statement, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence or willful misconduct, and such parties in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Combined Plan and Disclosure Statement.  Moreover, for the avoidance of doubt, this exculpation only applies to any acts or omissions of the exculpated parties that occurred on and after the Petition Date.

Notwithstanding any other provision of the Combined Plan and Disclosure Statement, no Holder of a Claim or an Interest, no other party in interest, none of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or affiliates, and none of their respective successors or assigns, shall have any right of action against: (a) Debtor, (b) the current and former directors, officers and managers of the Debtor, (c) employees or agents of the Debtor, (d) attorneys, financial advisors, accountants, investment bankers, investment advisors, consultants, agents, representatives and other Professionals of the Debtor, (e) the CRO, (f) the Special Committee, (g) the Committee and its Professionals and, solely in their respective capacities as members or representatives of the Committee, each member of the Committee, or (h) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (g), for any act or omission in connection with, relating to or arising out of, the Chapter 11 Case, the Store Closing Sales, asset sales, the negotiation and implementation of the Settlement Agreement, the formulation, negotiation or

implementation of the Combined Plan and Disclosure Statement, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence or willful misconduct.  Moreover, for the avoidance of doubt, this paragraph only applies to any acts or omissions of such protected parties that occurred on and after the Petition Date.

B.    **Injunction**

Confirmation of the Plan will have the effect of, among other things, permanently enjoining (a) all Entities or Persons that have held, hold or may hold or have asserted, assert or may assert Claims against or Equity Interests in the Estate with respect to any such Claim or Equity Interest, and (b) respecting (vi)(A) and (vi)(B) of this paragraph, the Estate and the Liquidating Trust, from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under the Combined Plan and Disclosure Statement): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estate or the Liquidating Trust or any of its or their property on account of such Claims or Interests; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estate or the Liquidating Trust or any of its or their property on account of such Claims or Interests; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estate or the Liquidating Trust or any of its or their property on account of such Claims or Interests; (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Estate or the Liquidating Trust or any of its or their property, except with respect to any right of setoff asserted prior to the entry of the Confirmation Order, whether asserted in a Proof of Claim or otherwise, or as otherwise contemplated or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) prosecuting or otherwise asserting (A) any Claim or Interest, including any right, claim or Cause of Action, released pursuant to the Plan, or (B) any form of objection to any Claim that is Allowed by the Plan; provided, however, that this injunction will not apply to the commencement or continuation of an action or proceeding by a governmental unit to which section 362(b)(4) of the Bankruptcy Code would be applicable.  Additionally, unless otherwise explicitly stated in the Plan, the injunction contemplated by this paragraph will prohibit the assertion against the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Committee, and the YFE Released Parties of all Claims or Interests, if any, related to the Debtor (and in addition, with respect to the YFE Released Parties, the assertion by any Entity of any Claims and Interests described as being released in the Settlement Agreement).

Confirmation of the Plan will further have the effect of permanently enjoining all Persons and Entities from obtaining any documents or other materials from current counsel for the Debtor and the Committee that are in the possession of such counsel as a

**result of or arising in any way out of their representations of the Debtor and/or the Committee, except in accordance with Article XIII of the Combined Plan and Disclosure Statement.**

C.    **Bar Provision**

**In accordance with the terms of the Settlement Agreement, the confirmation of the Plan shall have the effect of barring any Barred Person from commencing, prosecuting, asserting, or maintaining: (i) claims against any of the YFE Released Parties where the claims are the property of the Debtor's bankruptcy estate, were or could have been asserted by the Debtor, the Committee, or the bankruptcy estate, or are derivative claims of the Debtor, the Committee, or the bankruptcy estate, including those claims that arise from or relate to the claims asserted or that could have been asserted in the Adversary Proceeding (as defined in the Settlement Agreement); and (ii) any claims for indemnity or contribution brought against any of the YFE Released Parties and relating to the claims and allegations set forth in the Committee's complaint filed in the Adversary Proceeding. With respect to claims for indemnity or contribution, it shall not matter whether such claims are explicitly characterized as claims for indemnity or contribution, but rather the Barred Person must look to the underlying nature of the claim, including where the injury to the Barred Person is the liability of the Barred Person to another person or entity arising out of or relating to the claims or allegations released pursuant to the Settlement Agreement, whether arising under state, federal, or foreign laws as claims, cross-claims, counterclaims, or third-party claims. Any joint tortfeasor barred pursuant to this Bar Provision shall be entitled to a judgment reduction (i.e., setoff) to the extent provided for by applicable law. See, e.g., Cal. Code Civ. Proc. § 877.**

XVII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    **Rejected Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, an order of this Court, or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases to which the Debtor is a party shall be deemed automatically rejected by the Debtor as of the Effective Date, unless such contract or lease (i) previously has been assumed or rejected by the Debtor, (ii) expired or terminated pursuant to its own terms, (iii) is the subject of a motion to assume or reject pending before the Court as of the Confirmation Date or (iv) is identified on **Exhibit D** hereto as a Contract to be assumed; provided, however, that nothing contained in the Plan shall constitute an admission by the Debtor that any such contract is an Executory Contract or that the Debtor or its successors and assigns has any liability thereunder. The Confirmation Order shall constitute an order of the Court approving the rejections described in this Article XVII.A, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

B.      **Deadline for Filing Proofs of Claim Relating to Executory Contracts Rejected Pursuant to the Combined Plan and Disclosure Statement**

If the rejection by the Debtor, pursuant to the Plan or otherwise, of an Executory Contract or Unexpired Leases gives rise to a Claim, a proof of Claim must be filed with the Claims Agent, at the following address: (i) if by mail, Fresh & Easy, LLC Claims Processing Center c/o Epiq Bankruptcy Solutions, LLC, P.O. Box 4421, Beaverton, OR 97076-4421; and (ii) if by messenger or overnight courier, Fresh & Easy, LLC Claims Processing Center, c/o Epiq Bankruptcy Solutions, LLC, 10300 SW Allen Blvd, Beaverton, OR 97005, by no later than thirty (30) days after the later of (i) notice of entry of the Confirmation Order, or (ii) other notice that the Executory Contract or Unexpired Lease has been rejected.  Any proofs of Claim not filed and served within such time periods will be forever barred from assertion against the Debtor and its Estate.  Unless otherwise ordered by the Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims under the Combined Plan and Disclosure Statement.

XVIII.
**<u>CAUSES OF ACTION</u>**

A.      **Retention of Causes of Action**

**In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust shall retain and may enforce all rights to commence and pursue, as appropriate, the Liquidating Trust Claims, and the Liquidating Trust's rights to commence, prosecute or settle such Liquidating Trust Claims shall be preserved notwithstanding the occurrence of the Effective Date or the dissolution of the Debtor.  The Liquidating Trust may pursue such Liquidating Trust Claims, as appropriate, in accordance with the best interests of the Liquidating Trust beneficiaries.  No Entity may rely on the absence of a specific reference in the Combined Plan and Disclosure Statement to any Liquidating Trust Claims against them as any indication that the Liquidating Trust shall not pursue any and all available Liquidating Trust Claims against them.**

The Liquidating Trust expressly reserves all rights to prosecute any and all Liquidating Trust Claims against any Entity, except as otherwise expressly provided in the Combined Plan and Disclosure Statement.  Unless any Liquidating Trust Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Combined Plan and Disclosure Statement or a Court order, the Liquidating Trust expressly reserves all Liquidating Trust Claims for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppels (judicial, equitable or otherwise) or laches, shall apply to such Liquidating Trust Claims upon, after or as a consequence of the Confirmation or Consummation of the Combined Plan and Disclosure Statement.

B.    **Reservation of Rights**

Except as specifically provided in the Combined Plan and Disclosure Statement or in the Confirmation Order, nothing contained in the Combined Plan and Disclosure Statement or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtor had immediately prior to the Petition Date, against or with respect to any claim left unimpaired by the Combined Plan and Disclosure Statement.  The Debtor or the Liquidating Trust, as the case may be, shall have, retain, reserve and be entitled to assert all such claims, causes of action, rights of setoff or other legal or equitable defenses which they or any of them had immediately prior to the Petition Date fully as if the Chapter 11 Case had not been commenced, and all legal and equitable rights of the Debtor respecting any claim left unimpaired by the Combined Plan and Disclosure Statement may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced. The Liquidating Trustee's right to commence and prosecute Causes of Action shall not be abridged or materially altered in any manner by reason of confirmation of the Combined Plan and Disclosure Statement.  No defendant party to any Causes of Action brought by the Debtor or the Liquidating Trustee shall be entitled to assert any defense based, in whole or in part, upon confirmation of the Combined Plan and Disclosure Statement, and confirmation of the Combined Plan and Disclosure Statement shall not have any res judicata or collateral estoppel effect upon the commencement and prosecution of the Causes of Action.

## XIX.
## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    **Conditions Precedent to Confirmation**

The following are conditions precedent to Confirmation, each of which must be satisfied:

1)    the Confirmation Order will be in form and substance reasonably acceptable to the Plan Proponents;

2)    the Confirmation Order will have been entered by the Court; and

3)    any section of the Confirmation Order relating in any way to the YFE Parties or YFE Released Parties must be reasonably acceptable to the YFE Parties.

B.    **Conditions Precedent to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived:

1)    at least fourteen (14) days shall have passed since the Confirmation Date;

2) the Confirmation Order shall not be stayed, vacated or reversed and shall not have been amended without the agreement of the Plan Proponents;

3) the Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect, and which is not subject to a pending appeal, and with respect to which the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending;

4) all actions, documents and agreements necessary to implement the provisions of the Combined Plan and Disclosure Statement to be effectuated on or prior to the Effective Date will be reasonably satisfactory to the Plan Proponents, and such actions, documents and agreements will have been effected or executed and delivered;

5) the Liquidating Trust Agreement will be completed and in final form and, as applicable, executed by the parties thereto and all conditions precedent contained in any of the foregoing will have been satisfied or waived;

6) the Liquidating Trust will have been established and the Liquidating Trust Assets will have been transferred to and vested in the Liquidating Trust free and clear of all Claims and Liens, except as specifically provided in the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement;

7) the Professional Fee Reserve, the WARN Reserve and the Administrative Claims Reserve will have been funded in Cash in full;

8) the Liquidating Trustee will have been appointed and assumed his rights and responsibilities under the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, as applicable;

9) the Debtor will have retained and pre-paid appropriate professionals for the preparation of the Debtor's outstanding tax returns for 2016; and

10) the Debtor, in consultation with the Committee, will have determined in its reasonable discretion that sufficient Cash exists to: (i) satisfy all Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Priority Non-Tax Claims, and Secured Claims; and (ii) transfer at least $1 million in Cash to the Liquidating Trust; and

11) the Settlement Payment shall be received by the Debtor.

81

C.      **Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be a Business Day of, on or following the satisfaction or waiver of all conditions precedent to the Effective Date, which date will be selected by the Debtor, after reasonable consultation with the Committee.

D.      **Waiver of Conditions**

Each of the conditions precedent to the Effective Date set forth above may be waived in whole or in part by the Debtor without any other notice to parties in interest or the Court, provided that the Debtor has received the prior written consent of: (i) the Committee, and (ii) the YFE Parties (solely with respect to the conditions precedent to the Effective Date identified in B.(1)-(4) above), which consent will not unreasonably be withheld.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of any party to exercise any of its foregoing rights will not be deemed a waiver of any of its other rights, and each such right will be deemed an ongoing right that may be asserted thereby at any time.

XX.
**RETENTION OF JURISDICTION**

A.      **Retention of Jurisdiction**

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order, substantial consummation of the Plan and occurrence of the Effective Date, the Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case, the Combined Plan and Disclosure Statement, the Liquidating Trust Agreement and the Liquidating Trust to the fullest extent permitted by law, including, among other things, jurisdiction:

    1)      to the extent not otherwise determined by the Combined Plan and Disclosure Statement, to determine (i) the allowance, classification or priority of Claims upon objection by any party in interest entitled to file an objection, or (ii) the validity, extent, priority and nonavoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estate, Causes of Action, or property of the Estate or the Liquidating Trust;

2)      to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Combined Plan and Disclosure Statement or its execution or implementation by any Entity or Person, to construe and to take any other action to enforce and execute the Combined Plan and Disclosure Statement, the Confirmation Order or any other order of the Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Combined Plan and Disclosure Statement and all matters referred to in the Plan, and to determine all matters that may be pending before the Court in the Chapter 11 Case on or before the Effective Date with respect to any Entity or Person;

3)      to protect the assets or property of the Estate and/or the Liquidating Trust, including Causes of Action, from claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estate;

4)      to determine any and all applications for allowance of Professional Fee Claims;

5)      to determine any Priority Tax Claims, Priority Non-Tax Claims or Administrative Claims entitled to priority under section 507(a) of the Bankruptcy Code;

6)      to resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Combined Plan and Disclosure Statement and the making of Distributions under the Combined Plan and Disclosure Statement;

7)      to hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with the Plan, the Confirmation Order, the Settlement Order or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

8)      to determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or Unexpired Leases or determine any issues arising from the deemed rejection of Executory Contracts and Unexpired Leases set forth in Article XVII of the Combined Plan and Disclosure Statement;

9)    except as otherwise provided in the Combined Plan and Disclosure Statement, to determine all applications, motions, adversary proceedings, contested matters, actions and any other litigated matters instituted in and prior to the closing of the Chapter 11 Case, including any remands;

10)    to enter a Final Order closing the Chapter 11 Case;

11)    to modify the Combined Plan and Disclosure Statement under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out their intent and purposes;

12)    to issue such orders in aid of consummation of the Combined Plan and Disclosure Statement, the Settlement Agreement, and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity or Person, to the full extent authorized by the Bankruptcy Code;

13)    to determine any tax liability pursuant to section 505 of the Bankruptcy Code;

14)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

15)    to resolve any disputes concerning whether an Entity or Person had sufficient notice of the Chapter 11 Case, the applicable Bar Date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing or for any other purpose;

16)    to resolve any dispute or matter arising under or in connection with any order of the Court entered in the Chapter 11 Case;

17)    to authorize, as may be necessary or appropriate, sales of assets as necessary or desirable and resolve objections, if any, to such sales;

18)    to resolve any disputes concerning any release, injunction, exculpation or other waiver or protection provided in the Combined Plan and Disclosure Statement;

19)    to approve, if necessary, any Distributions, or objections thereto, under the Combined Plan and Disclosure Statement;

20)    to approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Liquidating Trust;

54567/0001-14098116v3

21)    to resolve any dispute or matter arising under or in connection with the Liquidating Trust;

22)    to order the production of documents, disclosures or information, or appearance at deposition in response to discovery demands pursuant to Bankruptcy Rule 2004; and

23)    to determine such other matters, and make rulings for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

Except with respect to actions to approve the Settlement Agreement and implement the Plan, the Bankruptcy Court shall not have exclusive jurisdiction with respect to any matter relating to the YFE Released Parties.

B.    **Retention of Non-Exclusive Jurisdiction by the Court**

Notwithstanding anything else in the Combined Plan and Disclosure Statement: (i) the Court will retain non-exclusive jurisdiction over all Liquidating Trust Claims prosecuted by the Liquidating Trust; and (b) except with respect to actions to approve the Settlement Agreement and implement the Plan, the YFE Released Parties do not consent, and are not deemed to have consented, to the jurisdiction of the Bankruptcy Court for any matter.

XXI.
**MISCELLANEOUS PROVISIONS**

A.    **Amendments or Modifications of the Combined Plan and Disclosure Statement**

The Plan Proponents may alter, amend or modify the Combined Plan and Disclosure Statement and any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date provided that the Debtor has received the prior written consent of the Committee, which consent will not unreasonably be withheld.  After the Confirmation Date and prior to substantial consummation of the Combined Plan and Disclosure Statement as defined in section 1101(2) of the Bankruptcy Code, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Combined Plan and Disclosure Statement or the Confirmation Order, and to address such matters as may be necessary to carry out the purpose and effect of the Combined Plan and Disclosure Statement so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Court.

Any amendment or modification of the Plan affecting any of the YFE Released Parties must be approved in writing by the YFE Parties.

B.    **Severability of Plan Provisions**

Subject to the subsequent paragraph dealing with the YFE Released Parties, if, prior to Confirmation, any term or provision of the Combined Plan and Disclosure Statement is held by the Court to be invalid, void or unenforceable, then the Court, at the request of the Plan Proponents, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Combined Plan and Disclosure Statement will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Combined Plan and Disclosure Statement, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

If, prior to Confirmation, any term or provision of the Combined Plan and Disclosure Statement that affects the YFE Released Parties is held by the Court to be invalid, void or unenforceable, then the Court, at the request of the Plan Proponents and the YFE Released Parties, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and, subject to the consent of the YFE Released Parties, such term or provision will then be applicable as altered or interpreted.

C.    **Successors and Assigns**

The rights, benefits and obligations of any Person or Entity named or referred to in the Combined Plan and Disclosure Statement will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of that Person or Entity.

D.    **Revocation, Withdrawal or Non-Consummation**

The Plan Proponents reserve the right to revoke or withdraw the Combined Plan and Disclosure Statement prior to the Confirmation Date and to file subsequent plans. If the Plan Proponents revoke or withdraw the Combined Plan and Disclosure Statement, or if Confirmation or consummation of the Combined Plan and Disclosure Statement does not occur, then (a) the Combined Plan and Disclosure Statement will be null and void in all respects, (b) any settlement or compromise embodied in the Combined Plan and Disclosure Statement (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Combined Plan and Disclosure Statement, and any document or agreement executed pursuant to the Combined Plan and Disclosure Statement, except the Global Settlement and the Settlement Agreement as discussed in Article IV, will be deemed null and void, and (c) nothing contained in the Combined Plan and Disclosure Statement, and no acts taken in preparation for consummation of the Combined Plan and Disclosure Statement, will (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person or Entity, (ii) prejudice in any manner the rights of such Debtor or any other Person or Entity or (iii) constitute an

86

admission of any sort by the Debtor or any other Person or Entity.  For the avoidance of doubt, the Global Settlement and the Settlement Agreement as discussed in Article IV of the Combined Plan and Disclosure Statement, if approved by the Bankruptcy Court, shall not be null and void. Moreover, to the extent the Plan Proponents withdraw the Plan, the Plan Proponents shall seek separate approval of the Global Settlement and the Settlement Agreement as set forth in the Settlement Agreement.

E.    **Supplements to Combined Plan and Disclosure Statement**

Exhibits to the Combined Plan and Disclosure Statement not attached thereto when Filed will be Filed in the Plan Supplements by the Plan Supplement Filing Date.  Substantially contemporaneously with their filing, the Plan Supplements may be viewed and downloaded, free of charge, at the Debtor's case website, http://dm.epiq11.com/fre, or for a fee, at the Court's website (www.deb.uscourts.gov) (PACER account required).  Copies of case pleadings also may be examined between the hours of 8:00 a.m. and 4:00 p.m., Monday through Friday, excluding federal holidays, at the Office of the Clerk of the Bankruptcy Court, 824 N. Market St., 3rd Floor, Wilmington, Delaware 19801.  Plan Supplements and other case pleadings may be obtained by written request to the Voting Agent, tabulation@epiqsystems.com, or by telephone 646-282-2500.

F.    **Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims and Interests, whether or not such Holders shall receive or retain any property or interest in property under the Combined Plan and Disclosure Statement, and their respective successors and assigns, including, but not limited to, the Liquidating Trust and all other parties in interest in the Chapter 11 Case.

G.    **Notices**

All notices, requests and demands to or upon the Debtor, the Liquidating Trustee or the Liquidating Trust to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by electronic mail, when received and electronically confirmed, addressed as shall be set forth in the Confirmation Order.

H.    **Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an Exhibit to the Combined Plan and Disclosure Statement provides otherwise, the rights and obligations arising under the Combined Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

I.       **Headings**

Headings are used in the Combined Plan and Disclosure Statement for convenience and reference only, and shall not constitute a part of the Combined Plan and Disclosure Statement for any other purpose.

J.       **Exhibits/Schedules**

The Plan Supplement(s) are an integral part of the Combined Plan and Disclosure Statement, and are hereby incorporated by reference and made a part hereof.

K.       **Filing of Additional Documents**

On or before substantial consummation of the Plan, the Debtor shall file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement; provided that the Plan Supplement shall be Filed at least ten (10) days prior to the Voting Deadline.

L.       **No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Plan and Disclosure Statement shall be deemed as an admission by any Entity with respect to any matter set forth herein.

M.       **Successors and Assigns**

The rights, benefits and obligations of any Person or Entity named or referred to in the Combined Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

N.       **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order.  Neither the filing of the Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtor with respect to the Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims or Equity Interest before the Effective Date.

O.       **Implementation**

The Debtor shall take all steps, and execute all documents, including appropriate releases, necessary to effectuate the provisions contained in this Combined Plan and Disclosure Statement.

88

P.      **Inconsistency**

In the event of any inconsistency among the Combined Plan and Disclosure Statement, the Liquidating Trust Agreement or any other instrument or document created or executed pursuant to the Combined Plan and Disclosure Statement, the provisions of the Combined Plan and Disclosure Statement shall govern.

Q.      **Compromise and Settlement of Claims and Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, Distributions, releases and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims, Equity Interests and controversies resolved pursuant to the Plan or relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest, or any Distribution to be made on account of such Claim or Interest.  The entry of the Confirmation Order will constitute the Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and reasonable.

54567/0001-14098116v3

R.    **Dissolution of the Committee**

Upon the occurrence of the Effective Date, the Committee shall dissolve automatically, whereupon their members, professionals and agents shall be released from any duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code (except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) applications for payment of fees and reimbursement of expenses of Professionals, and (iii) any pending motions or motions for other actions seeking enforcement of implementation of the provisions of the Combined Plan and Disclosure Statement).

Dated: February 21, 2017

**FRESH & EASY, LLC**

By: _____
AMIR AGAM
CHIEF RESTRUCTURING OFFICER

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF FRESH & EASY, LLC**

By: _____
MICHAEL MANDELL
Ryder Integrated Logistics,
solely in his capacity as Chair of the Committee
and not his individual capacity

90

**EXHIBIT A**
**TO COMBINED PLAN AND DISCLOSURE STATEMENT**

**SETTLEMENT AND RELEASE AGREEMENT**

**Redacted Pursuant to**
**Order Authorizing the Filing Under Seal of a Provision of Settlement Agreement,**
**entered February 21, 2017 [Docket No. 1899]**

## SETTLEMENT AND RELEASE AGREEMENT

This SETTLEMENT AND RELEASE AGREEMENT (the "Agreement") is made and entered into as of December 23, 2016, by and between the following parties (collectively, the "Parties," and each separately, a "Party"): (a) Fresh & Easy, LLC (the "Debtor"); (b) the Official Committee of Unsecured Creditors of Fresh & Easy, LLC (the "Committee"); (c) YFE Holdings, Inc. ("YFE"); Fresh Foods, LLC ("Fresh Foods"); FEFOS, LLC ("FEFOS"); Ronald W. Burkle, Ira L. Tochner, Robert P. Bermingham, and James W. Keyes (collectively with YFE, Fresh Foods, and FEFOS, the "YFE Parties"); and (d) The Yucaipa Companies, LLC ("Yucaipa").

WHEREAS, on October 30, 2015, the Debtor filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which case is captioned as *In re Fresh & Easy, LLC*, Case No. 15-12220 (BLS) (Bankr. D. Del.) (the "Bankruptcy Case");

WHEREAS, the Debtor is authorized to operate its business and manage its assets as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108;

WHEREAS, on November 10, 2015, the Office of the United States Trustee appointed the Committee in the Bankruptcy Case pursuant to 11 U.S.C. § 1102;

WHEREAS, on May 31, 2016, the Committee filed an adversary proceeding against the YFE Parties in the Bankruptcy Court, which adversary proceeding is captioned as *The Official Committee of Unsecured Creditors of Fresh & Easy, LLC v. YFE Holdings, Inc., et al.*, Adv. No. 16-50993 (BLS) (the "Adversary Proceeding");

WHEREAS, on May 31, 2016, the Committee filed a motion in the Bankruptcy Case seeking derivative standing to pursue the Debtor's claims asserted in the Adversary Proceeding, which motion was subsequently granted by the Bankruptcy Court;

WHEREAS, the YFE Parties have denied and continue to deny all allegations of wrongdoing asserted by the Debtor, Committee and related entities associated with the Bankruptcy Case and Adversary Proceeding in all forms;

WHEREAS, the Parties participated in a voluntary and in-person mediation with mediator Jed Melnick on August 11, 2016. Following that mediation, numerous communications governed by the mediation privilege were exchanged in the ensuing weeks that eventually resulted in the Agreement, all under the auspices of mediator Jed Melnick;

WHEREAS, the Parties are entering into this Agreement solely for the purpose of resolving this matter and avoiding the time, expense, inconvenience, uncertainty and delay incident to protracted litigation, and thus the Agreement is not to be construed or interpreted as an admission of liability by any Party, person, or entity in any court or other adjudicative tribunal; and

WHEREAS, the Debtor and the Committee each represents that, in the exercise of its respective business judgment and given the uncertainty of the results of litigation, each believes

that the settlement provided herein is in the best interest of the Debtor's estates and its creditors and falls well within the range of reasonableness in the circumstances.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants and promises contained in this Agreement, and other good and valuable consideration, the receipt and adequacy of which are hereby expressly acknowledged, the Parties agree as follows:

1.      Court Approval.  Subject to Paragraph 1(f) hereof, this Agreement shall be subject to approval by the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 9019 in connection and concurrently with confirmation of a plan of liquidation in the Bankruptcy Case (the "Approval Order").

   a. The Parties agree that this Agreement and the releases contained herein are not effective unless and until the Bankruptcy Court enters a final and non-appealable order approving the Agreement as defined below ("Final Order").

   b. For purposes of this Agreement, a Final Order as referenced in (a) above shall mean a final order of the Bankruptcy Court (x) (i) as to which the time to appeal shall have expired and as to which no appeal shall then be pending, or (ii) if a timely appeal has been filed or sought, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review, rehearing, or certiorari) shall have affirmed the district court's (or lower appellate court's) order affirming the order of the Bankruptcy Court or the appeal otherwise shall have been dismissed, and the time allowed to appeal from such affirmance or to seek review, rehearing, or certiorari thereof shall have expired, and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible and (y) as to which the time to file a motion for stay or modification of such order shall have expired and as to which no stay or modification of such order shall then be pending or otherwise in effect.

   c. Each of the Parties shall use reasonable, good-faith efforts to prepare, finalize, and support the settlement reflected herein and implement it as part of consummation of the Plan, provided that the Plan is consistent with the terms of this Agreement.  In addition to the obligations of law that good faith imposes on the Parties, it also means that the Parties shall not support any proposed plan or disclosure statement that is inconsistent with the terms of this Agreement. The Approval Order shall be in a form reasonably acceptable to the YFE Parties; provided, however, that if the terms of the Approval Order are part of the order confirming the Chapter 11 Plan (the "Confirmation Order"), the Confirmation Order must be reasonably acceptable to the YFE Parties to the extent it impacts, implements or describes the terms of this Agreement.

   d. The Committee shall request that the Approval Order contain a provision (the "Bar Provision") barring any person or entity (a "Barred Person") from commencing, prosecuting, asserting, or maintaining: (i) claims against any of

2

the YFE Released Parties as that term is defined in Paragraph 7 of this Agreement where the claims are the property of the Debtor's bankruptcy estate, were or could have been asserted by the Debtor, the Committee, or the bankruptcy estate, or are derivative claims of the Debtor, the Committee, or the bankruptcy estate, including those claims that arise from or relate to the claims asserted or that could have been asserted in the Adversary Proceeding; and (ii) any claims for indemnity or contribution brought against any of the YFE Released Parties and relating to the claims and allegations set forth in the Committee's complaint filed in the Adversary Proceeding.  With respect to claims for indemnity or contribution, it shall not matter whether such claims are explicitly characterized as claims for indemnity or contribution, but rather the Barred Person must look to the underlying nature of the claim, including where the injury to the Barred Person is the liability of the Barred Person to another person or entity arising out of or relating to the claims or allegations released pursuant to this Agreement, whether arising under state, federal, or foreign laws as claims, cross-claims, counterclaims, or third-party claims ("Barred Third Party Claim").  Any joint tortfeasor barred pursuant to this Bar Provision shall be entitled to a judgment reduction (*i.e.,* setoff) to the extent provided for by applicable law.  *See, e.g.,* Cal. Code Civ. Proc. § 877.  The proposed Bar Provision shall be in a form reasonably acceptable to the Parties.

e.  On or before February 1, 2017, the Committee and the Debtor shall (i) prepare and file a proposed Chapter 11 plan and disclosure statement (collectively, the "Chapter 11 Plan") in Bankruptcy Court, which will seek as part of the Chapter 11 Plan confirmation process approval of the terms of this Agreement; and (ii) request that the Bankruptcy Court set a confirmation hearing date for the Chapter 11 Plan on the same date as the hearing on the Settlement Motion.  The Parties shall not propose and shall not support any proposed plan or disclosure statement that is inconsistent with the terms of this Agreement, and this Agreement shall be attached to the Chapter 11 Plan and shall be incorporated by reference and constitute a material part of the Chapter 11 Plan.  The terms and conditions of the proposed Chapter 11 Plan and confirmation order with respect to the YFE Parties shall be consistent with the terms of this Agreement and otherwise acceptable to the YFE Parties.  The Parties shall use reasonable, good-faith efforts to prepare, finalize and support the Chapter 11 Plan.  In addition to the obligations of law that good faith imposes on the Parties, the Parties shall not support any aspect of the Chapter 11 Plan that is inconsistent with the terms of this Agreement.  Moreover, the Chapter 11 Plan shall provide that the YFE Released Parties will be released from any claims held by any holder of a claim against or interest in the Debtor in such holder's individual capacity (an "Individual Claim"), to the same extent as the YFE Released Parties would be released under Section 7 of this Agreement, unless such holder affirmatively opts out from granting the YFE Released Parties a release of an Individual Claim (collectively, the "Chapter 11 Individual Releases").

3

     f.   For the avoidance of doubt, this Agreement and the settlement reflected herein are not contingent on the approval or effectiveness of a Chapter 11 Plan. The Debtor, the Committee and the YFE Parties shall (i) provide in the Chapter 11 Plan and related motions/pleadings that such motions/pleadings constitute notice of approval of the Agreement in the event the Chapter 11 Plan is not confirmed or does not become effective by May 30, 2017; and (ii) promptly seek approval of the Agreement in the event the Chapter 11 Plan is not confirmed or does not become effective by May 30, 2017. Notwithstanding the foregoing, the Parties shall use their commercially reasonable efforts to obtain entry of the Confirmation Order and cause the Chapter 11 Plan to become effective by May 30, 2017. Notwithstanding the foregoing, if the Debtor and Committee determine in their reasonable discretion, after consulting with the YFE Parties, or if YFE determines in its reasonable discretion, after consulting with the Debtor and Committee, that the Chapter 11 Plan will not be confirmed and become effective by May 30, 2017, the Parties may seek approval of the Agreement outside of the confirmation process.

     2.    <u>Settlement Effective Date</u>. This Agreement shall be effective (the "<u>Settlement Effective Date</u>") upon the date that the Approval Order becomes a Final Order. In the event the Chapter 11 Plan is confirmed on the terms and conditions described herein and includes the provisions of this Agreement, the Confirmation Order shall be the Approval Order and the Settlement Effective Date shall be the date the Confirmation Order becomes a Final Order. In the event the Bankruptcy Court enters an order approving the Agreement outside of the Chapter 11 Plan pursuant to Paragraph 1(f) herein, that order shall be the Approval Order for purposes of this Agreement. Within twenty-four (24) hours of the Effective Date, the YFE Parties shall notify their Insurers of such Effective Date.

     3.    <u>No Admission of Liability</u>. By entering into this Agreement, none of the Parties admits the allegations or contentions of any other Party, and each Party is entering into this Agreement for the sole purpose of resolving this matter and avoiding the time, expense, inconvenience and delay incident to protracted litigation. All Parties agree that there is no assurance of any favorable outcome to any pending or threatened litigation or defenses. By entering into this Agreement, none of the Parties is agreeing that the YFE Released Parties acted wrongfully in any way.

     4.    <u>Settlement Payment</u>. No later than fifteen (15) business days after the Committee provides YFE with written notice of the Settlement Effective Date, the YFE Parties (and/or their insurers) shall make payment in the total amount of $21,500,000 in consideration of this Agreement and the Chapter 11 Individual Releases (the "<u>Settlement Payment</u>") by wire transfer to the Debtor, using the following wire instructions:

| | |
|---|---|
| Beneficiary Bank Name: | Wells Fargo Bank, N.A. |
| Beneficiary Account Name: | Fresh & Easy, LLC |
| Beneficiary Account Number: | 4941768954 |
| Beneficiary Routing Number: | 121000248 |
| Beneficiary Bank Contact Person: | Charlene Cortez |

Beneficiary Bank Contact No.:          415-243-7592
Beneficiary Bank Address:              420 Montgomery Street
                                       San Francisco, CA 94104

Alternatively, the Settlement Payment may be made by check payable to the Debtor and sent to:

Fresh & Easy LLC
Howard Hughes Center
6080 Center Drive, 6th Floor
Los Angeles, 90045, USA

Upon execution of this Agreement, the Debtor shall provide the YFE Parties with a completed Form W-9.  Upon receipt of the Settlement Payment, the Debtor shall promptly provide written notice to the Committee and the YFE Parties.  However, the YFE Parties' obligation to make the Settlement Payment shall be expressly subject to and conditional upon the Insurers' Payment of the amounts due under their "Respective Contributions" as set forth in the separate settlement agreement (the "YFE/Insurers Agreement") with the YFE Parties' Insurers.  YFE has provided a copy of the YFE/Insurers Agreement to Jed Melnick, subject to the mediation privilege.  Mr. Melnick will retain a copy of the YFE/Insurers Agreement until the Settlement Payment has been made to the Debtor.

To the extent that any portion of the Settlement Payment is funded with proceeds of insurance policies under which the Debtor is also an Insured, such payments shall reduce the Limits of Liability under such policies in like amount and the Approval Order shall contain a provision to this effect.

The Chapter 11 Plan shall provide that $2,500,000 (the "Release Consideration") of the Settlement Payment shall be expressly earmarked solely for those general unsecured creditors who do not opt-out (the "Releasing Creditors") of the Chapter 11 Individual Releases provided herein and to be incorporated into the Chapter 11 Plan, which Release Consideration shall be distributed on a pro-rata basis to such Releasing Creditors.





6. <u>PACA/PASA Liability</u>.  YFE and the Debtor shall equally divide and be responsible for any claims, damages, or other liability arising from or relating to any actual or alleged violations involving the Debtor of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a *et seq*. and/or the Packers and Stockyards Act, 7 U.S.C. § 181 *et seq*, ("PACA/PASA Liability") as long as the total sum of the PACA/PASA does not exceed $200,000.  That sum shall be exclusive of attorneys' fees and costs.  If the PACA/PASA Liability exceeds $200,000, the Parties shall agree to meet and conduct a good faith negotiation to discuss the appropriate allocation between the Parties of that liability in excess of $200,000.  If the Parties cannot agree on such allocation after a good faith negotiation, the Parties agree to equally divide any PACA/PASA Liability in excess of $200,000 in equal shares between the Debtor and YFE.  The

Parties recognize that the total sum of the PACA/PASA Liability may not be determined until the conclusion of litigation or dispute resolution regarding those claims. Further, regardless of whether the PACA/PASA Liability exceeds $200,000 or not, the Parties agree to exercise best efforts to cooperate with each other in the defense of all claims, issues and matters that relate to the PACA/PASA Liability, including settlement and the filing motions and pleadings that are reasonably acceptable to the Parties. With respect to such cooperation, the Parties agree to exercise a common interest and/or joint defense agreement to protect all applicable privileges to the greatest extent that the law permits. With respect to cooperation in any settlement of the PACA/PASA Liability claims, if the Parties cannot agree on a reasonable settlement amount after reasonable negotiations, then the Parties shall select the settlement amount that is the midpoint between YFE's proposed settlement amount and the Debtor's proposed settlement amount. In the defense of PACA/PASA Liability claims, the Parties will each bear their own respective attorneys' fees, costs and related expenses.

7.    Releases by the Debtor and the Committee. Upon the Debtor's receipt of the Settlement Payment, the Debtor, the Committee, and the Debtor's bankruptcy estate on behalf of themselves, and each of their predecessors, successors, affiliates, each and every member of the Committee, current and former members, partners, shareholders, officers, directors, managers, agents, employees, consultants, attorneys, and representatives, fully release and forever discharge the YFE Parties and Yucaipa, together with each of their predecessors, successors, and current and former affiliates, members, partners, shareholders, officers, directors, managers, agents, employees, attorneys (including Gibson, Dunn & Crutcher, LLP), insurers, reinsurers, and representatives, including, but not limited to, Peter McPhee, Stephanie Bond, Steve Mortensen, Derex Walker, Henry Orren, Mary Kasper, Mark Orr, Tom Dahlen, Terrence Wallock, and Catherine Schneider (collectively, the "YFE Released Parties"), from any and all claims, causes of action, damages, debts, liabilities, obligations, promises, and agreements, of any nature whatsoever, known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or derivative, that are related to the Debtor, the Committee, or the Bankruptcy Case, including, but not limited to, all claims asserted in or that could have been asserted in, and those that are related to, or contingent upon, the Adversary Proceeding and any claims in any way related to the operation of the Debtor's business and related entities, including Fresh Foods and FEFOS, and any claims or assertions made by the Committee in correspondence to the YFE Released Parties or its insurers, including, but not limited to, that correspondence sent by Eric Madden of Reid Collins & Tsai LLP dated March 24, 2016, and April 8, 2016. For the absence of doubt, each and every member of the Committee agrees it shall not "opt-out" of the Agreement, and shall be bound by the release provision set forth in Section 7, herein. As a material provision and covenant of this Agreement, the Committee warrants and represents that it has the authority, consent and ability to bind each and every member of the Committee to the Agreement, and in particular, the release provisions contained in Section 7, herein. Moreover, nothing in this Agreement releases: (a) any Party from its obligations under this Agreement or its liability for breach of any term, warranty, or representation in this Agreement; or (b) any claims that the Committee or its members may have against the Debtor or its estate, so long as such claim does not give rise to any claim against the YFE Released Parties or their insurers. No later than three (3) business days after the Debtor's receipt of the Settlement Payment, the Committee shall dismiss with prejudice the Adversary Proceeding.

8.    Releases by the YFE Parties and Yucaipa.  Upon the Debtor's receipt of the
Settlement Payment and the Committee's dismissal with prejudice of the Adversary Proceeding,
the YFE Parties and Yucaipa on behalf of themselves, and each of their predecessors, successors,
and current and former affiliates, members, partners, shareholders, officers, directors, managers,
agents, employees, consultants, attorneys (including Gibson, Dunn & Crutcher, LLP), and
representatives, including, but not limited to, the YFE Released Parties, with the exception of their
insurers and reinsurers (collectively, the "YFE Releasing Parties"), fully release and forever
discharge the Debtor, the Committee, and the Debtor's bankruptcy estate, together with each of
their predecessors, successors, affiliates, and current and former members, partners, shareholders,
officers, directors, managers, agents, employees, attorneys, and representatives, from any and all
claims, causes of action, damages, debts, liabilities, obligations, promises, and agreements, of any
nature whatsoever, known or unknown, suspected or unsuspected, asserted or unasserted, fixed or
contingent, matured or unmatured, liquidated or unliquidated, direct or derivative, related to the
Debtor, the Committee, or the Bankruptcy Case, including, but not limited to, all claims asserted
in or that could have been asserted in, and those that are related to, or contingent upon, the
Adversary Proceeding and any claims in any way related to the operation of the Debtor's business
and related entities, including Fresh Foods and FEFOS (the "Estate Released Parties").  The
releases in this paragraph include, but are not limited to, the following:

a.    Any claims in the Bankruptcy Case filed by or scheduled on behalf of any of the
YFE Parties, including: (i) the nonpriority unsecured claim in the amount of
$89,462,027.00 (plus any accrued interest or fees) scheduled on behalf of YFE; (ii)
the nonpriority unsecured claim in the amount of $9,415,096.00 (plus any accrued
interest or fees) scheduled on behalf of Fresh Foods; (iii) the nonpriority unsecured
claim in the amount of $4,902,183.00 (plus any accrued interest or fees) scheduled
on behalf of FEFOS; (iv) the priority unsecured claim in an unknown amount (plus
any accrued interest or fees) scheduled on behalf of James W. Keyes; (v) the
nonpriority unsecured claim in the amount of $438,065.39 (plus any accrued
interest or fees) scheduled on behalf of Fresh & Easy Campus Produce Cut Fruit,
to the extent that such entity is owned or controlled by any of the YFE Parties; and
(vi) the nonpriority unsecured claim in the amount of $596,057.02 (plus any
accrued interest or fees) scheduled on behalf of Fresh & Easy Kitchen-Kitchen SC,
to the extent that such entity is owned or controlled by any of the YFE Parties;

b.    Any claims in the Bankruptcy Case filed by or scheduled on behalf of Yucaipa;

c.    Any claims arising from or relating to any fees or expenses incurred by the YFE
Parties in connection with the Bankruptcy Case, including in connection with any
debtor-in-possession financing for the Debtor (the "DIP Financing"), and including
any legal fees incurred by Gibson, Dunn & Crutcher, LLP, and other counsel;
provided that upon entry of the Approval Order, any obligations of the YFE Parties
in connection with the DIP Financing shall be terminated;

d.    Any claims by any of the YFE Parties relating to their employment by the Debtor,
including any claims for unpaid wages, severance, indemnity, or expense
reimbursement;

e.      Any claims or liability by the YFE Parties, including based on contribution or indemnity, arising from or relating to any of the following agreements: (i) the Secured Promissory Note dated November 25, 2013, and as subsequently amended and restated, made by Fresh Foods in favor of Tesco Treasury Services, PLC; (ii) the Guaranty dated November 25, 2013, and as subsequently reaffirmed, made by the Debtor to guarantee the obligations under the foregoing promissory note; and (iii) the Transitional Services Agreement dated November 13, 2013, and as subsequently amended and modified, entered into between YFE and Tesco Stores Limited;

f.      Any claims or liability by the YFE Parties, including based on contribution or indemnity, arising from or relating to any of the following: (i) the Consulting Services Agreement dated November 25, 2013, entered into between YFE and FAEMF, LLC; (ii) any services provided by FAEMF, LLC to YFE or the Debtor; and (iii) any services provided by Yucaipa to YFE or the Debtor;

g.      Any claims or liability by the YFE Parties, including based on contribution or indemnity, arising from or relating to any of the following: (i) any guaranties of store leases entered into by YFE or the Debtor; and (ii) the Debtor's use of any property owned or leased by YFE, FEFOS, or Fresh Foods;

h.      Any claims arising from or relating to any of the accounts receivable listed in the schedule attached to this Agreement as Exhibit A;

i.      Any claims arising from or relating to any of the deposits, tax payments, insurance refunds, letters of credit, or retainers listed on the schedule attached to this Agreement as Exhibit B;

j.      Any claims or liability, including based on contribution or indemnity, arising from or relating to the Trademark License Agreement dated April 3, 2014, entered into between Yucaipa and the Debtor; and

k.      Any claims or liability by the YFE Parties, including based on contribution or indemnity, arising from or relating to any actual or alleged violations involving the Debtor of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. and/or California Labor Code § 1400 *et seq*., subject to the Debtor's obligations under Paragraph 5 of this Agreement.

Nothing in this Agreement, however, releases any Party from its obligations under this Agreement or its liability for breach of any term, warranty, or representation in this Agreement.  To the extent that any YFE Releasing Party, other than any of the YFE Parties or Yucaipa, asserts a claim against the Debtor in derogation of this Agreement and does not withdraw such claim within ten days of receipt of written request by the Debtor or the Committee, such YFE Releasing Party shall thereafter be excluded from the definition of YFE Released Parties set forth herein.  For avoidance

9

of doubt, nothing about the foregoing provision allows any of the YFE Parties or Yucaipa to assert any claims against the Estate Released Parties that have been released pursuant to this Agreement.

9.    <u>Waiver of Unknown Claims and California Civil Code § 1542</u>.    The Parties acknowledge and agree that the foregoing releases are intended to and do operate as a full and final release of all such claims that: (a) the Debtor, the Committee, or the Debtor's bankruptcy estate may have against the YFE Parties, Yucaipa, or the YFE Released Parties; and (b) the YFE Parties, Yucaipa, or the YFE Released Parties may have against the Debtor, the Committee, or the Debtor's bankruptcy estate.    Each of the Parties waives its rights under Section 1542 of the California Civil Code, which provides as follows:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

Each of the Parties hereby agrees, represents and warrants that it realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses that are presently unknown, unanticipated and unsuspected, and each of the Parties further agrees, represents and warrants that this Agreement has been negotiated and agreed upon in light of that realization and that, except as expressly limited above, each of the Parties nevertheless hereby intends to release and discharge the other Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses arising from or relating to any and all claims, disputes and other issues related to the subject matter of this Agreement.

10.    <u>Antitrust Claims</u>.    YFE, Fresh Foods, and FEFOS represent and warrant that they have no reason to believe that any claims or causes of action against third parties based on state or federal antitrust law (the "<u>Antitrust Claims</u>") related to the Debtor, its stores, or its operations, including related to the time period prior to the Debtor's acquisition of such stores and operations, have been assigned or otherwise transferred by the Debtor to any other person or entity since November 26, 2013.

11.    <u>Additional Representations and Warranties</u>.    Each of the Parties represents and warrants that: (a) it negotiated this Agreement at arm's length; (b) it participated in jointly drafting this Agreement and that any rule which construes ambiguities against the drafter is of no force or effect here; (c) it is represented by competent counsel who have had the opportunity to review this Agreement; (d) it enters into this Agreement knowingly and voluntarily; (e) the person executing this Agreement on its behalf is legally competent and able to execute this Agreement; (f) the person executing this Agreement on its behalf has the power and authority to enter into this Agreement, subject to the approval of this Agreement by the Bankruptcy Court; and (g) this Agreement is binding on their successors and assigns, including any trustee.

12.    <u>Governing Law and Venue</u>.    The Parties agree that this Agreement shall be governed by, interpreted under, and enforced in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of laws.    Any disputes related to or arising out of this

10

Agreement, including any action to enforce this Agreement, shall be brought only in the Bankruptcy Court. The Parties hereby consent to jurisdiction and venue in the Bankruptcy Court for any such action.

13.    Attorney's Fees and Expenses. Each of the Parties shall bear its own attorney's fees and expenses arising prior to the execution of this Agreement, provided that the Committee shall be entitled to seek payment of its attorney's fees and expenses from the Debtor's estate pursuant to 11 U.S.C. §§ 327 and 328. In the event that a Party takes action to enforce any provision of this Agreement, the prevailing Party in such an action shall be entitled to recover its reasonable attorney's fees and expenses from the opposing Party in the action.

14.    Notices. Any notices in connection with this Agreement shall be delivered to the Parties by first-class mail and email to each of the persons listed below:

        For the Debtor:

        Michael R. Nestor
        Young Conaway Stargatt & Taylor, LLP
        1000 North King Street
        Wilmington, DE 19801
        mnestor@ycst.com

        Norman L. Pernick
        Cole Schotz P.C.
        500 Delaware Avenue, Suite 1410
        Wilmington, DE 19801
        npernick@coleschotz.com

        For the Committee:

        Mette H. Kurth
        Fox Rothschild LLP
        1800 Century Park East, Suite 300
        Los Angeles, CA 90067
        mkurth@foxrothschild.com

        Eric D. Madden
        J. Benjamin King
        Reid Collins & Tsai LLP
        1601 Elm Street, 42nd Floor
        Dallas, TX 75201
        emadden@rctlegal.com
        bking@rctlegal.com

<u>For the YFE Parties and Yucaipa:</u>

Robert A. Klyman
Maurice M. Suh
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
rklyman@gibsondunn.com
msuh@gibsondunn.com

15.  <u>Complete Agreement</u>.  Each of the Parties agrees that: (a) this Agreement constitutes the full and complete agreement among the Parties regarding the subject matter of this Agreement; (b) this Agreement supersedes any prior oral or written agreements, representations, or understandings among the Parties regarding the subject matter of this Agreement; and (c) there are no oral or written agreements, representations, or understandings among the Parties regarding the subject matter of this Agreement, except as expressly stated in this Agreement.  This Agreement can be amended or modified only in a writing executed by all of the Parties.

16.  <u>Cooperation</u>.  The Parties agree to cooperate fully, to execute and deliver any and all supplementary documents, and to take all additional actions, which reasonably may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement without the receipt of further consideration.

17.  <u>Agreement Inadmissible</u>.  This Agreement shall not be admissible in any action, suit, or proceeding as evidence or as an admission of any claim or liability; provided, however, that any Party to this Agreement may use all or part of this Agreement in a proceeding between or among all of the Parties, or any of them, to the extent necessary to enforce any right conferred on that Party by this Agreement and to obtain the Approval Order from the Bankruptcy Court, and that the YFE Parties may use all or any part of this Agreement to the extent necessary in an action, suit, or proceeding related to insurance coverage.

18.  <u>Execution</u>.  The Parties agree that: (a) this Agreement may be executed in multiple counterparts, each of which shall be deemed to be and have the same force and effect of an original, and all of which taken together shall constitute and be construed as a single, binding agreement; and (b) a photocopied or PDF-scanned signature on this Agreement shall be deemed to be and have the same force and effect of an original signature.

IN WITNESS WHEREOF, and intending to be legally bound, each of the Parties has caused this Agreement to be executed as of the date set forth above.

**FRESH & EASY, LLC**

Amir Agam
Chief Restructuring Officer

**THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS**

Michael S. Mandell
Committee Chairman

**YFE HOLDINGS, INC.**

Robert P. Bermingham
Vice President and Secretary

**FRESH FOODS, LLC**

Robert P. Bermingham
Vice President and Secretary

**FEFOS, LLC**

Robert P. Bermingham
Vice President and Secretary

**RONALD W. BURKLE**

Ronald W. Burkle

**IRA L. TOCHNER**

Ira L. Tochner

**ROBERT P. BERMINGHAM**

Robert P. Bermingham

**JAMES W. KEYES**

James W. Keyes

**THE YUCAIPA COMPANIES, LLC**

Robert P. Bermingham
Vice President and Secretary

**EXHIBITS**

[TO BE FILED]

**EXHIBIT B**
**TO COMBINED PLAN AND DISCLOSURE STATEMENT**

**LIQUIDATING TRUST AGREEMENT**

[TO BE FILED]

**EXHIBIT C**
**TO COMBINED PLAN AND DISCLOSURE STATEMENT**


**RETAINED CAUSES OF ACTION**


[TO BE FILED]

**EXHIBIT D**
**TO COMBINED PLAN AND DISCLOSURE STATEMENT**

**CONTRACTS TO BE ASSUMED**

[TO BE FILED]